1   BRANCART & BRANCART
      Christopher Brancart (SBN 128475)
2    *cbrancart@brancart.com*
    Elizabeth Brancart (SBN 122092)
3      *ebrancart@brancart.com*
    P.O. Box 686
4   Pescadero, CA  94060
    Tel:    (650) 879-0141
5   Fax:    (650) 879-1103

6   Attorneys for Plaintiffs

7

8                  UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10  **LINCOLN JONES, JR. and**          )    **Case No.  CV 13-02390 LHK PSG**
    **MUYESSER NILE JONES, etc., et al,**  )
11                                      )    **PLAINTIFFS' OPPOSITION TO**
              **Plaintiffs,**            )    **DEFENDANT TRAVELERS CASUALTY**
12                                      )    **INSURANCE COMPANY OF AMERICA'S**
        **vs.**                          )    **MOTION FOR SUMMARY JUDGMENT**
13                                      )
    **TRAVELERS CASUALTY**               )    **Hearing:**
14   **INSURANCE COMPANY**               )    **Date:        April 9, 2015**
    **OF AMERICA,**                      )    **Time:        1:30 p.m.**
15                                      )    **Room:        Courtroom 8 (LHK)**
              **Defendant.**             )
16                                      )
                                        )
17  _____       )

18  //

19  //

20  //

21  //                  **PUBLIC VERSION**

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**<u>TABLE OF CONTENTS</u>**

I.  <u>INTRODUCTION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. <u>PLAINTIFFS' STATEMENT OF FACTS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The Section 8 Housing Choice Voucher Program. . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  The demographics of Section 8 HCV tenants.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.  Travelers' Apartment Pac Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    D.  Mr. and Mrs. Jones and the Cody Way Apartments.  . . . . . . . . . . . . . . . . . . . . . 3

    E.  The Joneses' experience with Travelers.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. <u>LEGAL FRAMEWORK</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. <u>ARGUMENT</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
    Disparate Treatment Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  The protections of the FHA and FEHA are not limited to renters. . . . . . . . . . . 8

        2.  Travelers engaged in disparate treatment based on stereotypes.  . . . . . . . . . . . 9

        3.  Travelers lacks a legitimate non-discriminatory justification.  . . . . . . . . . . . . 13

            a.  Insurance for private landlords who rent to one or more
            Section 8 HCV tenants is not a "speciality" market. . . . . . . . . . . . . . . . . 13

            b.  Apartments with one or more Section 8 tenants do not
            create "unique" risks for insurers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            c.  Travelers has no business need to distinguish between
            landlords with Section 8 HCV tenants and those without.  . . . . . . . . . . . 17

            d.  Travelers' purported "lack of knowledge" regarding the
            Section 8 program does not justify its underwriting rule. . . . . . . . . . . . 18

    B.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
    Interference Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
    Disparate Impact Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.  Both the FHA and FEHA allow proof by disparate impact. . . . . . . . . . . . . . . 23
        2.  Plaintiffs have made a prima facie showing of disparate impact. . . . . . . . . . 24
        3.  Travelers has no business justification for its policy.  . . . . . . . . . . . . . . . . . . 27
        4.  The McCarran-Ferguson Act does not reverse-preempt here. . . . . . . . . . . . . 28

V.  <u>CONCLUSION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1

**<u>TABLE OF AUTHORITIES</u>**

2

*Cases*

3

*Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . .

4

*Betsey v. Turtle Creek Assoc.*, 736 F.2d 983 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

5

*Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6

*Brown v. City of Tucson*, 336 F.3d 1181 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7

*Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8

*Chin v. Runnels*, 343 F. Supp. 2d 891 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

9

*City of Los Angeles v. JPMorgan Chase & Co.*,
    No. 2:14-cv-04168-ODW, 2014 WL 6453808 (C.D. Cal.  Nov. 14, 2014) . . . . . . . . . . . . .

10

*Cloutier v. Prudential Ins. Co. of America*, 964 F. Supp. 299 (N.D. Cal. 1997) . . . . . . . . . . . . . . . .

11

*Dyna-Med, Inc. v. Fair Employment & Hous. Com.*, 43 Cal. 3d 1379 (1987) . . . . . . . . . . . . . . . . . .

12

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) . . . . . . . . . .

13

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

14

*Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15

*Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16

*Graoch Assoc. #33, L.P. v. Lousiville/Jefferson County Metro Hum. Relations Comm.*
    508 F.3d 366 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

19

*HUD v Carter*, 1992 WL 406520 (H.U.D.A.L.J. May 1, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) . . . . . . . . . . .

21

*Inclusive Cmtys. Project .v Tex. Dept. Hous. & Cmty. Affairs*,
    747 F.3d 275 (5th Cir.), *cert. granted*, 135 S.Ct. 46 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . .

22

Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . .

23

*Julian v Hartford Underwriters ins. Co.* 35 Cal.4th 747 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

24

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

25

*Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702 (1978) . . . . . . . . . . . . . . . . . . . . .

26

*Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

27

28

| | |
|---|---|
| 1 | *Lumberman's Mut. Cas. Co. v. Wyman*, 64 Cal.App.3d 252 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 2 | *Lynn v. Regents of the Univ. of Calif.*, 656 F.2d 1337 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . |
| 3 | *Mangold v. California Pub. Util. Comm'n.*, 67 F.3d 1470 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . |
| 4 | *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 5 | *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 6 | *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 7 | *Meyer v. Holley*, 537 U.S. 280 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 8 | *Moore v. Hughes Helicopters*, Inc., 708 F.2d 475 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . |
| 9 | *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . |
| 10 | *Nevels v. West. World Ins. Co.*, 359 F. Supp. 2d 1110 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . |
| 11 | *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 12 | *Olmstead v. L.C. ex. rel. Zimring*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 13 | *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013) . . . . . . . . . |
| 14 | *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 15 | *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998) . . . . . . . . . . . . . . . . . . . . . . . |
| 16 | *Rodriguez v. Provident Life and Accid. Ins. Co.*, |
| 17 | No. CV 00-01828-GHK, 2001 WL 291961 (C.D. Cal. Mar. 2, 2001) . . . . . . . . . . . . . . . . . |
| 18 | *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . |
| 19 | *Sisemore v. Master Financial, Inc.*, 151 Cal. App. 4th 1386 (2007) . . . . . . . . . . . . . . . . . . . . . . . . |
| 20 | *Thomas v. Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 21 | *United States v. Bankert*, 186 F. Supp. 2d 623 (E.D.N.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 22 | *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 23 | *United States v. City of Hayward*, 36 F.3d 832 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 24 | *Wai v. Allstate Ins. Co.*, 75 F. Supp. 2d 1 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 25 | *Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 26 | *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 27 | *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| 28 | *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . |

*Statutes*

42 U.S.C. § 1437f(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
42 U.S.C. § 1437f(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fair Housing Act, 42 U.S.C. § 3601 et seq.
      § 3602(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3602(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3604(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 3613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

24 C.F.R. § 100.70(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
24 C.F.R. § 100.70(d)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
24 C.F.R. § 100.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Conn. Gen. Stat. § 46a-64c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

California Fair Employment and Housing Act, Govt. Code § 12900, *et seq.*
      § 12927(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12927(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12955.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12989.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
      § 12989.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Other Authorities*

Katy Chi-Wen Li, *The Private Insurance Industry' Tactics Against*
      *Suspected Homosexuals: Redlining Based on Occupation, Residence*
      *and Marital Status*, 22 Am. J.L. & Med. 477 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

George C. Galster, The Evolving Challenges of Fair Housing Since 1968:
      Open Housing, Integration, and the Reduction of Ghettoization, Cityscape:
      A Journal of Policy Development and Research, Vol.4, No. 3, 123, 1999
      (US Dept of HUD PDR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Impact of Source of Income Laws* (HUD PDR 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Gregory D. Squires, *Racial Profiling, Insurance Style*,
      25 Journal of Urban Affairs, No. 4, 391 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

John F. Stanton, *The Fair Housing Act and Insurance: An Update and the Question of Disability Discrimination*, 31 Hofstra L. Rev. 141, 143 (2002); *see also Dunn v. Midwestern Indem., Mid. Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1107 n.3 (S.D. Ohio 1979) . . . . . . . . . . . . . . . . . . . . . . . .

# I.  INTRODUCTION

Travelers insurance refuses to insure private apartment owners who rent to one or more tenants who use Section 8 Housing Choice Vouchers, although it relied on no loss experience or any other study when it created that ineligibility and has no basis to believe that apartments with one or more Section 8 tenants have a higher risk of loss than those without.  Travelers' practice is a new version of insurance "redlining" long understood to violate the fair housing laws.  Just as insurers formerly declined to write insurance for dwellings located in geographic areas that are in fact or perceived to be in minority neighborhoods, Travelers' perceptions of Section 8 tenants and the apartment buildings in which they reside are the basis for its refusal to insure.  Travelers' motion seeking summary judgment in its favor on its redlining practices should be denied for the reasons set forth below.

# II.  PLAINTIFFS' STATEMENT OF FACTS

**A.  The Section 8 Housing Choice Voucher Program.**  Federal, state and local governments administer a wide array of affordable housing programs.  The federal government's largest housing program is the Section 8 Housing Choice Voucher program, which provides rental assistance to more than two million low and moderate income families, the elderly, and the disabled.  *See generally Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1202 (9th Cir. 2009) (outlining Section 8 program); Decl. of Catherine Bishop filed herewith ["Bishop Dec."], Exh. 1 at 3.  The Section 8 voucher program seeks to help low-income families "in obtaining a decent place to live" and promotes "economically mixed housing,"  42 U.S.C. § 1437f(a), by "making assisted housing available and affordable, and a key means to that end is the creation of incentives for private owners to participate in the section 8 program." *Barrientos*, 583 F.3d 1197 at 1203.  The Section 8 Housing Choice Voucher ("HCV") program – the only housing subsidy program at issue in this action[1] – is funded by HUD under 42 U.S.C. § 1437f(o) and administered locally by public housing authorities ("PHAs"), such as the Housing Authority of Santa Clara County.  (Bishop Dec., Exh. 1 at 2-16 [explaining program].)  The program provides recipients with a voucher for use in obtaining rental housing in the private

---

[1]All references to "Section 8" or HCV in this brief are to the Section 8 Housing Choice Voucher Program only.

1  market – Section 8 HCV tenants do not live in "public housing" projects.  Just like any other tenant,

2  they are screened and selected by private landlords, pay security deposits, pay a portion of their rent

3  to the landlord, and must abide by the landlord's rules.  (Id.)  The PHA pays the balance of the Section

4  8 HCV tenant's rent pursuant to a housing assistance payment contract between PHA and the owner.

5  (Id.)  To participate, a landlord's dwelling must pass inspection and meet HUD housing quality

6  standards and the total rent charged by the landlord must be within HUD's fair market rental rate for

7  the local market.  (Id. at 6-9.)  In return, the landlord benefits knowing that he will receive a substantial

8  portion of the tenant's rent paid each month by the PHA.  (Id. at 10-11.)

