**EXHIBIT 3**

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN JOSE DIVISION


 3


 4
     LINCOLN JONES, JR., ET AL.,        )
 5          Plaintiffs,                 ) Civil Action No.
                                        ) CV-13-02390 LHK PSG
 6   VS                                 )
                                        )
 7   TRAVELERS CASUALTY INSURANCE       )
     COMPANY OF AMERICA,                )
 8          Defendant.


 9


10        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
                 PAGES 46 through 64
11


12

                 DEPOSITION OF:   Brian Kearney
13               DATE:            September 19, 2014
                 HELD AT:         Day Pitney LLP
14                                242 Trumbull Street
                                  Hartford, Connecticut
15


16


17


18


19


20


21        Reporter:  Robin Balletto, RPR, LSR #230
               BRANDON HUSEBY REPORTING & VIDEO
22                   249 Pearl Street
               Hartford, Connecticut 06106
23                   (860) 549-1850


24


25
```

```
 1              Brian Kearney, Deponent, having been
 2     first duly sworn by Robin Balletto, RPR, a Notary
 3     Public in and for the State of Connecticut, was
 4     examined and testified as follows:
 5
 6              DIRECT EXAMINATION BY MR. BRANCART
 7
 8        Q    Good morning, sir.
 9        A    Good morning.
10        Q    Would you please state your full name and
11     spell it?
12        A    Brian Kearney, last name is K-E-A-R-N-E-Y.
13        Q    Mr. Kearney, what is your middle name?
14        A    Thomas.
15        Q    Other than the first name of Brian, do you go
16     by any other first name, common name, or nicknames in
17     the course of your work in the insurance industry?
18        A    No.
19        Q    The court reporter just administered an oath.
20        A    Yes.
21        Q    What does that oath mean to you?
22        A    It means that I need to state the truth.
23        Q    Would you please state for me your current
24     job title?
25        A    I am the vice president of underwriting for
```

```
 1   stating what the underwriting principal is that's
 2   caused the ineligible list and includes subsidized
 3   housing as being an ineligible operation.
 4        Q    I'm not asking about the underlying
 5   principal, sir.  I'm asking a very focused question
 6   which concerns information broadly defined as data.
 7            Sir, did any Travelers employee at any time
 8   review any data or information in connection with the
 9   development, review, approval, implementation or
10   execution of the ineligible operation regarding public
11   housing?
12                MR. PETERSON:  Objection, overbroad,
13   vague.
14        A    I don't know.
15   BY MR. BRANCART:
16        Q    Did any Travelers employee at any time in the
17   period 2005 to 2014 review any information in
18   connection with their development, review, approval,
19   implementation or execution of the ineligible operation
20   regarding public housing?
21                MR. PETERSON:  Same objection.  It's
22   overbroad.
23        A    Not that I'm aware of.  It's been on the
24   ineligible operation list as currently stated since the
25   2005 CURE, and as such, it's not been a focus of the
```

 1    business to find ways to change that.  We've been

 2    focusing more on that business that is within our

 3    current eligibility structure.

 4    BY MR. BRANCART:

 5        Q    But I mean, the question then for the period

 6    2000 to 2005, did any Travelers employee review any

 7    study regarding -- any study in connection with the

 8    development, review, approval, implementation or

 9    execution of the ineligible operation regarding public

10    housing?

11              MR. PETERSON:  Objection, overbroad.

12    Calls for speculation.

13        A    Not that I'm aware of.  I know going back to

14    1999 both St. Paul as a separate company and Travelers

15    had specific direction within their underwriting

16    guidelines for apartment buildings to either make

17    Section 8 housing ineligible or have it be a referred

18    company.  When the companies came together in 2004 I

19    know that that changed and it became part of a stated

20    ineligibility, and then in the 2005 CURE the wording

21    changed to how it stands today, so from the history

22    back to '99 it's been on the ineligible list, and to my

23    knowledge no studies or no work data has been reviewed

24    to change that.

25        Q    So the testimony on behalf of Travelers is

```
 1   for the period since 2000 to today, no Travelers
 2   employee has reviewed a study, data, HUD document with
 3   the exception of the e-mail that you've identified in
 4   Exhibit 220?
 5        A    Not that I'm aware of and could find no
 6   evidence of that.
 7        Q    In connection with the ineligible operation
 8   for public housing; is that correct?
 9             MR. PETERSON:  Object to the form of the
10   question as overbroad and vague as to employee.
11        A    Yes, but there's no evidence that there's
12   been any review of a study on this ineligible
13   operation.
14   BY MR. BRANCART:
15        Q    Going back to the period 1995 to 2000,
16   identify for me, please, what studies were considered
17   or reviewed by any Travelers employee or predecessor
18   employee such as St. Paul?
19        A    I'm not aware --
20             MR. PETERSON:  Excuse me, I'm sorry, I
21   didn't realize he was finished.  Objection to the form
22   of the question as exceeding the scope of the
23   deposition.  Calls for speculation.
24   BY MR. BRANCART:
25        Q    Let me just get out the question.  My
```

 1  question is, going back to 1995 to 2000, are you aware

 2  of any, and let me be broad so we can get done with

 3  this, study, HUD document, with the exception of the

 4  e-mail you've identified in Exhibit 220, data set or

 5  information that was reviewed or considered by any

 6  Travelers employee or organization that became, such a

 7  St. Paul, part of the Travelers Companies in connection

 8  with the development, review, approval, implementation

 9  or execution of the ineligible operation regarding

10  public housing?

11       A    No, not that I'm aware of.

12       Q    Please state for me what interest is advanced

13  by Travelers through the adoption and enforcement of

14  the ineligible operation regarding public housing, now

15  as our shorthand for subsidized or government funded or

16  public housing complexes?

17       A    I'm not sure.  You're asking -- could you

18  repeat the question?

19       Q    Sure.  First, just so we're clear, just so

20  that we don't have to spend all day saying words over

21  and over again, when we're saying ineligible operation

22  regarding public housing, you understand that I'm

23  referring to the ineligible operation we've been

24  discussing.  It has been written in different ways, but

25  we're using that as a catchall term for our purposes

```
 1    right now.  Do you understand that?

 2        A    Yes.

 3        Q    We'll go through its evolution in a minute,

 4    but we're talking generally about that IO, to that type

 5    of particular function within housing.

 6             My question to you is, state for me what

 7    interest is advanced of Travelers by instituting,

 8    implementing and enforcing the ineligible operation

 9    regarding public housing?

10        A    So I'm struggling because of the way you've

11    posed the question, what interest is advanced.  I look

12    at it very basically in that subsidized or public

13    housing is a specialized type of housing that requires

14    knowledge of how the subsidies work, how they might be

15    administered in different jurisdictions, and how they

16    may change over time.  That would be knowledge that we

17    don't currently have today at Travelers that we would

18    need to gain, and as a result it doesn't -- this type

19    of operation doesn't fit within our operating model

20    within Travelers Express, which is a very fast,

21    efficient, low cost, low touch operating model.  So

22    we've designed our underwriting eligibility to capture

23    more low hazard, more easily defined risks that don't

24    require a lot of touch, both on the front end and on

25    the renewal side.  So that's why we see all of the
```

```
 1   occupancies on the ineligible operations list are all

 2   considered to be specialized, requiring some level of

 3   special knowledge and perhaps some special treatment.