9       **B. The demographics of Section 8 HCV tenants.**  As a group, Section 8 HCV tenants are

10  disproportionately minorities, single mothers, the elderly and disabled.  Plaintiffs' evidence shows that

11  in Santa Clara County and California there is a very significant correlation between being a renter with

12  a Section 8 voucher and being African-American, a female-headed household, a female-headed

13  household with children and/or having a head of household over age 62 as compared to the general

14  population of renters.  (Decl. of Calvin Bradford, Exh. 1 at 16.)  Section 8 voucher holders in Santa

15  Clara County are about three and one-half times more likely to be African American, more than twice

16  as likely to be headed by a female or person over age 62, and almost three times as likely to be female

17  headed with children as compared to the general renter population in Santa Clara County.  (Id.)  The

18  statistics for California are roughly the same.  (Id.)  Even when comparison is limited to renters in

19  Santa Clara County paying rent within HUD's Fair Market Rent limits, the disparities remain

20  statistically significant.  (Bradford, Exh. 2 at 5-6.)  In other parts of the country, Section 8 tenants, as

21  a group, are much more heavily African-American and female than in California or Santa Clara

22  County.  (Id. at 4 [table reflecting demographics of Section 8 recipients in a number of U.S. cities].)

23       **C. Travelers' Apartment Pac Program.**  Travelers offers Apartment Pac, a policy providing

24  combined property and general liability insurance to owners of apartment buildings whose operations

25  come within certain size and value limits.  (See Brancart Exh. 10, 16, 18 [Depo. Exh. 35, 43, DOI

26  000273-276].)  Since prior to 2005, Travelers has classified "subsidized, government funded or public

27  housing complexes" as "ineligible operations" not to be written as Apartment Pac accounts.  (Brancart

28  Exh. 17 [Depo. Exh. 39, TRAV0003945].)  According to Brian Kearney, Travelers' Rule 30(b)(6)

designee, Travelers does not know who wrote or approved the language making "subsidized, government funded or public housing complexes" an ineligible operation.  (Brancart Exh. 3 [Kearney Depo. 252-255].)  Travelers did not review any data or information in connection with the development or approval of its rule excluding "subsidized, government funded or public housing complexes" from its Apartment Pac program.  (Kearney Depo. 156:7-157:14.)  As discussed below, Travelers provided no training or guidance to its underwriters or agents about the scope, definition, or characteristics of "subsidized, government funded or public housing complexes" or any methodology to follow in determining whether an insurance applicant is ineligible under that rule; consequently, there is wide and arbitrary variation in Travelers' application of the rule.  Although the Section 8 HCV program subsidizes individual tenants – not whole housing complexes like traditional, project-based public housing programs – Travelers interprets "subsidized, government funded or public housing complexes" to exclude privately owned and operated apartment buildings where the landlord rents to one or more tenants paying a portion of her rent using a Section 8 Housing Choice Voucher).  (Kearney Depo. 161:22-23.)  Travelers has no actuarial basis for its rule.  Between 1999 and September 18, 2014 Travelers conducted no study or analysis of its decision to make subsidized housing, including Section 8, an ineligible operation.  (Kearney Depo. 157:25-159:11.) When, in 2013, Travelers evaluated its apartment insurance program, it made no changes, reviewed no reports, considered no data regarding risks, nor considered any proposals to change the language of the subsidized housing ineligible operation.  (Brancart Exh. 6 [Galli Depo. 34:21-35:23].)

**D. Mr. and Mrs. Jones and the Cody Way Apartments.**  Lincoln Jones, Jr. and Müyesser Jones are an elderly retired couple.  Mr. Jones met Mrs. Jones, a native of Turkey, while in the Air Force stationed in Turkey in the late 1950s.  (Brancart Exh. 1 [Müyesser Jones Declaration ("Jones Dec.") ¶ 2].)  The couple married and moved to Santa Clara where they raised their children.  Mr. Jones worked as a mechanic for United Airlines for 32 years; Mrs. Jones worked for 30 years at Memorex and Stanford University.  (Id.)  In the early 1980s, they purchased a 10-unit fixer-upper apartment building at 1883 Cody Way in San Jose.  Mr. Jones, a talented handyman, and Mrs. Jones worked on nights and weekends to renovate the building.  Several years later, they purchased another fixer-upper down the street, the 7-unit apartment building at 1895 Cody Way, and worked to rejuvenate that

building as well.  (Id. ¶ 3.)  Together the Joneses have operated those two apartment buildings (the "Cody Way apartments") for 30 years – Mr. Jones takes care of maintenance and repairs and Mrs. Jones takes care of the financials and paperwork.  (Id. ¶ 5.)  The Joneses have participated in the Section 8 HCV program administered by the Housing Authority of Santa Clara County for many years. (Id. ¶ 7.)  They treat and rent to Section 8 voucher holders just as they would treat any other qualified tenant.  (Id.)  At various times over the years, they have rented to several or none in the Cody Way apartments.  (Id. ¶¶ 8-10.)

**E. The Joneses' experience with Travelers.**  In late 2011, Mrs. Jones received a mailer from insurance broker National Insurance Solutions ("NIS") suggesting that she contact NIS to obtain lower insurance rates for the Cody Way apartments.  (Brancart Exh. 2 [Jones Depo.119:11-120:14].)  Mrs. Jones called NIS and spoke with Craig Franklin, who took her insurance application over the phone. (Jones Depo. 126:14-22; 128:4-7.)  Franklin asked Mrs. Jones if her apartments were subsidized by the government; he did not ask whether the Joneses had any Section 8 tenants at that time.  (Jones Depo. 144:11-145:2; 159:25-162:8.)  Mrs. Jones told Franklin her apartments were not subsidized housing. (Jones Depo. 161:25.)  Franklin faxed a completed application to Mrs. Jones with a quote for an Apartment Pac policy to be issued by Travelers and instructed her to fill in information indicated by bubbles, sign and fax back.  As directed, Mrs. Jones completed the bubbled parts of the application and returned the application by fax to Franklin at NIS.  (Jones Depo 142:2-12, 152:1-22.)  Later, she reviewed the application and saw that a part of the application that Franklin had not bubbled indicated "0" Section 8 tenants in each building.  Since the Joneses did, in fact, have some Section 8 tenants, Mrs. Jones called Franklin and asked what to do if there was an error.  Franklin told Mrs. Jones to fix the application, write "corrected" on the application, and return it to him.  Mrs. Jones wrote the correct number of Section 8 tenants and mailed the "corrected" application to NIS along with her check payable to Travelers.  (Jones Depo 142:18-21; 144:21-23; 156:6-9; 156:21-157:12.)  Six months later, one of Mrs. Jones's tenants called to say that a visitor had fallen on the garage stairs.  Mrs. Jones promptly called Travelers and reported the possibility of a claim.  (Jones Depo. 174:9-19.)  She cooperated with Travelers' investigation of the possible claim – which never materialized – providing information and volunteering that the household visited by the potential claimant participated in the

Section 8 program.  Based on that information volunteered by Mrs. Jones, Travelers red-flagged the Joneses' account, noting the presence of a Section 8 tenant.  (Brancart Exh. 5 and 10 [Noel Depo. 212:19-213:21; Depo. Exh. 60].)  Matt Noel, the Travelers underwriter responsible for the account, contacted NIS instructing it to contact the Joneses and determine the number of Section 8 tenants at 1883 Cody Way.  NIS called Mrs. Jones on a Friday.  Mrs. Jones asked why Travelers wanted information about whether her tenants participated in Section 8 program.  She expressed her concern that a quota on Section 8 tenants was "discrimination."  She asked NIS to provide her with Travelers' rule regarding Section 8 tenants before she responded.  (Jones Depo. 216:22-218:10.)  The next Monday morning, Travelers' underwriter Matt Noel decided to non-renew the Joneses' policy without waiting to hear back from Mrs. Jones.  (Noel 222:4-19.)  Later that Monday, Mrs. Jones gathered and provided the requested information to NIS.  (Jones Depo. 216:22-218:10.)  The But Noel had made his decision to non-renew the Joneses:  The presence of Section 8 tenants was the specific reason for the non-renewal.  (Noel Depo. 300:6-301;1.)  Noel confirmed in deposition that neither an alleged "OSHA code violation" nor the alleged delay by Mrs. Jones between Friday and Monday in returning a call to NIS was the basis for his non-renewal decision.  (Noel Depo. 295:20–296:2.)

A few weeks later, the Joneses received a notice of non-renewal of their policy from Travelers stating:

> "DURING OUR INVESTIGATION YOUR 8/22/2012 SLIP AND FALL LIABILITY CLAIM, THE UNDERWRITING DEPARTMENT WAS ADVISED THAT THE PROPERTY HAS SECTION 8 TENANTS. GOVERNMENTAL SUBSIDIZED HOUSING IS CONTRARY TO OUR UNDERWRITING GUIDELINES AND THUS INELIGIBLE FOR OUR APARTMENT PROGRAM.  AS A RESULT WE ARE NON-RENEWING YOUR POLICY EFFECTIVE 2/1/2013."

(Depo. Exh. 66; Jones Depo. 230:4-12.)  Mrs. Jones was very upset and  felt that Travelers was discriminating against her and her tenants; she also was very anxious about obtaining replacement insurance.  She contacted California Apartment Association, her landlord organization, and Project Sentinel, a local far housing organization, for help.  (Id. 231:6-232:15, 233:13-235:9.)  Her distress increased when she got a notice from Chase, her mortgage company, stating that it too had received notice from Travelers that the Joneses' insurance had been non-renewed and warning the Joneses that they were required to maintain coverage as a term of their mortgage.  (Jones Depo. 293:16-294:23;

Exh. 270.)  After Mrs. Jones complained to Project Sentinel about her experience with Travelers, Project Sentinel engaged in an education and outreach effort sending mailings to local landlords and California public housing authorities and apartment owners associations describing Travelers' practice as discriminatory and asking that recipients advocate to stop the practice.  (Brancart Exh. 8 [Marquart Depo. 78:19-85:2].)  Mrs. Jones eventually secured replacement coverage from her old insurance company, at a higher price than the Travelers insurance.  (Jones Depo. 238:10-239:14.)