 4          So I guess our interest is that the

 5   ineligible operations list allows us to sustain our

 6   operating model, low touch, quick, efficient, and not

 7   have to change that for other types of specialized

 8   occupancies that would require a different operating

 9   model.

10   Q    State for me, please, what interest is

11   advanced by Travelers by classifying Section 8 voucher

12   tenants renting dwellings within private rental

13   apartments owned and operated by private landlords,

14   what interest is advanced by Travelers by classifying

15   Section 8 as public housing or subsidized housing for

16   purposes of the ineligible operation?

17          MR. PETERSON:  Excuse me, object to the

18   form of the question as to the phrase interest advanced

19   as vague and ambiguous and also to the word

20   classification as vague.  You may answer the question.

21   A    So Travelers has subsidized housing in

22   Section 8 vouchers, or I should say subsidizing housing

23   as the language that would include Section 8 vouchers.

24   Because it's a different financial arrangement than a

25   traditional market rent, fully paid tenant paying rent
```

```
 1   voucher tenants renting in a private apartment that
 2   justify treating that apartment at risk as different
 3   from an identical apartment that doesn't happen to have
 4   a Section 8 voucher tenant?
 5              MR. PETERSON:  Object to the form of the
 6   question as compound and use of the word justifying as
 7   argumentative, mischaracterizes his prior testimony.
 8   You may answer the question.
 9        A    So the questions or concerns we may have is,
10   is it still a market rent for that subsidized unit, how
11   does the program change, and is it administered in a
12   different way in a different jurisdiction.  There's
13   also concerns, I've read some studies with regard to
14   Section 8 housing tenants may have a higher
15   preponderance of disability or mobility issues which
16   could lead to understanding the life safety concerns
17   that we would have underwriting apartment complexes.
18   There's the question about with regard to the financial
19   cash flow capital, whether the -- as a result is the
20   building owner getting sufficient funds to maintain the
21   property, and there could be others as well.  We
22   haven't studied really this realm of housing to know
23   the answers, but just the number of things that I've
24   brought up, you know, tells us that it's a specialized
25   realm within the housing segment, and as such would
```

 1    require a different underwriting approach than what we

 2    currently provide within Travelers Express with even a

 3    potential different way of pricing for it than what we

 4    have currently in Travelers Express.

 5    BY MR. BRANCART:

 6         Q    Currently Travelers Express, specifically --

 7    I'm sorry, prior to the 2nd Gen Travelers Express

 8    specifically required independent agents to populate

 9    the interface with cash flow data; is that correct?

10         A    So prior to 2nd Gen, there still would be a

11    connection to D&B, but that would be the extent of any

12    kind of financial information we would get.  The

13    challenge with underwriting --

14         Q    I'm sorry --

15              MR. PETERSON:  Can he finish his answer?

16              MR. BRANCART:  He can finish it, but

17    we're going to start asking some very specific yes or

18    no questions to examine this.  I would like you to

19    answer these yes or no, because we can go to the

20    website, which I haven't been provided, I got some

21    screen shots, I don't see this there, but you're going

22    to answer the questions about Travelers.  Do you want

23    to have him answer further now?

24              MR. PETERSON:  I would like him to

25    finish his answer.

```
 1   BY MR. BRANCART:
 2        Q    Please.
 3        A    I was going to say in small commercial it's a
 4   balance of what information we can readily access and
 5   get, and where do we have to understand based on our
 6   knowledge of the market what information we have to
 7   imply, so in a case around financials we don't ask
 8   specific questions.
 9        Q    So the answer to my question is Travelers
10   does not require independent agents to populate cash
11   flow data in the 1st Gen Travelers Express in terms of
12   the Apartment Pac, correct?
13        A    Correct.
14        Q    Travelers Express 1st Gen Apartment Pac, data
15   is required to be entered by the independent agent as
16   to when rents are collected by a landlord; is that
17   correct?
18        A    No.
19        Q    Number three is the rents that are charged by
20   a landlord, and specifically an algorithm that compares
21   those rents to the market rents for comparable housing,
22   is that built in to data that is gathered through 1st
23   Gen Travelers Express for Apartment Pac?
24        A    No, it's not.
25        Q    The amount of monies allocated or expended by
```

1    a landlord for maintenance of an apartment building, is

2    that populated by the independent agent, and therefore,

3    considered by Travelers?

4        A    That specific information isn't populated,

5    but what we do is look at the information around the

6    age of the building, updates that may have been made to

7    the building based on the age that's input.  We also

8    look at the amount of vacancy as another proxy for a

9    stable financially run apartment building, and really

10   use that in conjunction with knowing that in a

11   nonsubsidy situation the building owner is getting rent

12   through normal lease arrangement, and has the ability

13   to collect, or if not collect, begin down the path of

14   eviction in a way that -- we use that all as a proxy to

15   know that that should be sufficient.  The presence of

16   the subsidy creates enough difference that we would

17   have to understand that in a way that doesn't really

18   fit our model.

19       Q    Whether a private apartment building has a

20   Section 8 voucher holder as a tenant or not, Travelers

21   is still able to obtain information regarding the age

22   of that building, true?

23       A    Travelers has the ability to get that

24   information.

25       Q    And age of the building is something that

 1   Express interface by the agent, true?

 2       A    There is an ineligibility around vacancy.  If

 3   it's greater than -- they have to have occupancy of

 4   greater than 80 percent or greater to be considered

 5   eligible.

 6       Q    That information is available for a landlord

 7   who rents to one or more tenants who receives a Section

 8   8 voucher just as it would be for that very same

 9   landlord in the very same building if they did not rent

10   to one or more tenants who receives a Section 8

11   voucher, correct?

12       A    We would have to take the agents -- in both

13   cases we're taking the agents word for that.

14       Q    Let's put it in clearer terms.  There is

15   nothing causally connected with the presence or

16   nonpresence of a Section 8 voucher holder in effecting

17   the age of a building, whether updates were made to a

18   building, or the current vacancy rates of a building,

19   those are both independent variables, true?

20            MR. PETERSON:  Objection, lacks

21   foundation.

22       A    That would be true in my mind.

23   BY MR. BRANCART:

24       Q    Travelers Express requires that there be a

25   specific disclosure as to the nature of the rental

 1    agreement or lease that the landlord enters into with

 2    each of the tenants who rent in the apartment building.

 3    Is that correct?

 4         A    No, there's no requirement for that.

 5         Q    Well, it requires a disclosure of the

 6    mechanism by which the landlord will pursue eviction if

 7    money is not paid; isn't that correct?

 8         A    There is no specific stipulation within

 9    Travelers Express asking for that information.  As I

10    had stated earlier, when we define our appetite, it's

11    based on knowing, our knowledge, our business

12    knowledge, our risk taking appetite of a particular

13    class and type of business.  As a result, we structure

14    our underwriting questions and our underwriting rules

15    based on what we as a business, as a company understand

16    about that.  We understand the traditional apartment

17    building owner with nonsubsidized tenants collecting

18    rent on a monthly basis with a certain level of

19    occupancy and tenancy, and what they should be able to

20    do legally in the event that rent isn't paid in order

21    to sustain the appropriate level of cash flow.

22              In the event of a subsidy, including Section

23    8 vouchers, I couldn't explain to you today the

24    difference between a Section 8 voucher and any other

25    kind of subsidy, because we don't have the knowledge of

1    those programs within Travelers, and as a result,

2    that's why we don't have specialized knowledge, we

3    don't understand beyond the concerns of the financial

4    and management, and as I mentioned, mobility issues as

5    well as others, we just don't understand the risk, and

6    as a result have not built and researched it in a way

7    to build it into our operating model.  We view it, as I

8    believe the market does, as a more specialized kind of

9    risk within the housing market.

10        Q    You mentioned, of course, collection as a

11   concern, and you do request in Travelers Express 1st

12   Gen information about how it is that a landlord intends

13   to collect rent; is that correct?

14        A    No.

15        Q    You mentioned capital issues.  There is a

16   requirement in Travelers Express 1st Gen that there be

17   a disclosure of capital reserves, or some kind of

18   financial mechanism to ensure that landlords have

19   requisite capital to maintain their structures; is that

20   correct?

21        A    No.  We're looking at the level of occupancy

22   and the normal payment of rent as the primary piece of

23   information we need to make the assessment that we've

24   got enough stability.

25        Q    I'm glad you mentioned disability.  It is

1    Travelers practice and policy to compel landlords to

2    disclose which of their tenants are disabled in order

3    to submit an application through Travelers Express; is

4    that correct?

5         A    No.  We don't collect information on,

6    specific information of that nature on tenants.

7         Q    I understood that disability or mobility

8    impairments -- I'm sorry, it's mobility impairments.

9    You collect information on mobility impairments

10   regarding apartment buildings, and specifically the

11   mobility impairments of people living there as part of

12   the determination to qualify a landlord for an

13   Apartment Pac.

14        A    No, we don't.

15        Q    Travelers understands private rental housing

16   that doesn't have Section 8 or any subsidy; is that

17   your testimony?

18        A    Yes.

19        Q    Would you state for me the difference in the

20   eviction procedure between the state of California and

21   the state of Connecticut regarding the procedural

22   requirements and to what extent a landlord may request

23   back rents?

24             MR. PETERSON:  Excuse me.  Object to the

25   form of the question as calling for an opinion and is