## III.  LEGAL FRAMEWORK

Plaintiffs claim that Travelers violated the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the parallel California Fair Employment and Housing Act ("FEHA"), Govt. Code § 12900, *et seq.* The FHA and FEHA authorize an "aggrieved person" to bring suit.  42 U.S.C. § 3613(a)(1); Govt. Code § 12989.1. An "aggrieved person" includes "any person" who "claims to have been injured by a discriminatory housing practice" or believes that he or she "will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i); Govt. Code § 12927(g).  Plaintiffs claim that Traveler committed discriminatory housing practices in violation of 42 U.S.C. §§ 3604, 3617 and Govt. Code § 12955, which prohibit housing discrimination housing on the basis of, *inter alia*, race, sex, familial status and disability.  (Doc. 13.) The FHA defines disability broadly, covering person who are disabled as well as those perceived or regarded to be disabled.  42 U.S.C. § 3602(h)(3).  FEHA is even broader, prohibiting age discrimination, and defining race, disability, sex and familial status to include "a perception that the person has any of those characteristics or . . . is associated with a person who has, or is perceived to have, any of those characteristics." Govt. Code §§ 12955(d), 12955(m).

Plaintiffs claim that Travelers committed several specific discriminatory housing practices, including (1) refusing to rent or sell a dwelling "or otherwise make unavailable or deny" a dwelling because of protected class, 42 U.S.C. § 3604(a), 3604(f)(1); (2) discriminating in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," because of protected class, 42 U.S.C. § 3604(b), 3604(f)(2); and, (3) interfering with any person "on account of his having exercised or enjoyed" or "aided or encouraged any other person" in the exercise or enjoyment of rights protected by the FHA and FEHA.  42 U.S.C. § 3617;

1    Govt. Code §§ 12927(c)(1), 12955(d), (k) and 12955.7.  FEHA also prohibits inciting, compelling or

2    coercing the commission of a discriminatory housing practice, Govt. Code § 12955(g), and

3    discriminatory practices captured by the FHA's § 3617 through regulation.  24 C.F.R. § 100.400(c).

4    The FHA and FEHA apply to the underwriting of insurance for dwellings.[2]  *See* 24 C.F.R. §

5    100.70(d)(4) (FHA prohibits "[r]efusing to provide . . . property or hazard insurance for dwellings or

6    providing such ... insurance differently" because of race, sex, familial status or disability); 24 C.F.R.

7    § 100.70(c)(1) (FHA prohibits discouraging rental of dwellings . . . . because of race, sex, familial

8    status or disability) *Meyer v. Holley*, 537 U.S. 280, 281 (2003) (HUD regulations entitled to deference);

9    *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (en banc per curium) (giving deference

10   to HUD's interpretation of the FHA as applying to insurance for dwellings); Govt. Code § 12955.6

11   (FEHA may not be construed to provide fewer rights or remedies than the FHA and its implementing

12   regulations (24 C.F.R. § 100.1 *et seq.*).

13        A plaintiff can establish discrimination claims under the FHA and FEHA under several theories,

14   including disparate treatment and disparate impact. *Gamble v. City of Escondido*, 104 F.3d 300, 304-05

15   (9th Cir. 1997)(FHA); Cal. Govt. Code § 12955.8; *Sisemore v. Master Financial, Inc.*, 151 Cal. App.

16   4th 1386, 1418-23 (2007) (FEHA).  Although the Supreme Court is currently considering whether

17   disparate impact claims are cognizable under the FHA,[3] longstanding Ninth Circuit precedent binding

18   on this Court recognizes that method of proof.  *Ojo v. Farmers Grp., Inc.*, 600 F.3d at 1208; *City of Los

19   Angeles v. JPMorgan Chase & Co.*, No. 2:14-cv-04168-ODW, 2014 WL 6453808, *8 (C.D. Cal. Nov.

20   14, 2014) (relying on Ninth Circuit precedent while Supreme Court considers FHA disparate impact

21   claims).  California's FEHA, by statute, recognizes disparate impact as a method of proof.  *See* Govt.

22   Code § 12955.8(b) ("Proof of a violation causing a discriminatory effect is shown if an act or failure

23   to act that is otherwise covered by this part, and that has the effect, regardless of intent, of unlawfully

24

25        [2]"Dwellings" include buildings occupied by one or more families – like the Cody Way
     apartments.  42 U.S.C. § 3602(b).  Travelers concedes that under binding Ninth Circuit precedent

26   this Court must read the FHA as applying to property insurance.  ((Doc. 154 ["Motion"] at 13
     n.12.)

27        [3]*Inclusive Cmtys. Project .v Tex. Dept. Hous. & Cmty. Affairs*, 747 F.3d 275 (5th Cir.),

28   *cert. granted*, 135 S.Ct. 46 (2014).

discriminating" on the basis of protected class).[4]

# IV.  ARGUMENT

**A. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Disparate Treatment Claims.**

**1.  The protections of the FHA and FEHA are not limited to renters.** Travelers injured the Joneses by non-renewing their insurance policy solely because they rented to one or more Section 8 tenants.  Their injury was the direct result of Travelers' unlawful housing practices that discriminate in the terms and conditions of the provision of property/hazard insurance for the Cody Way apartments, 42 U.S.C. § 3604(b); 24 C.F.R. § 100.70(d)(4); Govt. Code § 12927(c)(1) and 12955(d), and make housing "otherwise unavailable" to persons protected by those laws,  42 U.S.C. §3604(a); Govt. Code § 12955(k); *N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297 (7th Cir. 1992) ("Lenders require their borrowers to secure property insurance. No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.")

Contrary to Travelers' assertion (Motion at 8), the FHA protects persons who are injured by discriminatory housing practices, not just members of protected classes or tenants.  *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 n.16 (9th Cir. 2013) cert. denied sub nom. *City of Newport Beach v. Pac. Shores Properties*, LLC, 135 S. Ct. 436 (2014); 42 U.S.C. §§ 3602, 3613; Govt. Code § 12989.2. Fair housing organizations like Project Sentinel also have standing.  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.2002).  Moreover, an aggrieved person may sue to recover for his or her own injury under the FHA even where no housing has actually been denied to persons protected under the Act.  *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998); *Wai v. Allstate Ins. Co.*,75 F. Supp. 2d 1, 4 (D.D.C. 1999).

Travelers discriminated against the Joneses in the terms and conditions of apartment insurance. That same policy made housing unavailable because it discourages landlords from renting to persons

---

[4]Since FEHA may be construed to grant more rights than the FHA, even if the Supreme Court rules that FHA requires intentional discrimination, FEHA will still allow proof by disparate impact.  *See* Govt. Code § 12955.6 ("This part may be construed to afford greater rights and remedies to an aggrieved person than those afforded by federal law and other state laws."); 42 U.S.C. § 3615 ("Nothing in [the FHA] shall be construed to invalidate or limit any law of a State . . . that grants, guarantees, or protects the same right as granted by [the FHA].").

1  using Section 8 vouchers. 24 C.F.R. § 100.70(c)(1). *Wai v. Allstate Ins. Co.*, a closely analogous case,

2  examined the effect of a similar policy barring insurance to landlords renting to disabled persons. "If,

3  in order to rent to disabled persons, a landlord must risk losing her home through loss of mortgage

4  financing, loss of catastrophe insurance, and loss of liability insurance, she will be disinclined to rent

5  to disabled persons. Such powerful disincentives to rent to disabled persons, make housing unavailable

6  to them." 75 F. Supp. 2d at 6. *Nevels v. West. World Ins. Co.*, 359 F. Supp. 2d 1110, 1119 (W.D.

7  Wash. 2004) followed that reasoning in a similar case.

8      Contrary to Travelers' assertion, plaintiffs do not need to establish the elements of the

9  *McDonnell Douglas* prima facie case to prove their claims under the FEHA and FEHA.[5]  (Motion at

10  8.)   Rather, to prove a claim of disparate treatment a plaintiff need "simply produce direct *or*

11  *circumstantial evidence* demonstrating that a discriminatory reason more likely than not motivated the

12  challenged decision." *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 (9th Cir. 2008) (emphasis

13  added)(internal quotations omitted). Plaintiffs submit in this opposition substantial evidence to support

14  their claims for disparate treatment and disparate impact, as discussed below.

15      **2. Travelers engaged in disparate treatment based on stereotypes.** Travelers argues

16  that it is entitled to summary judgment because plaintiffs cannot show discriminatory intent. (Motion

17  at 8.)  Plaintiffs, however, offer substantial evidence that Travelers' underwriting rule is the product

18  of discriminatory stereotypes.  Decisions or practices "based in large part on stereotypes unsupported

19  by objective fact" are prohibited by the anti-discrimination laws.[6]  The ultimate question is whether

20

21      [5]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff without direct or

22  circumstantial evidence of discriminatory intent may nonetheless establish a prima facie case of
disparate treatment by showing that (1) his is a member of a protected class; (2) that he applied for

23  and was qualified for a benefit (such as a job opening); (3) that he was rejected; and (4) that the
job opening remained available. *Id.* at 802; *Gamble*, 104 F.3d at 305. The burden then shifts to

24  the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Gamble*, 104 F.3d
at 305. If the defendant articulates a legitimate reason, the burden shifts back to the plaintiff to

25  demonstrate that the stated reason is a pretext for unlawful discrimination.

26      [6]*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-11 (1993) (internal quotation omitted)

27  (the "very essence of age discrimination" is when an employer fires an older employee "because
the employer believes that productivity and competence decline with old age"). *See also Los*

28  *Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978) ("employment decisions

**PLAINTIFFS' OPPOSITION TO DEFENDANT TRAVELERS CASUALTY INSURANCE**
**COMPANY'S MOTION FOR SUMMARY JUDGMENT; Case No. 5:13-cv-02390-LHK**          9

1    Travelers' policy was created and applied – overtly or through stereotyping – because of the race, sex,

2    familial status, age or disability of Section 8 recipients.  This is so regardless of whether Travelers

3    "consciously intended" to base its policy on those characteristics, "or simply did so because of

4    unthinking stereotypes or bias." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58-61 (1st Cir. 1999)

5    (discussing prohibition on decisions based on stereotypes).   As Justice Kennedy has written,

6    "Underlying much discrimination law is the notion that animus can lead to false and unjustified

7    stereotypes, and vice versa.  Of course, the line between animus and stereotype is often indistinct, and

8    it is not always necessary to distinguish between them." *Olmstead v. L.C. ex. rel. Zimring*, 527 U.S.

9    581, 611 (1999) (Kennedy, concurring).  The Supreme Court has not suggested a limitation on the

10   possible ways of proving that stereotyping played a motivating role in a challenged policy.  *Price*

11   *Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (plurality).  Closely related to discrimination

12   based on stereotypes is proxy discrimination, where the defendant uses seemingly neutral criteria – like

13   "subsidized housing" or Section 8 voucher receipt – that are "closely associated" with the disfavored

14   group. *Pacific Shores*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013); *see also United States v. Bishop*, 959

15   F.2d 820, 825-26 (9th Cir. 1992)(prosecute used Compton residence as a discriminatory racial proxy.)

16        Travelers adopted its no Section 8 rule without study, data or analysis. (Kearney Depo. 156:7-

17   157:14.)  In the complete absence of any factual support, Travelers has no legitimate justification for

18   disqualifying private landlords with Section 8 tenants.  Instead, the evidence shows that Travelers' no

19   Section 8 rule is highly correlated to exclude minorities among others protected classes and closely

20   aligned stereotypes regarding Section 8 tenants.