```
 1   outside the scope of the deposition.  It is verging on
 2   harassment.
 3       A    I do not possess and we don't look at that
 4   level of detailed information.
 5   BY MR. BRANCART:
 6       Q    I'm sorry, let me -- there's an assumption
 7   that there is an ability to collect and evict tenants
 8   in a private market that somehow you believe is
 9   different from the Section 8 program, and you would
10   recognize that Travelers is in 50 different markets
11   with 50 different state jurisdictions governing 50
12   different sets of landlord tenant laws, you do
13   recognize that?
14       A    Yes.
15       Q    And you further recognize that there is
16   substantial difference among the 50 state codes
17   regarding eviction and collection of rents, true?
18            MR. PETERSON:  Objection.  Calls for a
19   legal opinion.  Outside the scope of the deposition.
20       A    It would be my understanding that 50
21   different states would have 50 different regulations.
22   BY MR. BRANCART:
23       Q    The importance of market rents, what is it
24   that -- put that aside.  Sir, what is it that -- let me
25   withdraw that.
```

1  raise one factor, and that was the change over time of

2  the Section 8 program.  So Travelers presently collects

3  information for purposes of 1st Gen Travelers Express

4  Apartment Pac from a landlord that you can assess the

5  creditworthiness and/or the ability to pay rent by any

6  of the tenants in the dwelling that Travelers is about

7  to insure; is that correct?

8            MR. PETERSON:  Excuse me.  I object to

9  the preface of the question as argumentative and

10 mischaracterizing testimony.  Go ahead.

11     A    No, we don't collect that information.  As I

12 said earlier, we collect -- we understand what the

13 operation is, and if it is private rental market with

14 no subsidy, then we make -- if there's been no losses,

15 they've been renting the building for a number of

16 years, we infer from that that there is an operation

17 that's running effectively.

18 BY MR. BRANCART:

19     Q    Identify for me then -- I think we've gone

20 through every factor.  Is there one I've missed that

21 you identified as factors that you thought were

22 distinguishing between Section 8 and -- let me finish.

23 Between a private landlord renting to one or more

24 Section 8 voucher holders and a private landlord, the

25 same landlord, identical landlord, identical building,

 1    think that's the only -- the existence of the presence

 2    of the subsidy is the only thing that I've been able to

 3    identify that you've been able to provide to me.  Have

 4    I missed -- is there anything else?

 5                    MR. PETERSON:  Objection.  Asked and

 6    answered, mischaracterizes his testimony, and calls for

 7    speculation as to what you've missed.

 8        A    It's the presence of the subsidy that creates

 9    the distinction of trying to understand that it's

10    different.

11    BY MR. BRANCART:

12        Q    So let's talk about the absence of the

13    subsidy then.  State for me what are the assumptions

14    that are made by Travelers regarding private apartment

15    buildings where there is no Section 8?

16        A    We set forth in our eligibility guidelines

17    certain criteria.  I can't name them off the top of my

18    head, but a certain number of years in business, prior

19    insurance coverage, loss activity, age of the building,

20    certain age, upkeep of the building.  We capture this

21    information to get a snapshot of the upkeep, the

22    management, the finances of the business.  That is the

23    information that we use in order to determine whether a

24    risk is acceptable or not.

25        Q    All of which is available whether that

1    landlord accepts one Section 8 person or doesn't accept

2    any, true?

3         A    I'm not --

4         Q    The criteria you just listed, sir, is equally

5    available for a landlord who has no Section 8 tenants

6    and a landlord who one Section 8 tenant, true?

7         A    The same information is available, but it is

8    the existence of the subsidy, again, that creates the

9    question.

10        Q    So let's talk about the absence of the

11   subsidy.  What is it about apartment buildings with an

12   absence of a subsidy.  What assumptions do you make

13   that render that risk understandable whereas a landlord

14   who happens to have one of 15 tenants with a Section 8

15   voucher makes that risk alien, or unknowable, or

16   unknown?

17        A    It comes down to how the subsidies work and

18   the payment to the insured, and do those ever lapse.

19   It really comes down to understanding the variety of

20   subsidies that could occur, do they, are they paid

21   differently, is market rent calculated in a different

22   way.  There are just a number of questions that would

23   still come to mind, you know, to --

24        Q    I would like you to state all of them.

25        A    I don't know that I can state all of them.  I

 1    stated several.  There likely could be more, but again,

 2    without studying it and understanding it, it's a part

 3    of the habitational market that we've stayed away from

 4    because we don't understand it, and there hasn't really

 5    been a need for us to understand it based on our

 6    ability to write business in the housing market, and

 7    it's my understanding that there are markets available

 8    for subsidized housing.

 9        Q    I don't think you've added any new factors,

10    but let's go through them.  One is concern about a

11    lapse of payment of rent.  You identified that that was

12    something that was unknown, and yet there is no data

13    that is collected by Travelers under the original

14    Travelers Express or the 2nd Gen for Apartment Pac that

15    ascertains any data regarding lapse of rents, true?

16              MR. PETERSON:  Objection, argumentative,

17    asked and answered.

18        A    It is true.

19    BY MR. BRANCART:

20        Q    There is no data that is gathered by

21    Travelers Express regarding Apartment Pac that

22    determines whether the rents that are being charged by

23    the landlord are at market or not, true?

24        A    That's true, but I would say we infer that in

25    the private rental market that is part of our defined

```
 1    BY MR. BRANCART:

 2        Q    Did you have any role in gathering, compiling

 3    the information that is set forth in these

 4    interrogatory responses which is Exhibit 209?