21        Travelers readily admits that it relies on stereotyping or assumptions about landlords and their

22   tenants.  It assume that an apartment building with a Section 8 tenant will be more risky than that very

23   same apartment building with a Section 8 tenant, though it admits it has no knowledge regarding the

24   Section 8 program and has not conducted any actuarial studies to evaluate or price the exposures.  (Id.

25   _____

26   cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or
     females"); *Lynn v. Regents of the Univ. of Calif.*, 656 F.2d 1337, 1343 n.5 (9th Cir. 1981)

27   ("[W]hen plaintiffs establish that decisions regarding ... employment are motivated by
     discriminatory attitudes relating to race or sex, or are rooted in concepts which reflect such

28   attitudes, however subtly, courts are obligated to afford the relief provided by Title VII.").

¶ 13.)  But each underwriting criterion cited by Travelers in assessing risk – (1) a certain number of years in business; (2) prior insurance coverage; (3) age of the building; (4) vacancy rate – is equally available to Travelers regardless of the Section 8 status of a property's renters.  For Travelers, the presence of one or more Section 8 tenants transforms an apartment from an acceptable risk to an unacceptable risk, though it never identifies the factual basis for that transformation, except for its discriminatory stereotyping.  (Kearney Depo. 166:5-24, 167:23-168:13, 178:8-10, 178:25-179:9.)  In the absence of any factual basis for drawing a distinction between private apartment buildings with Section 8 voucher tenants and those with no such tenants, the jury could make the reasonable inference that stereotypes played a role in Travelers' decisionmaking.[7]

Travelers' assumptions about subsidized housing rely on stereotypes that are well-documented. "From the earliest days of public housing construction, race has been a central issue."[8]  Before passage of the FHA, public housing often had explicit racial policies regarding tenants and, even after passage of the Act, site selection criteria kept public housing segregated.  Galster, supra. The legislative history of the FHA contains evidence of the racial stereotypes in existence in 1968, including that "Negroes will not maintain their property."  114 Cong. Rec. 4040, 4053 (1968).  These stereotypes persist today: "public opinion research suggests that, despite being a race-neutral policy, the public associates subsidized housing with the race of its potential residents," and that negative attitudes toward subsidized housing are likely based on stereotypes regarding "public housing."  (Tighe Dec., Exh. 1 at 2.)  The American public "dramatically exaggerates the proportion of African Americans among the poor."  (Id. at 6.)  The stereotypes regarding the poor and racial minorities coincide – that they lack

---

[7]"When people do not have a lot of information about something – such as subsidized housing – they rely on cognitive shortcuts to make decisions.  . . . A lack of information creates the need to infer from limited knowledge.  One of the most pervasive cognitive shortcuts is stereotypes – particularly about different races and classes of people . . . When people rely on stereotypes as cognitive shortcuts in their decisionmaking, it can result in discrimination."  (Rosie Tighe Decl., Exh. 1at 3, 4-5.)

[8]George C. Galster, The Evolving Challenges of Fair Housing Since 1968:  Open Housing, Integration, and the Reduction of Ghettoization, Cityscape: A Journal of Policy Development and Research, Vol.4, No. 3, p. 123 at 125, 1999 (US Dept of HUD PDR) available at http://www.huduser.org/portal/Periodicals/CITYSCPE/VOL4NUM3/galster.pdf (last viewed 2/19/15).

1   motivation, prefer public assistance and lack the drive to maintain and keep up their homes and

2   neighborhood.  (Id. at 3.)  Subsidized housing is associated by the public with poverty and criminal

3   activity.  (Id.)  Although neutral on its face, Travelers' policy against subsidized echos these historic

4   negative stereotypes.  *See Chin v. Runnels*, 343 F. Supp. 2d 891, 907 (N.D. Cal. 2004) (considering

5   challenge to lack of Asian-Americans serving as grand jury foremen and noting that "many of the

6   facially neutral criteria used [resulting in no Asian-American foremen] echo the negative stereotypes

7   that have long plagued Asian-Americans and others").

8          These facts, coupled with Travelers' failure to have any reasoned basis for its Section 8

9   prohibition, raise a strong inference that stereotypes played a role in Travelers' decisionmaking.  That

10  conclusion is bolstered by statements made by Travelers' underwriters applying the rule.  Working

11  without any training or guidance from Travelers about rule's scope or purpose (Kearney Depo. 221:12-

12  222:20, 228:2-231:12), these contemporaneous statements demonstrate how stereotypes informed

13  Travelers' practices:

14          • "The reason we don't want subsidized, public or government funded housing is we are
           concerned about the tenants and/or location of the property."  (Doc. 155-15, Tighe Report at
15         10, quoting Exh. 110)[9].

16          • "Being poor or disabled doesn't always mean somebody will be a bad tenant. I think a lot of
           us 'older' folks think of the housing projects that came about during the Lyndon Johnson era
17         that were poorly maintained and dangerous." (Id., quoting Depo. Exh. 275.)

18          • "[W]hen it comes to rent subsidies we are generally in low income (stay away from places)."
           (Id., quoting TRAV 164935.)
19
            • "My thoughts are that if there are incidental (10% or less) subsidized units, they should be
20         referred and we may be able to accept if the crime rates and loss history are acceptable." (Id.
           at 11, quoting TRAV 164936.)
21
            • "Section 8 basically means they're governmentally subsidized housing meant for low income
22         families. They tend to have a higher loss ratio than standard apartment complexes."  (Id.
           quoting Depo. Exh. 74.)
23
            • "A lot of times the Section 8 recipient will be single Moms, but you shouldn't have that
24

25          [9]Victor Foggie, a managing underwriter, wrote this statement to a subordinate underwriter.
    In deposition, Foggie testified that in this email he "was trying to explain or rationalize why the
26  subsidized housing was on the [ineligible operations] list.  Again, I didn't have a definition as to
    why it was on the list.  I was trying to convey that message what I thought might be a concern,"
27  because Travelers never explained why subsidized housing was excluded from insurance.
    (Brancart Exh. 24 [Foggie Depo. 206:14-22].)
28

1    concern here [with a 55 and older complex]."  (Id., quoting Depo. Exh. 108.)

2  There are not "stray remarks."  They are statement of decision-makers applying Travelers' ineligible

3  operation rule in the course of their work, the kind of evidence used to build a circumstantial case of

4  discrimination, *Mangold v. California Pub. Util. Comm'n.*, 67 F.3d 1470, 1477 (9th Cir.1995), because

5  they reflect the understanding and "atmosphere" in which Travelers applied its rule against subsidized

6  housing.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993).  These statements

7  also demonstrate how 'an employer's undisciplined system of subjective decisionmaking [can have]

8  precisely the same effects as a system pervaded by impermissible intentional discrimination,'"

9  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011) (quoting *Watson v. Fort Worth Bank &*

10  *Trust*, 487 U.S. 977, 990-91 (1988); *see Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308

11  F.3d 523, 535 (6th Cir. 2002) (noting circumstantial evidence of discriminatory intent based on state's

12  failure to train officers concerning what facts give rise to reasonable suspicion of immigration

13  violations, leaving perceived ethnicity as the only apparent basis for detention).[10]

14        **3.  Travelers lacks a legitimate non-discriminatory justification.**  In response,

15  Travelers imagines, *post hoc*, several fact-free justifications that could plausibly explain its

16  discrimination.  None withstands scrutiny; at best, they demonstrate a genuine issue of fact for the jury.

17        ***a.  Insurance for private landlords who rent to one or more Section 8 HCV***

18  ***tenants is not a "speciality" market.***  Travelers repeatedly states that insurance for Section 8 has long

19  been considered a "speciality" market requiring particularized expertise.  (Motion at 3, 9.)    But

20  Travelers admits that it is "unaware of" any specialized carrier handling private housing with Section

21  8 tenants.  (Kearney Depo. 190:21-192:8.)  Nor is it aware of any specialized niche market for

22  _____

23    [10]In *Cloutier v. Prudential Ins. Co. of America*, 964 F. Supp. 299, 304-05 (N.D. Cal. 1997),
      for example, the plaintiff established disputed material facts whether insurer's outright rejection of

24    his life insurance application based upon his association with a disabled person – his HIV-positive
      partner – discriminated against him in violation of the ADA where the insurer's underwriters

25    received no training regarding HIV and relied on "common knowledge" about AIDS and its
      dangers.  In *Rodriguez v. Providant Life and Accid. Ins. Co.*, No. CV 00-01828-GHK, 2001 WL

26    291961, *6-7 (C.D. Cal. Mar. 2, 2001) (insurer's failure to train its employees on an English

27    proficiency requirement for insureds and lack of actuarial evidence showing higher claims
      payment rates for non-English speakers supported inference of discrimination).

28

1   insurance for private landlords with Section 8 tenants.  (Id.)  Nor is it aware of the existence of a

2   separate risk retention group for private landlords who rent to one or more section 8 tenants.  (Kearney

3   Depo. 246:19-22.)  Significantly, insurance by surplus lines or risk retention groups is recognized as

4   significantly less desirable then coverage offered by "admitted" insurers such as Travelers who are

5   regulated by the State of California. (Doc. 157-1, Costigan ¶¶ 18-19; Hunter Dec. filed herewith, Exh.

6   1, at 15-16.)  For example, after Travelers non-renewed the Joneses' policy, Mrs. Jones obtained a

7   quote for replacement coverage from Northfield Insurance – a surplus lines carrier affiliated with

8   Travelers for "hard-to-place risks" – that was almost three times as expensive as her Travelers' policy.

9   (Brancart Exh. 1, 4, 12, [Jones Dec. ¶ 6; Wood Depo. 274; Northfield website]; Doc. 155-9, Exh. I.)

10  The insurers that Travelers' expert refer to as the subsidized housing "specialists" do not write

11  insurance for small, private landlords like the Joneses – they specialize in public housing, non-profit

12  entities, and entities operating subsidized housing.  (Hunter Dec., Exh. 1 at 15-16.)

13          The report of the California Department Insurance ("DOI") data call on AB 421, submitted by

14  Travelers, also contradicts its claim that the insurance market for private apartments with Section 8

15  tenants or subsidized housing is "specialty."  (See Doc. 155-17, Exh. Q at DOI000652, 696-698.)

16  According to the DOI, "[o]f the 98 companies that represent the commercial residential property and

17  liability insurance market, 86 companies [including Travelers] . . . did not track of maintain data on

18  their systems that identified if a property was being used as subsidized or non-subsidized rental

19  housing," nor did those companies consider the stated use of the property as subsidized or non-

20  subsidized rental housing as a factor in either the development of the policy's premiums or the

21  underwriting acceptability of a property.  (Id.)  Virtually all were willing to write new business or

22  renew business with subsidized housing. (Id.)  If it was so well known that subsidized housing was a

23  speciality market, it is unlikely that all of these insurers, including Travelers, would advise the DOI that

24  they did not keep track whether their insureds operated subsidized housing, did not consider that factor

25  in underwriting or rating *and* were willing to write new policies or continue to renew them.