 5        A    Yes.

 6        Q    State for me what role you had in gathering

 7    information that appears in Exhibit 209.

 8        A    Well, I discussed the various interrogatory

 9    questions and responses as part of a discussion of this

10    case and helping to provide understanding to the

11    underwriting guidelines that we have in place with

12    regard to Apartment Pac, and then also talk to a number

13    of individuals to understand the history of those

14    guidelines.

15        Q    Sir, you verified these interrogatories,

16    correct?

17        A    For Exhibit 209 you're saying, yes.

18        Q    That's your signature that appears there,

19    correct?

20        A    Yes.

21        Q    Sir, would you please identify for me the

22    niche insurers who serve private landlords renting on

23    the private housing market but who happen to have one

24    or more Section 8 tenants?

25        A    I don't know that I understand that level of
```

 1    a niche.  I do know that for subsidized housing

 2    insurance there are markets that specialize in it.  I

 3    know Philadelphia Insurance has a program, I know Wells

 4    Fargo is a broker, they have a special program for

 5    subsidized housing insurance.  I have not seen a

 6    special niche of Section 8 only housing defined within

 7    the marketplace as a specialized niche.

 8        Q    Sir, regarding private rental housing that

 9    happens to rent to one or more -- that happens to rent

10    to one or more -- are you referring to the

11    interrogatories again, sir, 209?

12        A    I thought you were, I'm sorry.

13        Q    Could you please identify for me any insurer

14    who has developed specialized knowledge regarding

15    insuring private apartments that happen to rent to one

16    or more Section 8 tenants?

17        A    I don't know if there is an insurer that's

18    got that level of specialization.  It's not a marked

19    that we've actively looked to understand since it's

20    part of our ineligibility guidelines.  I am aware that

21    subsidized, for subsidized housing there are special

22    programs --

23        Q    Are you referring back to the interrogatories

24    again, sir?

25        A    No, I thought you were, so I'm sorry for

1    following suit.

2         Q    No, I'm just asking for your knowledge?

3              MR. PETERSON:  So let him finish his

4    answer.

5         A    So as you've narrowly asked the question

6    around private housing market with Section 8 tenants,

7    I'm not aware of a specialized carrier that is handling

8    that narrow market.  I am aware that there are

9    specialized carriers looking at the subsidized housing

10   market, and I believe that's inclusive of Section 8 as

11   well.

12        Q    Why do you form that belief -- let me ask you

13   this.  That's just an assumption that you're making; is

14   that correct?

15        A    Well, no.  As I was engaging in some of this

16   research I did a Google search on subsidized housing

17   insurance and saw that there are companies marketing to

18   this, and I looked on those websites and saw how they

19   were -- how their applications were set up, and what

20   kind of information they were asking for.

21        Q    Sir, let me ask the question again.  I asked

22   if you had identified all the documents that you had

23   reviewed, and perhaps I should have been clearer when I

24   talk about documents.  I meant the electronically

25   stored information or e-mails.  I don't just mean

```
 1   to use in ascertaining the existence of the attribute
 2   you identified for determining the distinction between
 3   public and nonpublic housing?
 4        A    There's no tool that we ask our agents to
 5   use.  We ask them to talk to the insured and get the
 6   answer to that question.
 7        Q    What definition do you provide to the
 8   agents -- strike that.
 9             Do you provide the attribute that you've
10   identified for distinguishing public from nonpublic
11   housing to the agents so they can communicate
12   consistently with the insureds or prospective insureds?
13        A    We provide our agents with the ineligible
14   operations list and the underwriting guidelines as the
15   direction for engaging with the insureds to answer the
16   questions.
17        Q    So there's no specific provision -- I think
18   you identified that it was owned and operated by the
19   government for public housing, that specific attribute
20   is not provided to the agents; is that correct?
21        A    No, it's not.  The only attribute that's
22   provided or the only words that are provided are the
23   ineligible operations wording.
24        Q    What is government funded housing?
25        A    It's housing that receives funding from the
```

Kearney, Brian

```
 1    BY MR. BRANCART:

 2        Q    Well, for purposes of the application of the

 3    ineligible operation for government funded housing

 4    complexes, does government funding for purposes of

 5    housing construction, is that an attribute that would

 6    convert nongovernmental housing into governmental

 7    funded housing?

 8                  MR. PETERSON:  Objection, overbroad.

 9    Calls for a hypothetical.

10        A    It could.  We've never been asked to define

11    the question to that level.

12    BY MR. BRANCART:

13        Q    Is a governmental funded or backed mortgage

14    an attribute that would convert nongovernmental housing

15    into governmental housing for purposes of the

16    application of the ineligible operation?

17                  MR. PETERSON:  Objection, compound.

18        A    We've never defined the terms to that extent,

19    so...

20    BY MR. BRANCART:

21        Q    Would you please provide me with an example

22    of government funded housing?

23        A    I think my example would be similar to the

24    example I gave around public housing.  We don't

25    necessarily define the terms differently between
```

1    subsidized government funded or public housing.  We

2    don't discern differences there.

3         Q    Could you give me an example of government

4    funded housing as the term is used within the

5    ineligible operation?

6              MR. PETERSON:  Objection, asked and

7    answered.  Calls for a hypothetical.

8         A    I don't have the expertise on government

9    funded or publicly funded or public housing to be able

10   to give you an example in this realm.

11   BY MR. PETERSON:

12        Q    Please identify for me the instrument or tool

13   that Travelers presently employs to ascertain the

14   presence of this attribute you identified for

15   government funded housing which is capitalization and

16   financing from the government?

17        A    Travelers doesn't have a tool for that.  We

18   ask our agents to get that information.

19        Q    What tool or instrument does Travelers

20   instruct its agents to utilize in connection with

21   ascertaining the attribute you've identified which is

22   capitalization or funding or financing in part from the

23   government?

24              MR. PETERSON:  May I have that question

25   read back?

1                    (Record read by the court reporter.)

2        A    There is no specific tool.  We ask our agents

3    to talk to their insureds and ascertain, ask the

4    question, provide the answer.

5    BY MR. BRANCART:

6        Q    You've identified a specific attribute as

7    capitalization or financing in part from a governmental

8    source.  Does Travelers instruct its agents to utilize

9    that question in determining whether or not a dwelling

10   falls within the ineligible operation?

11       A    No, we don't ask that question individually.

12   We ask our agents to look --

13       Q    I'm sorry?

14               MR. PETERSON:  Can you speak up?

15       A    We ask our agents to review the ineligible

16   operations list with the insured.

17   BY MR. BRANCART:

18       Q    But there's no specific tool or instrument

19   that you ask them to utilize, correct?

20       A    Correct.

21       Q    The ineligible operation we're discussing is

22   subsidized, quote, government funded, quote, or public

23   housing complexes, end quote.  It's written in the

24   disjunctive.  Would you please state for me the

25   attributes or characteristics that distinguish public

```
 1   words for our staff or our agents.
 2        Q    What instrument or tool is utilized by
 3   Travelers today in order to distinguish subsidized from
 4   nonsubsidized housing?
 5             MR. PETERSON:  Objection, asked and
 6   answered.
 7        A    There is no specific tool.  We ask our agents
 8   to work, to use our ineligible operations list in
 9   discussing their operations with their insured.
10   BY MR. BRANCART:
11        Q    What specific instrument or tool is utilized
12   or are agents instructed to use in determining the
13   distinction between subsidized and nonsubsidized
14   housing?
15        A    The agents aren't provided a specific tool.
16   They're provided with our eligibility guidelines and
17   our ineligible operations list as the means to work
18   with their insureds.
19        Q    When you say eligibility guidelines, what are
20   you referring to?
21        A    The underwriting, the guidelines that we --
22   they're one of the exhibits that we have.
23        Q    Exhibit, I think, 36 that we looked at.
24             MR. PETERSON:  The witness is looking at
25   Exhibit 237.
```

```
 1        A    I'm talking about the ineligible operations

 2   list and the Apartment -- it's Exhibit 3948, Travelers

 3   Apartment Pac and Apartment Pac Plus guide, shows

 4   eligibility, general product features, underwriting

 5   guidelines.