26                  ***b. Apartments with one or more Section 8 tenants do not create "unique" risks***

27  ***for insurers.***  Travelers contends that properties with Section 8 tenants create "unique risks" different

28  from private housing which help illustrate why it is a specialized market. (Motion at 9, 15 n.13, 21;

1   Costigan Dec. ¶¶ 2-4, 57-58; Painter Dec.; Kearney ¶ 19.)  Travelers cites concerns regarding the

2   financial structure and relationship between the building owner/landlord and tenants and assumptions

3   that the tenants (paying less) are less motivated to maintain the property, that the landlord is receiving

4   less than market-rate rents, that there may be lower occupancy rates, government restrictions, cash flow

5   issues and a possible increased likelihood that renters will not have renter's insurance. (Kearney ¶¶ 15,

6   17.)  Travelers' assumptions regarding why landlords renting to one or more Section 8 tenants are

7   different from landlords renting to no Section 8 tenants are simply false.   Contrary to Travelers'

8   suppositions, Section 8 tenants have very strong incentives to maintain their units and abide by the

9   terms of their leases because failure to do so may result in loss of their vouchers on which they depend

10  for housing.  (Bishop Dec. Exh. 1 pp. 16-17.)  The rates charged by landlords who rent to Section 8

11  HCV tenants are set by the landlord and are set at market rate levels.  (Bishop Exh. 1 at 8-9.)  Nor does

12  the HCV program have anything to do with occupancy rates – the same market incentives exist for

13  landlords with HCV tenants and those without to keep a high occupancy rate.  (Bishop Exh. 1 at 15.)

14  Moreover, all landlords who participate in the Apartment Pac insurance program must maintain 80%

15  occupancy; making Travelers' concern unjustified.   (Brancart Exh. 17 [Depo. Exh. 39 at

16  TRAV003943.)  The government regulation Travelers fears actually works to its benefit – the HCV

17  program imposes housing quality standards on properties which presumably would make the property

18  *more* desirable as an insurance risk.  (Bishop Exh. 2 at 5-6.)  Although the landlord may not be able

19  to require an HCV tenant to maintain renter's insurance (if that is an additional charge on top of the

20  rent), Travelers does not require *any* Apartment Pac landlord to impose a renter's insurance

21  requirement.  (Kearney Depo. 256:15-18.)  Finally, the design of the HCV program is to pay market-

22  based rents and it is structured to protect, stabilize and improve, the cash flow of landlords.  (Bishop

23  Exh. 1 at 13-14, 16.)[11]

24

25       [11]Plaintiffs submit the declaration of Catherine Bishop, an expert in HUD low-income
26  housing programs.  Ms. Bishop's reports, incorporated in her declaration, contradict the
    statements of Travelers' expert Gary Painter regarding the Section 8 program and claims
27  regarding life-safety risks raised by subsidized tenants.  (Bishop Dec. Exh. 1 and 2.)
    Fundamentally, Painter conflates and confuses the HCV program at issue in this case with other
28  HUD programs providing for project-based housing assistance.  (Id., Exh. 2 at 1; Exh. 1 at 11-12.)

1    Travelers also quotes plaintiffs' expert Daniel Schwarcz as admitting that there are "potentially

2    plausible reasons" to believe that lessors who rent to Section 8 tenants may be higher risk with respect

3    to a commercial insurance policy.  (Motion at 10.)  Travelers, however, fails to quote the continuation

4    of Professor Schwarcz's statement – "But there are just as many potential plausible reasons to believe

5    that this may not be so."  (Schwarcz Dec., Exh. 1 ¶ 21.)  Plausibility, standing alone, is probative of

6    nothing.  Travelers – drawing on unfounded stereotypes – imagines, post hoc, fact-free justifications

7    that could plausibly explain its discrimination.  But even if this plausible, post hoc speculation were

8    credited, Travelers undermines its own claims:  If any of the factors – maintenance, cash flow, etc. –

9    were genuine concerns, then Travelers would ask them of every landlord applying for insurance rather

10   that base its decisions on stereotypes.  Not surprisingly, there is no recognized risk differences in the

11   economic sector between private landlords with Section 8 tenants and private landlords without any

12   such tenants as there is, for instance, between private landlords and public housing entities. (Schwarcz

13   Exh. 1 ¶ 19, Exh. 2 ¶ 7.)

14        ***c. Travelers has no business need to distinguish between landlords with***

15   ***Section 8 HCV tenants and those without.***   According to Travelers, Section 8 is included as

16

17   Painter claims HCV landlords' costs are increased because of government regulation (¶ 34), but
     the HCV program imposes few costs *unique* to the HCV program – increased costs are minimal

18   are arise from the housing quality standards (HQS) imposed by the program, which presumably
     would make the property *more* desirable as an insurance risk.  (Bishop Exh. 2 at 5-6.)  The

19   landlord, not HUD or the PHA, sets the rent.  (Id. Exh. 1 at 8-9.)  HUD has payment standards
     based on "fair market rents" and, with some exceptions, families can pay only up to 40% of their

20   monthly income for rent – but that cap does not continue after the first year and families can pay

21   more if the landlord  raises the rent.  (Id., Exh. 1 at 8-9.)  Landlords may elect not to renew the
     lease at the end of the term for no reason.  (Bishop Exh. 1 at 16.)  The 90-day notice requirement

22   cited by Painter is from California law, not HUD.  (Bishop Exh. 2 at  10.)  In fact, California law

23   requires 60-day notice to all tenants if they have lived in the unit for a year.  (Id.)  The
     "constraint" on rents referred to by Painter (¶¶ 37-38) had to do with the federal government's

24   anomalous "sequestration," which did not affect the amount of contractual rent the housing
     authority paid to landlords.  (Bishop Exh. 2 at 8-9.)  Painter's assertions concerning the

25   "difficulties" landlords face with dealing with the housing authorities are conjecture – PHAs are
     concerned about responding to landlords' needs since they depend on landlords for the success of

26   the HCV program.  (Id. at 9.)  Painter's statements regarding the alleged poor health of Section 8

27   HCV participants are misleading – most of the studies he cites, as he admits, do not deal with
     Section HCV tenants, but with public housing or other HUD assisted housing tenants.  (Exh. 2 at

28   11-12.)

1  "subsidized housing" ineligible for Apartment Pac because it is a specialized risk because it is a

2  different financial arrangement than a traditional market rent paid by a tenant to a landlord, raising

3  questions whether the owners would get the rent money at a different period of time, whether there

4  would be cash flow problems, and whether there would be potential capital issues making the owner

5  unable to maintain the property.  (Kearney Depo. 160:21-161:10.)  Travelers describes its need to keep

6  Section 8 landlords out of Apartment Pac because of the needs of the "highly automated" process

7  Travelers uses.[12]  (Motion at 9.)  But Travelers does not collect or consider the information it contends

8  makes landlords who take Section 8 "different" from landlords who do not take Section from *any*

9  landlord in the Apartment Pac application process.[13]  And, although Travelers expresses concern that

10 Section 8 housing tenants may have a higher preponderance of disability or mobility issues which could

11 lead to life safety concerns, (Kearney Depo. 163-164), it does not collect information from any

12 Apartment Pac landlords regarding whether their tenants are disabled or have mobility impairments

13 when it determinations whether they are qualified for Apartment Pac (Kearney Depo. 170:25-171:13).

14

15     [12]Travelers' claim that its prohibition on insuring landlords with Section 8 is "necessary"

16 to preserve its "low-touch" automated underwriting is also highly suspect because the same
   prohibition applies to Travelers' Apartment Pac Plus program for more complex risks requiring

17 underwriting involvement.  (Noel Depo. 177:16-19; 179:6-15.)

18     [13]Specifically:  (i) Travelers does not obtain information from landlords regarding when or

19 how their rents are collected (Kearney Depo. 165:14-15, 170:10-14); (ii) Travelers does not obtain
   information from landlords regarding what rental rates the landlord is charging or whether they are

20 market rate rents (Kearney Depo. 165:18-24; 180:20-24); (iii) Travelers does not collect
   information regarding a landlord's cash flow (Kearney Depo. 165-9-13); (iv) Travelers does not

21 collect information regarding the amount of money allocated or expended by a landlord on
   maintenance of an apartment building (Kearney Depo. 165:25-166:4); (v) Travelers does not

22 require disclosures of the nature of the rental agreement or lease that the landlord enters into with
   each of the tenants who rent in the apartment building (Kearney Depo. 168:24-169:4); (vi)

23 Travelers does not ask for information regarding the mechanism by which the landlord will pursue
   eviction if rent money is not paid (Kearney Depo. 169:5-9); (vii) Travelers does not require that a

24 landlord disclose capital reserves or some other kind of financial mechanism "to ensure that
   landlords have requisite capital to maintain their structures" (Kearney Depo. 170:15-21); (viii)

25 Travelers does not look at any differences in eviction procedures between states or to what extent
   landlords may collect back rents in determining eligibility under Apartment Pac (Kearney Depo.

26 171:19-172:4); and, (ix) Travelers does not collect information that can be used to assess
   "creditworthiness and/or the ability to pay rent by any of the tenants in the dwelling that Travelers

27 is about to insure" (Kearney Depo. 176:1-11).

28

1  Travelers' refusal to insure apartments with Section 8 tenants utterly fails to promote any business need

2  identified by Travelers.  Insuring such properties would hardly require Travelers to re-price its

3  Apartment Pac policy or withdraw from the market.

4      ***d. Travelers' purported "lack of knowledge" regarding the Section 8 program***

5  ***does not justify its underwriting rule.***  Travelers claims that its lack of understanding of the Section

6  8 program justifies is refusal to participate in the insurance market for that risk.  (Motion at 9; Kearney

7  ¶¶ 8, 11, 13.)  Nor, says Travelers, does it need to expand into this sector.  (Motion at 10 n.8; Kearney

8  ¶¶ 8-10, 13-15, 22.)  Travelers' purported "lack of knowledge" is a pretext for discrimination.

9  Travelers has extensive knowledge regarding the process and risks of insuring small apartment

10  buildings, like the Cody Way apartments.  It will insure the Joneses under Apartment Pac if they evict

11  their Section 8 HCV tenants, but it deems them suddenly ineligible if they keep or accept one.  This

12  is truly a distinction without a difference.  Travelers can point to no data to support this distinction, or

13  even identify the mechanism inherent in the Section 8 HCV program that generates unique risks.  All

14  of the objective concerns identified by Travelers – vacancy rates, maintenance, eviction procedures –

15  apply to all landlords and if these were real concerns, Travelers would collect and consider information

16  regarding these factors from all.