 6                 MR. PETERSON:  Counsel, my witness is

 7   getting tired, I'm getting tired.  Can we take a break

 8   shortly?

 9                 MR. BRANCART:  We can.  Let me just

10   finish this question.

11   BY MR. BRANCART:

12        Q    So you were going to identify for me the

13   eligibility guidelines that are provided, and you can

14   just reference it by the Bates numbers on the bottom,

15   if you want.

16        A    Yes, it's 3948 and 3954.

17        Q    Sir, what are the attributes that distinguish

18   the term government funded housing from subsidized

19   housing as those terms are used in the ineligible

20   operations definition?

21                 MR. PETERSON:  Objection, asked and

22   answered.

23        A    We don't have any separate attributes that we

24   provide our agents and internal staff.  We just use our

25   underwriting guidelines in the ineligible list.
```

```
 1    BY MR. BRANCART:

 2        Q    Please state for me on behalf of Travelers

 3    what differences are there in these two separate terms

 4    presented in the disjunctive in the ineligible

 5    operation subsidized housing versus government funded

 6    housing?

 7               MR. PETERSON:  Counsel, you've asked

 8    this question several times, he's answered it several

 9    times.

10        A    We don't provide any specific further

11    direction other than the words that are in the

12    ineligible operations list.

13               MR. PETERSON:  Let's take a break.

14               MR. BRANCART:  I'm just going to ask

15    this last question if I could.

16    BY MR. BRANCART:

17        Q    I'm not asking you for what you provide, I'm

18    asking you for what Travelers intends to communicate by

19    having those two different terms written in the

20    ineligible operation.

21               MR. PETERSON:  Asked and answered.

22        A    And I thought I had answered it already.  We

23    let those words speak for themselves.  We have not

24    gotten any questions asking to better clarify either

25    internally or from our agents, and as a result, we
```

```
 1    haven't clarified them in any greater detail.

 2    BY MR. BRANCART:

 3        Q    Last question is, could you please draw then

 4    the distinction in meaning between public housing and

 5    subsidized housing as those terms are used in the

 6    ineligible operation?

 7                   MR. PETERSON:  Objection, asked and

 8    answered.

 9        A    Again, we don't spend -- we have no direction

10    internally or externally to our agents defining those

11    terms in any more detail than how they're listed in the

12    ineligible operations list.

13                   MR. PETERSON:  Let's take a break.

14    We're going off the record.

15                   (Recess:  5:43 p.m. to 5:55 p.m.)

16    BY MR. BRANCART:

17        Q    Sir, was there any distinction or meaning

18    that Travelers intended to communicate in identifying

19    public as well as subsidized housing in the ineligible

20    operation?

21        A    There was no further clarification of those

22    words.

23        Q    Was there any meaning that Travelers intended

24    to communicate by indicating subsidized along with

25    government funded and public housing in the ineligible
```

```
 1   BY MR. BRANCART:

 2        Q    More landscaping activities?

 3                  MR. PETERSON:  Same objection.

 4        A    Not that I'm aware of.

 5   BY MR. BRANCART:

 6        Q    More repair activities?

 7                  MR. PETERSON:  Same objection.

 8        A    Not that I'm aware of, although, again, the

 9   question of subsidized tenants does bring the

10   underwriting question of is there sufficient funding

11   for upkeep and maintenance of premises.

12   BY MR. BRANCART:

13        Q    And the information that's gathered by

14   Travelers to ascertain whether or not there is

15   sufficient funding for an apartment to maintain itself

16   or to have maintenance, what is the instrument that's

17   used in Travelers Express?

18        A    There's no specific instrument used.  It's

19   inferred in the fact that there is no rental subsidy

20   for any of the tenants.  It's inferred that the insured

21   is getting the best market rate they can for the unit,

22   and as a result, that based on other factors, looking

23   at age, updates to the building and loss information,

24   that they are able to maintain the property

25   effectively.
```

```
 1   Pac, true?
 2              MR. PETERSON:  Objection, overbroad.
 3        A     We use our ineligibility, ineligible
 4   operations guidelines in that regard.
 5   BY MR. BRANCART:
 6        Q     Perhaps I need to restate my question.
 7   Travelers does not utilize any instrument or collect
 8   data in association with its Travelers Express
 9   automatic underwriting system for Apartment Pac, it
10   doesn't gather data on any of these when people are
11   paying their rents, whether or not there is a change in
12   rental rates, and I believe you made one other -- oh,
13   the amount of rents paid.  That's just not gathered?
14        A     No.  Again, it's inferred that in the private
15   housing market that a well maintained apartment
16   building will get the highest market rate available,
17   and we look at things like vacancy and building age and
18   upkeep and any loss activity as signs of either
19   corroborating that inference or suggesting that that's
20   not true in a given case or not.
21        Q     Sir, does the presence of a Section 8 renter
22   in a private housing apartment lead to lower rates of
23   preventative maintenance?
24              MR. PETERSON:  Objection, asked and
25   answered.
```

```
 1    BY MR. BRANCART:

 2         Q    And the question raised is what, sir?

 3              MR. PETERSON:  Asked and answered.

 4         A    Is there sufficient funding available in

 5    order to maintain housekeeping.

 6    BY MR. BRANCART:

 7         Q    And that is sufficient funding because a

 8    subsidy is involved?

 9         A    Yes.

10         Q    Sir, does the presence of a Section 8 renter

11    in a privately owned and operated apartment complex

12    lead to lower rates of renter's insurance being

13    obtained by tenants?

14         A    I don't know.

15         Q    Does Travelers Express for the Apartment Pac

16    ask whether or not any of the tenants have renter's

17    insurance?

18         A    No, it doesn't.

19         Q    Sir, is there a separate risk retention group

20    for private landlords that rent to one or more Section

21    8 tenants?

22         A    Not that I'm aware of.

23         Q    Is there any association with the number of

24    Section 8 tenants renting in a private apartment

25    complex and the risk of loss?
```

```
 1    BY MR. BRANCART:

 2        Q    Would you identify for me the person who

 3    developed -- the person or persons who developed,

 4    reviewed, or approved this language of this ineligible

 5    operation?

 6        A    I don't know who was involved in developing

 7    that language.

 8        Q    Sir, I want to direct your attention to

 9    Exhibit 215.  Do you recognize Exhibit 215?

10        A    Yes.

11        Q    What is it?

12        A    Exhibit 215 is the St. Paul Travelers Master

13    Pac Apartment Pac underwriting criteria and general

14    criteria and property criteria.  It's the underwriting

15    criteria for the various lines of business for

16    Apartment Pac.

17        Q    During what period of time was this the

18    underwriting criteria that governed Apartment Pac?