17     Against this backdrop, Travelers' underwriting rule and its obvious and acknowledged

18  disproportionately negative effect on persons protected by the fair housing laws required Travelers to

19  educate itself.  As stated by plaintiffs' expert Professor Daniel Schwarcz, an expert in insurance law

20  and regulation:

21     In response to the insurance industry's well-documented history of empirically-
unmoored racial and ethnic discrimination,[14] the broad understanding has emerged in

22

23    [14]Historically, the insurance industry openly discriminated against certain groups of

24  persons, relying on racial and ethnic stereotypes.  Gregory D. Squires, *Racial Profiling, Insurance Style*, 25 Journal of Urban Affairs, No. 4, 391, 396-97 (2003); see also discussion in Schwarcz at ¶

25  11 and Bradford at pp. 14-15 and authorities cited.  Insurers also engaged in "redlining," a term that originates "from insurers' and mortgage lenders' historical practice of drawing 'red lines' on

26  maps and dividing covered areas (which invariably were 'white' neighborhoods) from other areas where coverage would not be available (which invariably were minority neighborhoods).  John F.

27  Stanton, *The Fair Housing Act and Insurance: An Update and the Question of Disability Discrimination*, 31 Hofstra L. Rev. 141, 143 (2002).  The insurance industry has also "redlined"

28

1   recent decades that it constitutes unfair discrimination[15] for insurers to use empirically
2   unsupported underwriting guidelines that clearly correlate with suspect characteristics
    such as race or income.

3   (Schwarcz Dec., Exh. 1 ¶ 13.)  According to the National Association of Insurance Commissioners

4   (NAIC) – the U.S. standard-setting and regulatory support organization created and governed by the

5   chief insurance regulators across the nation – underwriting guidelines raise "red flags" where they

6   clearly violate public policy or are obvious proxies for prohibited characteristics.  (Id.)  Where an

7   underwriting guidelines raises a "red flag" it should serve a necessary underwriting purpose, i.e., be

8   "demonstrably related to risk of loss." (Id.) According to Professor Schwarcz, Travelers' underwriting

9   rule raises "red flags" because it has clearly has a disparate impact on a number of protected classes

10  and because it has the potential to undermine a federal policy by decreasing the effectiveness of the

11  Section 8 voucher program.  (Id. ¶¶ 15-18, 20; *Barrientos*,583 F.3d at 1203.)

12      Under prevailing regulatory and industry norms and customs, Travelers cannot
        permissibly defend its underwriting guideline in this case by claiming that it does not
13      have sufficient information or knowledge regarding buildings that rent to Section 8
        voucher recipients. Where an insurer distinguishes among different policyholders and
14      that discrimination raises red flags and is not empirically supported, the insurer
        transgresses well-established norms and customs within the insurance regulatory and
15      industry communities.

16  (Schwarcz Exh. 1 ¶ 22.)  Otherwise, "insurers could (either consciously or not) rely on the very same

17  racial, ethnic, and sex-based stereotypes that they historically employed, for instance, to red-line

18  minority communities."  (Id.)

19      Travelers understood that its exclusion of landlords renting to Section 8 HCV tenant raised red

20  flags.  Its own "Fair Access Policy," prohibited "redlining" and required underwriters to discard

21  ███████████████████████████████████████████████████████████████████████████

22

23  ────────────────────────

    individuals.  *See* Katy Chi-Wen Li, *The Private Insurance Industry's Tactics Against Suspected*
24  *Homosexuals: Redlining Based on Occupation, Residence and Marital Status*, 22 Am. J.L. &
    Med. 477 and 502 n.199 (1996) (recounting insurance industry's practice of refusing to provide
25  coverage to male hairdressers or those residing in certain zip codes as constituting discriminatory
    "redlining" – using those characteristics as a proxy for homosexuality and assumed higher risk of
26  AIDS, although no evidence that the practice had actuarial basis).

27      [15]"Unfair discrimination" as used by Prof. Schwarcz refers to the term as "customarily
28  understood in insurance regulatory and industry communities."  (Schwarcz Report at ¶¶ 8-10, 15.)

1  ██████████   (TRAV 0003978.)  (Brancart Exh. B [Depo. Exh. 56].)  Travelers employees repeatedly

2  expressed concerns about the policy.[16]  Twice Travelers mislead the California Department of Insurance

3  regarding its prohibition on Section 8 and subsidized housing.[17]

4       Travelers' asserted "legitimate business justification" for refusing to insure apartments with

5  Section 8 tenants that it "lacks knowledge" regarding subsidized housing can itself raise the inference

6  of discrimination.  (Motion at 9-10.)  Travelers' "lack of knowledge" may be viewed by the jury as a

7  kind of willful blindness.  *See, e.g.*, *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004)

8  ("GTE's attempt to deny the possible racial overtones of many of the comments made to McGinest or

9  uttered in his presence indicates a willful blindness to racial stereotyping."); *Luciano v. Olsten Corp.*,

10 110 F.3d 210, 216 (2d Cir. 1997) (jury properly considered that company's lack of investigation into

11 gender-based disparities in its workforce or into reasons for terminations as evidence of discriminatory

12 intent).  Thus, even where the defendant "might believe its stated reason for its action and honestly

13 believe that the reason was nondiscriminatory, ... the jury might find that the same reason was honestly

14 held but conclude that it constituted discrimination (e.g., stereotyping)."  *Zapata-Matos v. Reckitt &*

15 *Colman, Inc.*, 277 F.3d 40, 45-46 (1st Cir. 2002).  Plaintiffs have raised genuine issues of material fact

16 for the jury whether Travelers' no Section 8 rule was based on discriminatory stereotypes regarding

17

18

19    [16]Brancart Exh. I, T (Depo. Exh. 253 ██████████████████

20    ███████████TRAV 164635███████████████████████████

21    ████████████████████████████████████████████████

22    ████████████████████████████████

23    [17]Compare Brancart Exh. T (TRAV 164635 ███████████████

24    █████████████████with Brancart Exh. 11 (DOI 727█████

25    ███████████████████████████████████████

26    █████████████████████Brancart Dec. N [Depo. Exh 317, TRAV 006339-

27    6341 Q-7], with Brancart Exh. O███████████████████

28

1    the tenants using Section 8 vouchers.[18]

2    **B.    Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs'
     Interference Claims.**

3    Travelers contends that plaintiffs' "interference" claims fail.  (Motion at 12.)  The FHA (and

4    FEHA) make it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise

5    or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided

6    or encouraged any other person in the exercise or enjoyment of, any right granted or protected by"

7    those laws.  42 U.S.C. § 3617; Govt. Code § 12955.7.  Section 3617 must be "broadly applied to reach

8    all practices which have the effect of interfering with the exercise of rights under the federal fair

9    housing laws."  *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001) (internal citations

10   and quotations omitted).  Notably, proof of a § 3617 violation does not necessarily require evidence

11   of an intent *to discriminate* as Travelers claims, although plaintiffs have proof of that as just detailed

12   above.  (Motion at 12.)  Rather, a prima facie case of "interference" is established by showing that the

13   plaintiff (1) was engaged in protected activity, (2) suffered an adverse action, and (3) there was a causal

14   link between the two.  *Brown v. City of Tucson*, 336 F.3d 1181, 1191-92 (9th Cir. 2003) (construing

15   section of ADA identical to § 3617 and citing *Walker*, 272 F.3d at 1128 (FHA)).

16   Here, the Joneses were engaged in activity protected under the FHA and FEHA at the time

---

[18]If the defendant comes forward with a legitimate, nondiscriminatory reason, the plaintiff must counter the defendant's explanation with some evidence suggesting that the challenged action "was due in part or whole to discriminatory intent."  *Budnick*, 518 F.3d at 1114 (quotations omitted).  The plaintiff may satisfy that burden by showing, as plaintiffs have, that the defendant's proffered explanation "is unworthy of credence."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Where, as here, the plaintiff does not simply rely on *McDonnell Douglas* to state a prima facie case, the plaintiff may rely on the same evidence that she introduced to establish a prima facie case to determine whether the defendant's explanation is merely pretext.  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999); *Warren v. City of Carlsbad*, 58 F.3d 439, 442 n.1 (9th Cir. 1995).  Once a prima facie case is established summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of the issue is the elusive factual question of intent.  *Harris*, 183 F.3d at 1051.  The legal authorities cited by Travelers suggesting that plaintiffs have a heavier burden of rebuttal are cases where the plaintiff relied on the *McDonnell Douglas* prima facie case to create the inference of discrimination.  (Motion at 11-12.)  As *Budnick* makes clear, in an FHA case a plaintiff need not rely on the *McDonnell Douglas* prima facie case if she has direct *or circumstantial* evidence raising the inference of discrimination.  *Budnick*, 518 F.3d at 1114.

PLAINTIFFS' OPPOSITION TO DEFENDANT TRAVELERS CASUALTY INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT; Case No. 5:13-cv-02390-LHK        21

1  Travelers non-renewed their insurance.  The Joneses were renting to a number of Section 8 tenants,

2  including tenants who were female headed households, female headed households with children,

3  persons with disabilities, persons age 62 and over and/or Black.  (Jones Dec. ¶ 8.)  Thus, the Joneses

4  were exercising rights protected by the FHA and FEHA – to rent to persons protected under those laws

5  – when Travelers non-renewed the Joneses' policy because of the presence of those tenants.  That

6  constituted interference with the Joneses' exercise of their rights to rent to persons protected under the

7  fair housing laws.  *See HUD v. Carter*, 1992 WL 406520 *9 (H.U.D.A.L.J. May 1, 1992) (when mobile

8  home park owner notified resident that he would not approve the sale of her mobile home to a family

9  with children, owner interfered with resident's exercise of her right to sell her home to a family with

10  children in violation of § 3617).[19]  The Joneses suffered an adverse action by Travelers – non-renewal

11  of their insurance – and there was a causal link between the exercise of protected rights and the adverse

12  of action.   That establishes a prima facie violation of § 3617 and FEHA's parallel provision,

13  Government Code § 12955.7.  *See also Nevels v. Western World Ins. Co.*, 359 F. Supp. 2d 1110, 1123

14  (W.D. Wash. 2004) (where insurer non-renewed insurance policy of group home for persons with

15  disabilities because the insurer no longer was writing insurance for adult family homes for persons with

16  mental illness, the nexus between defendant's threats and an impact on housing satisfies § 3617).  That

17  Mrs. Jones expressed her opinion that Travelers' demand that she disclose the number of Section 8

18  tenants was "discrimination," and that Matt Noel made reference to Mrs. Jones's statement in the same

19  email in which he stated his intention to non-renew her policy, also raises the inference of a causal

20  connection.  (M.Jones Depo. 217:1-8; see Exh. 62.)