19        A    This would have been -- this was the

20    eligibility that was put in place after the merger and

21    prior to the completion and implementation of the 2005

22    CURE.

23        Q    When you say after the merger, you're

24    referring to the 2004 St. Paul Travelers merger?

25        A    Yes.
```

1    Q    I direct your attention, please, to the page

2    that ends in Bates 22.  This is the ineligible

3    operation list in connection with those underwriting

4    standards, correct?

5    A    Yes.

6    Q    Sir, it identifies two relevant entries, one

7    says public housing including Section 8 properties, the

8    other says subsidized or government funded complexes.

9    Do you see that?

10   A    Yes.

11   Q    Would you please state for me why this

12   language change occurred from Exhibit 213, which was

13   the referral rule that we looked at, and what we see

14   here in Exhibit 215?

15   A    So, I can't speak to specifically why this

16   wording was chosen.  I can say that when the two

17   companies came together in the small commercial space

18   teams were looking at the guidance from both companies

19   and bringing those together in a way that would come

20   together as one set of guidance.

21       MR. PETERSON:  Excuse me.  Counsel, I do

22   want to forewarn you, as we briefly discussed off the

23   record at our last break, we do intend to end this

24   deposition after seven hours on the record.

25       I understand that you made a statement

```
 1   to me that you believe the Federal Rules require that

 2   you be permitted enough time to conduct a fair

 3   examination.

 4              As I said to you, I think that you will

 5   have examined Travelers pursuant to your 30(b)(6)

 6   notice for 14 hours, including the deposition of Brad

 7   Wood, and I do note that according to my notes it was

 8   about four hours into the deposition today before you

 9   asked the witness a question about subsidized housing.

10              So I understand you preserve your

11   rights, but I do want to forewarn you that we are

12   adjourning the deposition after seven hours.  So I

13   think we're getting close.

14   BY MR. BRANCART:

15       Q    Sir, would you please identify for me who, or

16   which group of persons determined the language that

17   appears on page 22 of Exhibit 215?

18       A    I don't know who put those words together.

19       Q    Please identify who reviewed and approved the

20   inclusion of this language?

21       A    I don't know who reviewed or approved the

22   language.

23       Q    Sir, please state for me why it is that the

24   language, quote, Including Section 8 properties, is

25   included here in conjunction with public housing?
```

```
 1        A    I don't know.  I don't know why that specific

 2   wording exists.

 3        Q    Sir, I would like to direct your attention

 4   now to Exhibit 216.  Please identify this exhibit for

 5   us.

 6        A    These are underwriting guidelines for the

 7   apartment segment for St. Paul Travelers.  I was

 8   hesitating -- I was looking for a date.  It dates to

 9   2005.

10        Q    Would you please state for me during what

11   time period these underwriting guidelines, including

12   their statement of the ineligible operations, were in

13   force at Travelers, then as Travelers St. Paul?

14        A    So these were in force from 2005 until the

15   time we changed the wording as a result of the 2005

16   Habitational CURE, Apartment CURE.

17        Q    This wording that appears here on the page

18   Bates ending in 94 appears to be identical to that that

19   appears in the prior Exhibit 215.  Am I seeing that

20   correctly?

21        A    Yes.

22        Q    Sir, I would like to direct your attention to

23   Exhibit 217.  Would you please identify this document

24   for us?

25        A    It looks like it's an internal document that
```

 1   notes recommended changes to the Master Pac and Pac

 2   plus agents manual and the internal manual outlining

 3   changes to portions of the Apartment Pac section of the

 4   manual.

 5        Q    Do you understand this to be a document that

 6   was created in the course of the 2005 CURE process?

 7        A    That's my understanding.

 8        Q    I direct your attention to the third bullet,

 9   quote, Remove public housing including Section 8

10   properties on the ineligible list.  Do you see that?

11        A    Yes.

12        Q    Who is it that made that recommendation?

13        A    I don't know.

14        Q    Who approved that recommendation?

15        A    I don't know.

16        Q    I direct your attention to the next bullet,

17   quote, Revise subsidized or government funded complexes

18   to read subsidized public or government funded

19   complexes on the ineligible list.

20             Who determined that that language,

21   recommended that that language change should be made?

22        A    I don't know.  It came out of the CURE, but I

23   don't know who specifically came up with that wording.

24        Q    Who approved that language change?

25        A    I don't know.

```
 1                            JURAT

 2

 3        I, BRIAN KEARNEY, do hereby certify that the

 4   foregoing testimony taken on September 19, 2014, is

 5   true and accurate, including any corrections noted on

 6   the corrections page, to the best of my knowledge and

 7   belief.

 8

 9
                     _____
10                             BRIAN KEARNEY

11

12

13

14

15       At _____ in said county of _____,

16   this _____day of _____, 2014, personally

17   appeared BRIAN KEARNEY, and he made oath to the truth

18   of the foregoing corrections by him subscribed.

19

20

21   Before me,_____, Notary Public

22   My commission expires:

23

24

25
```

```
 1              CERTIFICATE OF REPORTER

 2       I, Robin Balletto, a Registered Professional

 3   Reporter/Notary Public within and for the State of

 4   Connecticut, do hereby certify there came before me, on

 5   the 19th day of September, 2014, the following named

 6   person, to wit:  BRIAN KEARNEY, who was by me duly

 7   sworn to testify to the truth and nothing but the

 8   truth; that he was thereupon carefully examined upon

 9   his oath and his examination reduced to writing under

10   my supervision; that this deposition is a true record

11   of the testimony given by the witness.

12            I further certify that I am neither counsel

13   for, related to, nor employed by any of the parties to

14   the action in which this deposition is taken; and

15   further, that I am not a relative or employee of any

16   attorney or counsel employed by the parties hereto, nor

17   financially or otherwise interested in the outcome of

18   the action.

19       WITNESS my hand and affixed my seal this 23rd day

20   of September, 2014.

21                              Robin L. Balletto

22                    _____

23                         Robin Balletto, RPR

24

25   My commission expires:  October 31, 2018
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

LINCOLN JONES, JR. and
MUYESSER NILE JONES,
individually and as trustees
of the Lincoln and M. Nile
Jones Revocable Trust; and
PROJECT SENTINEL, INC.,

       Plaintiffs,

vs.                    Case No.
                       CV 13-02390 LHK PSG

TRAVELERS CASUALTY INSURANCE
COMPANY OF AMERICA,

       Defendant.

                      /

VIDEOTAPED 30(B)(6) DEPOSITION OF BRIAN KEARNEY

VOLUME II

PAGES 263 to 420

DATE:          Tuesday, November 4, 2014

TIME:          1:12 p.m. - 4:43 p.m.