21      Contrary to Travelers' assertion, the FHA or FEHA do not require that plaintiffs capitulate to

22  the interference – e.g., stop renting to Section 8 tenants or take action to evict them – to prove an

23  interference claim.  *United States v. City of Hayward*, 36 F.3d 832, 833-34 (9th Cir. 1994)(Section

24  3617 does not require a person who is "interfered with" to capitulate to the interference.)  The

25  imposition of additional costs alone is sufficient to establish interference.  *Id.  See also Wai*, 75 F. Supp.

26  ─────────────────

27      [19]HUD's construction of the FHA in adjudicative proceedings is entitled to considerable
      deference.  *Harris v. Itzhaki*, 183 F.3d 1043, 1051-53 (9th Cir. 1999).

28

1  2d at 6 ("Nothing in the FHA requires that before filing suit plaintiffs [whose insurance was non-

2  renewed because they rented to persons with disabilities] must either lose their homes or refuse to rent

3  to persons with disabilities.")[20]   The non-renewal of insurance itself results in additional negative

4  consequences.  Nonrenewal results in issuance of notice to the landlord's mortgage company (Noel

5  Depo. 203:21-204:4), *and* it follows the landlord in future insurance applications – insurers (including

6  Travelers) ask applicants whether they have had coverage cancelled, declined or non-renewed within

7  the past three years and if so, why.  (Noel Depo. 195:10-25.)   Nor does the Ninth Circuit require a

8  plaintiff who claims interference under § 3617 to establish that the "defendant engaged in a pattern of

9  harassment, invidiously motivated" as Travelers claims relying on out-of-circuit authority (and a Los

10  Angeles federal court opinion following it) that define "interference" in that way.  *Bloch v. Frischholz*,

11  587 F.3d 771, 738 (7th Cir. 2009) (en banc) (quotations omitted) (Motion at 12).  Instead, in the Ninth

12  Circuit, the language "interfere with" is broadly applied "to reach all practices which have the effect

13  of interfering with the exercise of rights under the federal fair housing laws." *City of Hayward*, 36 F.3d

14  at 835 (internal quotations omitted) and may consist of discrete acts. *Id.* at 833-34.

15  **C. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Disparate Impact Claims.**

16

17     **1. Both the FHA and FEHA allow proof by disparate impact.**  Travelers argues that

18  disparate impact theory should not be applied here because the Section 8 HCV program is voluntary

19  for landlords.  (Motion at 14.)  In other words, since landlords cannot be *forced* to rent to Section 8

20  tenants, Travelers should not be penalized for refusing to insure landlords who do.  That argument fails

21  for three reasons:   First, a landlord and an insurer are not similarly situated under the Section 8

22  program.  Under the Section 8 program, a landlord is required to maintain his property up to HUD's

23  housing quality standards and submit to annual inspection by HUD to confirm compliance; an insurer

24  of a Section 8 landlord is subject to no additional regulatory burdens.  On the contrary, Travelers

25  acknowledges that the Section 8 housing quality standards and inspections inure to an insurer's benefit,

26  _____

27     [20]*See also United States v. Bankert*, 186 F. Supp. 2d 623, 628-29 (E.D.N.C. 2000) (plaintiff
    stated a claim under FHA where seller refused to deal with buyers because they insisted on using

28  an African-American-owned mortgage company).

1   reducing defects and conditions that increase the risk of loss.  (Compare Galli Depo., at 91:14-93:18

2   with 24 C.F.R. § 982.401[admitting the HUD HQS standard reflect "best practices" to reduce risk of

3   loss].)   Second, the voluntary nature of participation in the Section 8 program by the landlords

4   Travelers refuses to insure is irrelevant.  As  stated in *Graoch Assoc. #33, L.P. v. Lousiville/Jefferson*

5   *County Metro Hum. Relations Comm.*, 508 F.3d 366, 376-77 (6th Cir. 2007), "to say that Section 8

6   participation is 'voluntary' is only to say that a landlord does not break the law by declining to

7   participate."  Even if landlords cannot be forced to participate in the first instance in the Section 8

8   program, they may incur FHA liability for withdrawing from the program if that withdrawal has a

9   disparate impact and the landlord lacks an adequate business justification. *Id.* at 377.  The FEHA cases

10  Travelers cites are inapposite because they relate to the definition of  "source of income," not disparate

11  impact.  (Motion at 14.)  Third, discrimination against tenants based on their Section 8 status is, in fact,

12  unlawful in ten states and numerous cities, *Impact of Source of Income Laws* (HUD PDR 2011),

13  including Travelers' home state of Connecticut, Conn. Gen. Stat. § 46a-64c.  Despite the existence of

14  these state laws, Travelers' underwriting process rules do not take into account that participation in the

15  Section 8 is not voluntary in those jurisdictions.  (Kearney Depo. 292:18-300:17.)                    **2.**

16  **Plaintiffs have made a prima facie showing of disparate impact.**  To prove disparate impact, the

17  plaintiff must show that the defendant's action had a "discriminatory effect."  *Gamble v. City of*

18  *Escondido*, 104 F.3d 300, 306 (9th Cir. 1997).  Conduct has a "discriminatory effect" if it "actually *or*

19  *predictably* results in racial discrimination." *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988) (internal

20  quotations  omitted)(emphasis added).  *See also* 24 C.F.R. § 100.500(a) ("A practice has a

21  discriminatory effect where it actually or predictably results in a disparate impact on a group of persons

22  . . . because of race . . . sex, handicap, [or] familial status . . ..").  The elements of a disparate impact

23  prima facie case require the plaintiff to identify (1) a specific outwardly neutral act or practice, and (2)

24  a significantly adverse or disproportionate impact on a protected class that is caused – or predictably

25  *will be* caused – by that act or practice.  *Gamble*, 104 F.3d at 306; 24 C.F.R. § 100.500(c)(1) (the

26  plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a

27  discriminatory effect").  Plaintiffs seek injunctive relief to stop discrimination that predictably results

28  from Travelers' practice.

1    Here, the ostensibly neutral practice is Travelers' underwriting rule making apartments with

2    Section 8 tenants ineligible for its Apartment Pac policy.  The plaintiff must next identify the group

3    affected by the challenged decision or policy.  *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983, 987 (4th

4    Cir. 1984); 24 C.F.R. § 100.500(a).  Here, that group is persons who rent or seek to rent dwellings

5    using Section 8 vouchers.  (Bradford Report, Exh. 1 at 6-7.)  Once the practice and the pool of affected

6    persons is identified, the plaintiff must show a discriminatory impact, which is usually done through

7    the use of statistical evidence demonstrating the effect or predictable effect of the challenged act or

8    practice on the protected minority group.  (Id. at 16.)  The Bradford reports show that Travelers' no

9    Section 8 rule has a statistically significant disparate impact on the basis of race, sex, age, and familial

10   status, and Travelers does not contest that evidence in this motion.

11   Instead, Travelers argues it is entitled to summary judgment based on the intensely factual

12   question of causation, conflating and then confusing the relevant legal standards.  First, Travelers

13   conflates different disparate impact theories, disproportionate representation and disparate adverse

14   impact.  In disproportionate representation cases, a plaintiff shows that the neutral practice *caused* the

15   disparate impact – for example where the plaintiff claims that an employer's promotion practices have

16   resulted in disproportionately fewer women in management, *Moore v. Hughes Helicopters*, Inc., 708

17   F.2d 475, 482 (9th Cir. 1983).  That paradigm does not apply here; this is a disparate adverse effect

18   case.  Plaintiffs offer evidence showing that the negative effect of Travelers' policy predictably falls

19   more heavily on protected classes because they constitute a far greater percentage of the population of

20   Section 8 voucher holders as compared to their percentage in the general renter population.  This

21   paradigm of disparate impact is commonly used in FHA cases.[21]  Under a disparate adverse impact

22   case, causation is shown by demonstrating the correlation between the negative impact of the policy

23   _____

24   [21]For example, in *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926,
     938 (2d Cir.) aff'd in part sub nom. *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*,

25   488 U.S. 15 (1988), the Second Circuit found that the town's refusal to rezone property to enable
     the building of a subsidized housing project had a disparate impact on minorities where, *inter alia*,

26   minorities constituted a far greater percentage of those currently occupying subsidized rental
     projects as compared to their percentage in the town's population.  The failure to rezone did not

27   *cause* minorities to be more heavily represented in the subsidized housing group, it just injured

28   them at a greater rate than non-minorities.

1    and the protected status of the class of persons subject to that policy, as the Ninth Circuit recognized

2    in *Gamble*, noting that "[i]f a significant correlation exists between being disabled and living in group

3    houses, a disparate impact on group housing could conceivably establish a prima facie disparate impact

4    claim" of disability discrimination.  104 F.3d 307 n.2.  Plaintiffs have shown such a correlation.

5           Travelers next confuses the requirements to state a disparate impact claim, arguing that

6    plaintiffs cannot prove a violation unless they identify specific protected class members denied housing

7    pursuant to that policy.  That is not the law.  Plaintiffs need only show that Travelers' no Section 8 rule

8    will predictably cause an adverse effect on protect class members.  24 C.F.R. § 100.500.  That effect

9    is hardly speculative in light of Travelers' own policy, which bars insurance to any landlord who rents

10   to a Section 8 tenant.  Travelers' no Section 8 rule defines a specific class of persons and that specific

11   class – it is undisputed – is overwhelmingly comprised of minorities, single mothers, the disabled and

12   elderly.  Unlike a zoning case, where the court must speculate if a land use decision "may" affect poor

13   persons in a region, the effect of Travelers' policy is direct and robust.  Travelers deprives landlords

14   of a necessity – insurance coverage – unless they refuse to rent to Section 8 voucher holders,

15   discouraging rental to a class of persons who are overwhelmingly protected from discrimination under

16   the FHA and FEHA.  That discouragement is not only predictable, it is inevitable and unlawful.  *See*

17   *e.g.*, 24 C.F.R. § 100.70(c)(FHA bars discouraging rental); see also 24 C.F.R. § 100.5 ("Illustrations

18   of unlawful housing discrimination [in HUD rules] may be established by the practices' discriminatory

19   effect.") This linkage is robustly supported by the policy itself, Bradford's demographic analysis, and

20   legal analysis reflected in *Am. Family Mut. Ins. Co.*, 978 F.2d at 297, *Wai*, 75 F. Supp. 2d at 4, and

21   *Nevels*, 359 F. Supp. 2d at 1119.   And it is also found in Travelers' own documents, showing

22   Travelers non-renewed other landlords because they rented to Section 8 tenants.  (See Brancart Exh.

23   R [TRAV 059985-86; 069332-34; 096120].)  For those it continued to insure, it expressly conditioned

24   coverage on a reduction of or no increase in the number of Section 8 tenants.[22]

25   _____

26          [22]See Brancart Exh. 14, A, Q, S (TRAV 102259 ████████████████████

27   and Doc. 40-4 re how document created; Depo. Exh. 81, TRAV 007139 ████████████

28   ██████████████████ Depo. Exh. 28, TRAV 0005069 ████████████████

1   Causation – including whether Travelers' policy caused housing to be "otherwise unavailable"

2   or "discouraged" rental of dwellings – "is an intensely factual question that should typically be resolved

3   by a jury." *Pac. Shores*, 730 F.3d at 1168.  Indeed, it is jurors' "common experience of living on a

4   populated planet" that renders them at least as reliable, if not more so, than a single judge at assessing

5   issues of causation.  *Id.* (plaintiffs need not show identifiable persons were discouraged from living in

6   their particular sober living homes where the city's rule designed to reduce number of sober living

7   homes).  Plaintiffs have generated a jury question.