LOCATION:      Carlson Calladine & Peterson, LLP
               353 Sacramento Street, 16th Floor
               San Francisco, California

REPORTED BY:   SHELLEY M. SAILOR
               California CSR No. 10254

               MBreporting
               111 Deerwood Road, Suite 200
               San Ramon, CA 94583
               (925) 989-6080

|   |   |   |
|---|---|---|
|        | 1  | reporter please administer the oath. |
|        | 2  | BRIAN KEARNEY, |
|        | 3  | called as a witness and, having been by me duly |
|        | 4  | sworn, was thereupon examined and testified as |
|        | 5  | hereinafter set forth. |
|        | 6  | EXAMINATION (RESUMED) BY MR. BRANCART |
|        | 7  | Q.  Good afternoon, sir.  Would you please |
|        | 8  | state your full name and spell your last name. |
|        | 9  | A.  Brian Kearney, K-e-a-r-n-e-y. |
| 01:14  | 10 | Q.  Please state your current business address. |
|        | 11 | A.  Is One Tower Square, Hartford, Connecticut. |
|        | 12 | Q.  And ZIP code, please.  If you know it. |
|        | 13 | A.  That, I'm afraid I don't recall. |
|        | 14 | Q.  That's no problem.  State your current |
| 01:14  | 15 | business telephone. |
|        | 16 | A.  Is 860-954-7522. |
|        | 17 | Q.  State your current business email. |
|        | 18 | A.  Is btkearne@travelers.com. |
|        | 19 | Q.  Since your last deposition on |
| 01:14  | 20 | September 19th, 2014, have your job duties changed? |
|        | 21 | A.  No, they haven't. |
|        | 22 | Q.  Since your last deposition on |
|        | 23 | September 19th, 2014, have the persons for the job |
|        | 24 | titles that report to you changed? |
| 01:14  | 25 | A.  I do have one new employee. |

|        |    |                                                      |
|--------|----|------------------------------------------------------|
|        | 1  | A.   No, it is not.                                  |
|        | 2  | Q.   Sir, would you please go ahead and direct       |
|        | 3  | your attention to the far right-hand corner of the   |
|        | 4  | first page of Exhibit 306.  One of the columns       |
| 01:44  | 5  | reads, "Companion Rules BRID."  Do you see that?     |
|        | 6  | A.   Yes.                                            |
|        | 7  | Q.   What information is recorded in that            |
|        | 8  | column?                                              |
|        | 9  | A.   Nothing on this exhibit.                        |
| 01:44  | 10 | Q.   If there were data populating that column,      |
|        | 11 | what would it represent?                             |
|        | 12 | MR. FRANKEL:  Object to form.                        |
|        | 13 | THE WITNESS:  It's a -- this is a way for            |
|        | 14 | us to aggregate rules that may apply in same or      |
| 01:45  | 15 | similar situations.  It's a way for us to manage our |
|        | 16 | rules.                                               |
|        | 17 | BY MR. BRANCART:                                     |
|        | 18 | Q.   Okay.  Sir, immediately to the right of         |
|        | 19 | that there is a column that says, "CW."  Do you see  |
| 01:45  | 20 | that?                                                |
|        | 21 | A.   Yes.                                            |
|        | 22 | Q.   What does CW stand for?                         |
|        | 23 | A.   Countrywide.                                    |
|        | 24 | Q.   To the right of that is AL, and it proceeds     |
| 01:45  | 25 | on to the end of page AI.  These are initials for    |

| | | |
|---|---|---|
| | 1 | states.  Correct? |
| | 2 | A.  Yes. |
| | 3 | Q.  Proceed to the next page.  We have initials |
| | 4 | for the balance of the states that comprise the |
| 01:45 | 5 | Continental United States.  Correct? |
| | 6 | A.  Yes. |
| | 7 | Q.  And I should say also Hawaii and Alaska. |
| | 8 | So it's not just the Continental United States. |
| | 9 | They comprise the United States.  Correct? |
| 01:45 | 10 | A.  Yes. |
| | 11 | Q.  What information is to be recorded there? |
| | 12 | A.  Some of our rules can apply for a specific |
| | 13 | state, geographic regions, and so that's a way for |
| | 14 | us to track how those rules are applying. |
| 01:46 | 15 | Q.  If, for example, a state outlawed |
| | 16 | explicitly discrimination against assisted living |
| | 17 | facilities, one of the ineligible operations, that |
| | 18 | rule would be populated here.  Is that correct? |
| | 19 | MR. FRANKEL:  Object to form.  Foundation. |
| 01:46 | 20 | THE WITNESS:  We would have to populate a |
| | 21 | field for a specific state in the event that the |
| | 22 | state had a specific requirement.  The way you |
| | 23 | stated your question, we would actually have to |
| | 24 | split out assisted living as a separate rule and |
| 01:46 | 25 | then apply it to that state. |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | BY MR. BRANCART:                                       |
|          | 2  |    Q.  And it would be documented here in the |
|          | 3  | rules inventory adjacent to the state code with some   |
|          | 4  | kind of indicator.  Correct?                           |
| 01:46    | 5  |      MR. FRANKEL:  Object to form.  Foundation. |
|          | 6  |      THE WITNESS:  Yes.  If that were the case. |
|          | 7  | BY MR. BRANCART:                                       |
|          | 8  |    Q.  There are no individualized state   |
|          | 9  | indicators listed in this rule set.  Correct?          |
| 01:47    | 10 |    A.  Correct.                         |
|          | 11 |    Q.  As far as you know, there were no |
|          | 12 | separately programmed criteria on an individual        |
|          | 13 | state basis during the period of time that             |
|          | 14 | Exhibit 306 reflected the rules inventory for IENet,   |
| 01:47    | 15 | also referred to as Travelers Express.  True?          |
|          | 16 |    A.  Yes.                             |
|          | 17 |      MR. FRANKEL:  Object to form. |
|          | 18 | BY MR. BRANCART:                                       |
|          | 19 |    Q.  Direct your attention to Exhibit 307.  The |
| 01:47    | 20 | testimony you provided for Exhibit 306 is              |
|          | 21 | substantially similar to what you provide here in      |
|          | 22 | terms of identifying these columns.  Is that           |
|          | 23 | correct?                                               |
|          | 24 |      MR. FRANKEL:  Object to form. |
| 01:47    | 25 |      THE WITNESS:  Yes.       |

|  |  |  |
|---|---|---|
|  | 1 | BY MR. BRANCART: |
|  | 2 | Q.  Is there anything that is unique -- strike |
|  | 3 | that. |
|  | 4 | Is there anything that you testified about |
| 01:47 | 5 | Exhibit 306 in terms of column identification that |
|  | 6 | does not apply here to Exhibit 307? |
|  | 7 | MR. FRANKEL:  Object to form.  Vague and |
|  | 8 | ambiguous, compound. |
|  | 9 | THE WITNESS:  No.  I don't believe so. |
| 01:48 | 10 | BY MR. BRANCART: |
|  | 11 | Q.  This, then, would be the rule set for the |
|  | 12 | effective period in California from October 2013 to |
|  | 13 | present.  Correct? |
|  | 14 | A.  Yes. |
| 01:48 | 15 | Q.  It has at the top of the page "Rule |
|  | 16 | Effective Date."  Do you see that? |
|  | 17 | A.  Yes. |
|  | 18 | Q.  It says, "July 9th, 2011."  Do you see |
|  | 19 | that? |
| 01:48 | 20 | A.  Yes. |
|  | 21 | Q.  What does that date indicate? |
|  | 22 | A.  That was the date the rule first became |
|  | 23 | effective in the second gen Travelers Express |
|  | 24 | system. |
| 01:48 | 25 | Q.  And do you know a list of states as to how |

```
 1    it rolled out?

 2         A.   I don't have that with me.

 3         Q.   Sir, would you please go ahead and direct

 4    your attention to the Bates 157138 of Exhibit 307.

01:49  5    And specifically directing your attention to the

 6    column that is CW for countrywide.  Correct?

 7         A.   Yes.

 8         Q.   You see that?

 9         A.   I am there.  Yeah.

01:49 10         Q.   There is an X indicated there.  Do you see

11    that?

12         A.   Yes.

13         Q.   What does that X mean?

14         A.   That means that this rule applies on a

01:49 15    countrywide basis.

16         Q.   And the very same X appears in the prior

17    exhibit, Exhibit 306.  Is that correct?

18         A.   Yes.

19         Q.   To the top, the CW, we have the state codes

01:50 20    AL up to KY for Kentucky.  Correct?

21         A.   Yes.

22         Q.   On the next page we have WY for Wyoming

23    down to LA for Louisiana.  Correct?

24         A.   Yes.

01:50 25         Q.   What is the purpose of having the separate
```

```
          1   state categories?

          2            MR. FRANKEL:  Object to form, foundation.

          3            THE WITNESS:  Some of our rules could apply

          4   at just a state level, and so that's why this table

01:50     5   is built, to show that.

          6   BY MR. BRANCART:

          7      Q.   There are -- there is no data recorded

          8   adjacent to any of the states that are identified

          9   here on the Bates pages 138 and 139.  True?

01:50    10      A.   Correct.

         11      Q.   There were no separate rules recorded for

         12   any of the states in terms of the second gen rules

         13   inventory that governed the operation of second gen.

         14   True?

01:51    15            MR. FRANKEL:  Object to form, foundation.

         16            THE WITNESS:  For this particular rule, the

         17   Apartment Pac --

         18            MR. BRANCART:  Right.

         19            THE WITNESS:  -- segment eligibility.

01:51    20   BY MR. BRANCART:

         21      Q.   Yes.  Exactly.  That's for what we're

         22   looking at here.

         23      A.   Yes.

         24      Q.   If there were specific state-based rules

01:51    25   that applied to this particular rule inventory for
```