8       **3. Travelers has no business justification for its policy.**  Travelers contends that it

9   has "a complete business necessity defense." (Motion at 20.)  As set forth above, however, plaintiffs

10   have submitted substantial evidence raising a genuine issue of material fact whether Travelers'

11   purported business justification is legitimate.  (See Part IV.A.3.)  In addition, Travelers' own failure

12   to enforce its rule proves its lack of necessity.[23]  Finally, the fact that Travelers relied entirely on its

13   independent agents to assess whether an applicant had subsidized housing but never gave them any

14   guidance other than the rule itself – "subsidized, public or government funded complexes" are

15   ineligible – is strong evidence that the rule is not important to Travelers' business.  (Kearney Depo.

16   217:9-23, 221:12-222:20, 228:2-231:12.)  Nor would imposing disparate impact liability in situations

17   like this case "require" insurers to collect data or consider the race, national origin, familial status, etc.

18   ───────────────

19   ████████████████████████████████████████████  Depo. Exh. 28 TRAV 005072 [████████

20

21   [23]Bryan Lewis, former Regional Underwriting Director for California (1 of 10 national
regions) testified that during his tenure, 2008-2011, it was acceptable to write properties with 25%
subsidized housing the California region.  (Brancart Exh. 7 [Lewis Dpeo. 14:4-6; 15:24-16:2,

22   118:14-24].)  While the region wrote accounts with more than 25% subsidized housing, those with
under 25% could be written by account executives at their discretion.  (Lewis Depo. 121:14-20;

23   123:2-5, 20-18.)  The account executives would advise the independent agents to submit the
application on Travelers*Express*, but to indicate that the property had "no" subsidized housing.

24   (Noel Depo. 318:8-319:21.)  Even within the California region, account executives followed no
guidelines in authorizing issuance of polices to properties with subsidized housing.  Matt Noel, the

25   Travelers underwriter on the Joneses' account, applied limits of anywhere from 0 to 50%

26   percentage subsidized housing as acceptable in issuing Apartment Pac policies.  (Noel Depo.
251:25-253:25, 254:1-10; Brancart Exh. C, D, E, F, G, J, , L, M [Depo. Exh. 73 ████; Exh. 75

27   ████; 77 ████████]); 79 ████]; 81 (████; 286 (2██████████████████████ 292

28   ████); 293 ████ 296 (████████); 302 (████

of insureds.  (Motion at 21.)  First, recognizing the disparate impact on Section 8 voucher holders would not require the collection of data regarding the race, etc. of landlords.  Second, plaintiffs allege an elemental type of discrimination – denying insurance based on an underwriting factor obviously linked to protected class status – not something complex like the application of disparate impact analysis to insurance rates determined by credit-scoring.  Yet the Ninth Circuit has held that even credit scoring may be subject to disparate impact analysis.  *Ojo*, 600 F.3d 1205.  Finally, Travelers claims that holding insurance to the same disparate impact standards as other financial entities with respect to housing discrimination would have adverse consequences for the business of insurance.  (Motion at 21.)  To the contrary, adopting a blanket principle that insurers are immune from disparate impact liability would itself substantially undermine state insurance law and regulation.  (Schwarcz Rebuttal ¶ 5.)

      **4.   The McCarran-Ferguson Act does not reverse-preempt here.**  Under the McCarran–Ferguson Act, state law "reverse preempts" a federal statute if (1) the federal law does not specifically relate to insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of federal law to the case might invalidate, impair, or supersede the state law.  *Ojo v. Farmers Grp., Inc.*, 600 F.3d at 1208-09.  The Fair Housing Act is subject to "reverse preemption." *Id.* at 1209.  The question, therefore, is whether application of the Fair Housing Act's disparate impact theory in this case might invalidate, impair or supersede California insurance law. *Id.*  Here, California insurance law would not be impaired, invalidated or superceded by allowing plaintiffs to sue Travelers under an FHA disparate impact theory because California law itself prohibits the type of discrimination alleged here. FEHA prohibits discrimination in providing insurance for dwellings and allows proof of a violation by disparate impact.  The classes protected under California's FEHA have rights and remedies rights and remedies equal to those afforded the protected classes under the FHA and its implementing regulations and FEHA may, in fact, be construed to "afford greater rights and remedies to an aggrieved person than those afforded by federal law and other state laws." Govt. Code § 12955.6. Thus, the FHA sets the floor, but not the ceiling, for FEHA protection.  HUD regulations implementing the FHA prohibit "[r]efusing to provide . . . property or hazard insurance for dwellings" because of race, sex, familial status and disability.  24 C.F.R. § 100.70(d)(4).  "Dwellings" include buildings

occupied by one or more families – like the Cody Way apartments.  42 U.S.C. § 3602(b).  Thus, FEHA must be construed to prohibit discrimination in the sale of policies insuring residential apartment buildings.  That prohibition, by FEHA's own terms, overrides any other state law provision that would allow such discrimination, including the insurance code.  *See* Gov't. Code § 12993(c) (the Legislature intended FEHA "to occupy the field of regulation of discrimination in employment and housing" encompassed by its provisions); § 12955.6 ("Any state law that purports to require or permit any action that would be an unlawful practice under [FEHA] shall to that extent be invalid.").  FEHA allows proof of discriminatory housing practices by either disparate treatment *or* disparate impact.  Gov't. Code § 12955.8.  The Insurance Code itself makes the application of FEHA clear when it states that "[t]he business of insurance shall be subject to the laws of California applicable to any other business."  Ins. Code § 1861.03(a).

Travelers makes several claims in favor of reverse preemption.  First, it contends that the California Insurance Commissioner's approval of Travelers' Apartment Pac rates means that its *underwriting* rule is not unfairly discriminatory. (Motion at 23-24.) However, the California Insurance Commissioner explicitly did not approve Travelers' underwriting rules for Apartment Pac – a fact Travelers does not dispute.  (See Brancart Exh. 10 [DOI 00649].)  Next, Travelers argues that the California Legislature's consideration in 2003 of a proposed bill to prohibit insurers from discriminating in residential property insurance on the ground that the occupants were low-income or subsidized "confirmed that that California insurance law allows for risk discrimination with regard to subsidized housing."  (Motion at 23.)  That assertion fails for several reasons.  First, the Legislature did not "consider and reject" legislation.  Travelers refers to a bill – AB 421 – that was initially proposed as an amendment to Insurance Code § 679.71 prohibiting discrimination in insurance to prohibit discrimination on the additional bases of ethnicity, familial status, disability, age or the intended occupancy of a residential development by low-income persons, including those using Section 8 vouchers.  (Brancart Exh. 13 [Leg.Hist. pp. 54-60].)  While still in committee, the bill was rewritten to require the Insurance Commissioner to conduct a study of the insurance market for affordable

1   housing.[24]  (Leg.Hist. at pp. 61-68.) Unpassed bills have little value as evidence of legislative intent.

2   *Dyna-Med, Inc. v. Fair Employ.& Hous. Com.*, 43 Cal.3d 1379, 1396 (1987); *Marina Point, Ltd. v.*

3   *Wolfson*, 30 Cal. 3d 721, 735 n.7 (1982).

4        Travelers concludes its brief with a number of quotes taken from inapposite cases regarding the

5   rights of insurers to pick the insureds and class of insurance they wish to underwrite.  (Motion at 24.)

6   Travelers recognizes that, in fact, insurers can limit coverage only *so long as such limitation conforms*

7   *to the law and is not contrary to public policy*.  (Motion at 24.)  The refusals to write insurance in the

8   cases Travelers cites are not similar to this case, since they did not involve refusals to write insurance

9   for classes protected by the anti-discrimination laws,[25] and an underwriting rule that discourages

10  landlords from participating in the Section 8 program violates public policy.  *See Barrientos*, 583 F.3d

11  1197 at 1203.  Travelers' motion should be denied.

12                              **V.  CONCLUSION**

13       Plaintiffs respectfully request that the Court deny Travelers' motion in its entirety.

14       Dated:  March 5, 2015              Respectfully submitted,

15                                          BRANCART & BRANCART

16                                          /s/ *Elizabeth Brancart*
                                            Elizabeth Brancart
17                                          Attorneys for Plaintiffs

18

19

20   _____

21       [24]Travelers' own employees' emails re AB 421 belie its contention.  (See Depo. Exh. 320
22   ["Originally, (prior to becoming a 'study') the bill provided for a complete rewrite of California's
     insurance antidiscrimination law to address allegations that insurers are discriminating against
23   low-income persons by not insuring apartment houses and similar multi-unit complexes if these
     units subsidize such individuals. . . [l]uckily we were able to amend this bill into a study, hence
24   the CDI study"].)

25       [25]*See Julian v Hartford Underwriters ins. Co.* 35 Cal.4th 747, 759 (2005) (policy covered
26   some weather conditions and not others); *Lumberman's Mut. Cas. Co. v. Wyman*, 64 Cal.App.3d
     252, 259 (1976) (policy covered some settlements and not others); *Quelimane Co. v. Stewart Title*
27   *Guaranty Co.*, 19 Cal. 4th 26, 42-43 (1998) (title insurance for some types of purchases and not
     others); *Wolfe v. State Farm Fire & as. Ins. Co.*, 46 Cal.App.4th 554, 563 n.12 (insurers cannot
28   refuse to insure for a discriminatory reason).

1

## CERTIFICATE OF SERVICE

2

   On March 5, 2015, I served electronically, via the Court's ECF system, a copy of the attached **PLAINTIFFS' OPPOSITION TO DEFENDANT TRAVELERS CASUALTY**

3

**INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT** upon the following attorneys:

4

Robert Peterson                          Andrew Frankel

5

Michael Cooper                           Paul Curnin
Carlson, Calladine & Peterson LLP        Matthew O'Connor

6

353 Sacramento Street                    Simpson Thacher & Bartlett LLP
San Francisco, CA 94111                  425 Lexington Ave

7

Fax:  (415) 391-3898                     New York, NY 10025
*rpeterson@ccplaw.com*                   Fax: (212) 455-2502

8

                                         *pcurnin@stblaw.com*
                                         *moconnor@stblaw.com*

9

                                         *afrankel@stblaw.com*

10

11

12

                        */s/ Elizabeth Brancart*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28