|  |  |  |
|---|---|---|
| | 1 | apartment -- Apartment Pac second gen Travelers |
| | 2 | Express, what would be indicated here adjacent to |
| | 3 | one of the state codes on 138 and 139? |
| | 4 | MR. FRANKEL:  Object to form. |
| 01:51 | 5 | THE WITNESS:  There would be an X placed |
| | 6 | next to the state. |
| | 7 | BY MR. BRANCART: |
| | 8 | Q.  Sir, would you please give me an example -- |
| | 9 | strike that. |
| 01:51 | 10 | Exhibit 306 and 307 are the rules inventory |
| | 11 | for the ineligible operation associated with the |
| | 12 | Travelers Express Apartment Pac system.  True? |
| | 13 | A.  Yes. |
| | 14 | Q.  And that's all that's represented here. |
| 01:52 | 15 | Correct? |
| | 16 | A.  Yes. |
| | 17 | Q.  Give me an example of a situation where |
| | 18 | there is a state unique rule that would affect the |
| | 19 | rules inventory in the Travelers Express system. |
| 01:52 | 20 | A.  We could have a rule and do have rules in |
| | 21 | some of our coastal eastern states where we require |
| | 22 | a certain wind deductible based on the location of |
| | 23 | the property.  So that would be an example where |
| | 24 | there would be a state-specific rule for property |
| 01:52 | 25 | coverage. |

Jones v. Travelers

```
         1    Q.   Okay.  Exhibit 307 sets forth the rules

         2    inventory that have been in place from the effective

         3    date as indicated on the first page, July 9th, 2011

         4    to present.  Correct?

01:53    5    A.   Yes.  This is when it first went in place

         6    in the system.  In that system.

         7    Q.   During that period of time, July 9th, 2011

         8    to today, there have been no separate rules

         9    identified on a state-by-state basis for Travelers

01:53    10   Express for the date reported here -- I should say

         11   the function reported here, the ineligible

         12   operation.  Is that correct?

         13        MR. FRANKEL:  Objection.  Foundation,

         14   beyond the scope.

01:53    15        THE WITNESS:  That's correct with regard to

         16   this rule.

         17   BY MR. BRANCART:

         18   Q.   And regarding the prior document,

         19   Exhibit -- what was the prior document?  Was it 306?

01:53    20   Yeah.  Exhibit 306, there is no X populated next to

         21   any of the states.  Correct?

         22   A.   Correct.

         23   Q.   And there were no specific state-based

         24   rules that governed the operation of Travelers

01:54    25   Express during the period of time it was the
```

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | so-called first gen or from its effective date              |
|         | 2  | July 1st, 2006 till it was superseded by second gen         |
|         | 3  | as reflected in Exhibit 307.  Is that correct?              |
|         | 4  | MR. FRANKEL:  Object to form.                                |
| 01:54   | 5  | THE WITNESS:  Yes, with regard to the                       |
|         | 6  | ineligible operations.                                      |
|         | 7  | BY MR. BRANCART:                                             |
|         | 8  | Q.  All right.  So I just want to be clear.  So             |
|         | 9  | regarding the ineligible operations, there has never        |
| 01:54   | 10 | been programmed into the rule set that governs the          |
|         | 11 | operation of Travelers Express any unique state             |
|         | 12 | rules.  Is that correct?                                     |
|         | 13 | A.  With regard to the ineligible operations,               |
|         | 14 | that's correct.                                             |
| 01:54   | 15 | Q.  And that's true for the first gen and                   |
|         | 16 | second gen.  Correct?                                        |
|         | 17 | A.  Yes.                                                     |
|         | 18 | (Exhibit 308 was marked for                                 |
|         | 19 | identification.)                                            |
| 01:55   | 20 | BY MR. BRANCART:                                             |
|         | 21 | Q.  Okay.  Show you Exhibit 308.  Do you                    |
|         | 22 | recognize this document?                                    |
|         | 23 | A.  I do.                                                    |
|         | 24 | Q.  What is it?                                              |
| 01:55   | 25 | A.  It's a training document for our business               |

```
 1              ::: DECLARATION OF WITNESS :::

 2           I hereby declare I am the deponent in the
    within matter; that I have read the foregoing
 3  deposition and know the contents thereof, and I
    declare that the same is true of my knowledge except
 4  as to the matters which are therein stated upon my
    information or belief, and as to those matters, I
 5  believe it to be true.
             I declare under the penalties of perjury of
 6  the State of California that the foregoing is true
    and correct.
 7
             Executed this _____ day of
 8  _____, 201__, at
    _____, _____.
 9       (City)                          (State)

10

11  _____
    BRIAN KEARNEY

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              ::: CERTIFICATE OF REPORTER :::

 2

 3         I, SHELLEY M. SAILOR, a Certified Shorthand
    Reporter, holding a valid and current license issued
 4  by the State of California, CSR No. 10254, duly
    authorized to administer oaths, do hereby certify:
 5         That the witness in the foregoing
    deposition was by me duly sworn to testify the truth
 6  in the within-entitled cause; that said deposition
    was taken at the time and place therein cited; that
 7  testimony of said witness was reported by me and
    thereafter transcribed under my direction into
 8  typewriting; that the foregoing is a complete and
    accurate record of said testimony; and that the
 9  witness was given an opportunity to read and correct
    said deposition and to subscribe the same.
10         Should the signature of the witness not be
    affixed to the deposition, the witness shall not
11  have availed himself of the opportunity to sign or
    the signature has been waived.
12         I further certify that I am not of counsel
    nor attorney for any of the parties in the foregoing
13  deposition and caption named nor in any way
    interested in the outcome of the cause named in said
14  caption.

15         Reading and Signing was NOT REQUESTED.

16

17         DATED:  November 18, 2014

18

19
                Shelley M. Sailor
20

21

22         SHELLEY M. SAILOR
           California CSR No. 10254

23

24

25
```