# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LINCOLN JONES, JR. and | ) Case No.: |
| MUYESSER NILE JONES, | ) 5:13-CV-02390-LHK |
| individually and as trustees of | ) |
| the Lincoln and M. Nile Jones | ) |
| Revocable Trust; and | ) |
| PROJECT SENTINEL, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| TRAVELERS CASUALTY | ) |
| INSURANCE COMPANY | ) |
| OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

VIDEOTAPED DEPOSITION OF MATTHEW R. NOEL

Costa Mesa, California

Thursday, June 5, 2014

Reported by:  Jana J. Bommarito, CSR No. 10880

1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5   LINCOLN JONES, JR. and          ) Case No.:
    MUYESSER NILE JONES,            ) 5:13-CV-02390-LHK
6   individually and as trustees of )
    the Lincoln and M. Nile Jones   )
7   Revocable Trust; and            )
    PROJECT SENTINEL, INC.,         )
8                                   )
                 Plaintiffs,        )
9                                   )
          vs.                       )
10                                  )
    TRAVELERS CASUALTY              )
11  INSURANCE COMPANY               )
    OF AMERICA,                     )
12                                  )
                 Defendant.         )
13  _____)

14

15

16          Videotaped deposition of MATTHEW R. NOEL,

17  taken on behalf of Plaintiffs, at Hahn & Bowersock

18  Court Reporters, 151 Kalmus Drive, Suite L1,

19  Costa Mesa, California, beginning at 9:31 a.m., and

20  ending at 6:49 p.m., on Thursday, June 5, 2014,

21  before Jana J. Bommarito, Certified Shorthand

22  Reporter No. 10880.

23

24

25

```
 1                    MATTHEW R. NOEL,
 2   having been first duly sworn by the Certified
 3   Shorthand Reporter, was examined and testified as
 4   follows:
 5

 6                    EXAMINATION
 7   BY MR. BRANCART:
 8        Q    Good morning, sir.
 9        A    Good morning.
10        Q    Would you please state your full name and
11   spell it.
12        A    Matthew, M-a-t-t-h-e-w, middle initial R.,
13   last name Noel, N-o-e-l.
14        Q    Mr. Noel, in the course of your work, you
15   typically go by the first name of Matt, correct?
16        A    That is correct.
17        Q    Are you presently employed?
18        A    Yes, sir.
19        Q    And where are you presently employed?
20        A    I work for AmTrust Insurance Company.
21        Q    State for me your business address.
22        A    I work out of my house.
23        Q    Where -- whatever you use for your
24   business address would be fine.
25        A    Okay.  27291 Eastridge Avenue,
```

09:32:05  5
09:32:07  10
09:32:21  15
09:32:30  20
09:32:44  25

11

                1    the possibility of ineligibilities.

                2    BY MR. BRANCART:

                3        Q    Uh-huh.

                4        A    And to what extent that posed to an

14:34:59        5    increase in hazard that may make the account beyond

                6    what the product was designed to accept and

                7    underwrite and price for.

                8        Q    Did these ineligibilities that are listed

                9    here on the top of Page 344, if an Apartment Pac

14:35:54       10    risk was classified as one of these ineligible

               11    operations, was it automatically declined if it was

               12    an Apartment Pac Plus with the standard

               13    underwriting?

               14        MR. COOPER:  Objection; vague, lacks

14:36:18       15    foundation.

               16        THE WITNESS:  I don't believe the eligibility

               17    requirements were any different between the

               18    Master Pac and the Master Pac Plus.  They were

               19    generally the same.

14:36:32       20    BY MR. BRANCART:

               21        Q    Okay.  So if a -- if a -- an Apartment Pac

               22    risk were determined to be one of these ineligible

               23    operations listed at the top of Page 384 of

               24    Exhibit 45, was it automatically declined while you

14:36:58       25    were at Travelers?

                                                                    177

doesn't -- it's -- it determines on how it's rated

and how it's classified.  As you mentioned before,

it could be a 10 C or it could be a KK 3 for

purposes of tracking pricing and -- and statistics,

14:38:10  I assume.

        But the same account, whether or not

it's -- because the -- the system determines whether

or not it's Master Pac or Master Pac Plus based on

the data input by the agent.  If the agent doesn't

14:38:29  put in the information and they just submit a paper

application, then it would be input by our rating

that it would still decline the thing saying that it

doesn't meet these eligibility requirements.  And if

it's -- if you say, "No, it doesn't meet the

14:38:45  eligibility," then yes, it would decline.

        Q    Okay.  And -- and that is an automatic

declination executed by the commands from the

TravelersExpress program?

        A    Yes.

14:39:15  Q    Okay.  Let's now take a look at

Exhibit 44.

        Exhibit 44 -- well, first of all, do you

recognize it?

        A    No.

14:39:30  Q    It's a document, "How to Quote and Issue

179

1        A     Yes.

2        Q     If it wasn't checked, would the automatic

3   underwriting still process?

4        A     No.

15:01:33 5        Q     Do you know how it is that this is

6   supposed to be -- this -- whether this thing was

7   checked "yes" or "no" on the bottom of 374, this was

8   supposed to be done by the agent, correct?

9        A     Correct.

15:01:46 10        Q     All right.  If you turn to Page 3708 --

11        A     Uh-huh.

12        Q     -- it asks a question here, "Has insurance

13   coverage been cancelled, declined or nonrenewed in

14   the last three years?"

15:02:16 15        A     Yes, I see that.

16        Q     Why is that significant from an

17   underwriting point of view?

18        A     Well, it goes to the account's

19   acceptability for being placed with a new carrier.

15:02:31 20   If it's been cancelled, you would want to know why

21   it was cancelled, what were the reasons behind the

22   cancellation.  If it was declined, they'd want --

23   they'd want to know an explanation of all those, why

24   it was declined, nonrenewed, cancelled.  What are

15:02:49 25   the reasons why?

195

1    the information that was provided to me during

2    this.

3        Q    Right.  And I never -- never worked at

4    Travelers, and -- and all I know is what you know.

15:12:06  5    I saw it in the documents.  It was closed without

6    pay.

7        A    Right.  Yeah, yeah.  Okay.

8        Q    Yeah.  All right.  Okay.

9             Sir, would you please take a look at 3715.

15:12:54 10        A    (Witness complies.)

11        Q    This says "Additional Interests."

12             What information is recorded there?

13        A    This is input by the agent themselves as

14    to people that have a vested interest in the

15:13:13 15    property --

16        Q    Uh-huh.

17        A    -- as far as either a mortgagee, a loss

18    payee on a loan or a lease, so on and so forth.

19    Additional insureds may be other parties that have a

15:13:29 20    financial concern about the property.

21        Q    Why would a mortgagee be notified of

22    insurance?

23        A    Because they've put a loan out, and if the

24    loan -- if -- if the insurance is cancelled, then

15:13:44 25    there's no property insurance on that -- the

203

1    property that they've lent money on.  So then that

2    would trigger them to place what they call "forced

3    place coverage" in the event so that they don't have

4    any uninsured properties.

15:14:02  5        Q    Okay.  If you're a permit owner, what are

6    the benefits of having insurance versus not having

7    insurance?

8        MR. COOPER:  Objection; vague, overbroad, lacks

9    foundation.

15:14:18 10        THE WITNESS:  The benefit of insurance is that

11    you're not subject to any financial loss that's not

12    recoverable by insurance that could be, and you have

13    peace of mind of knowing that there's also liability

14    coverage in the event of an injury at those premises

15:14:39 15    that you could be held liable for, for millions of

16    dollars that may go affect your financial

17    stability.

18    BY MR. BRANCART:

19        Q    Sir, would you turn to the next page,

15:14:55 20    "General Issue Information."

21        A    (Witness complies.)

22        Q    It says here "Audit Indicator, not

23    audible."

24        A    Uh-huh.

15:15:09 25        Q    What does that mean?

204

```
 1   the Joneses?

 2        A    I believe I went into the claims notes and

 3   read that it was an OSHA -- a possible OSHA

 4   violation based on a railing, but it was, at the

 5   current time, being still investigated; that no

 6   determination of lack of maintenance or any other

 7   existing problems were an occurrence, so it was not

 8   acted upon with any decision at that time.

 9        Q    Okay.  What's the next event or occurrence

10   that you recall regarding your interaction with the

11   Joneses?

12        A    I believe that would have been in the form

13   of a red flag received into my work bin at my desk,

14   computerwise, from -- I believe it came from

15   Michael Leeds who reviewed Stephanie Frazier's notes

16   and red flagged it to me to review the account based

17   on what he had discovered in his review of the

18   account.

19        Q    Okay.  And what is it that you recall that

20   Leeds had discovered that caused the issuance of red

21   flag?

22        A    Well, I believe he reviewed the same

23   claims notes that I did possibly for -- in -- in

24   more detail, because I was really just looking

25   towards what the cause of the ARN was, which at the
```

15:24:16 5
15:24:44 10
15:25:05 15
15:25:24 20
15:25:39 25

212

       1   time was a Cal/OSHA violation.

       2          But I believe he reviewed the entire

       3   claims notes, and I believe there was some reference

       4   within the claims adjuster's documentation that

15:25:58  5   there may have been subsidized housing tenants

       6   within this building.

       7      Q    Okay.  When you say that you received a

       8   red flag, does that mean it was some kind of

       9   electronic form of mail that you received from

15:26:17 10   Leeds?  What -- what is it you recall receiving from

      11   him?

      12      A    Well, on our desktop we have a work list

      13   of items that have to be addressed on a daily basis.

      14   Referrals will come in on new business.  Referrals

15:26:32 15   will come in on all other things.  Red flag is when

      16   an account that comes up that's been sent by

      17   whomever to say, "You need to review this."

      18      Q    Uh-huh.  Uh-huh.

      19      A    At that point we then go into the account

15:26:44 20   notes page and review what the reason for the

      21   referral is or the red flag referral.

      22      Q    Going back to Exhibit 29, let's see if we

      23   can find --

      24      A    3703.

15:27:23 25      Q    3703.  All right.

                                                              213

```
        1    information being received by the agent, that we

        2    indicated that we would be nonrenewing the

        3    account.

        4         Q    Okay.  So between -- you make a -- and

15:39:53 5    this is a decision that you make, correct?  You have

        6    to make --

        7         A    Decision to nonrenew?

        8         Q    Yes.

        9         A    Yes.

15:40:01 10        Q    Okay.  And do you discuss this decision

       11    with anyone within the Travelers organization?

       12         A    No, not on this case.

       13         Q    Okay.  So you've -- you make the decision

       14    sometime after receiving Ingrid's e-mail here

15:40:23 15    identified as the November 12, 2012, 8:37 a.m.

       16    e-mail, correct?

       17         A    Uh-huh.

       18         Q    And -- is that a "yes"?

       19         A    Yes.

15:40:34 20        Q    Okay.  And is there anything that occurs

       21    between receipt of this e-mail from Ingrid and you

       22    making the determination or decision that you're

       23    going to nonrenew?

       24         A    At some point in time I -- although I

15:40:59 25    don't have a specific reference in the timing of it,
```

222

1    A    I would say that NIS would submit

2  something to me and they would have gone beyond just

3  telling me what percentage of tenants they are.

4  They would have said, "This is an account that has

16:36:56  5  established long-term tenants.  We have a history of

6  no losses.  The property -- property is owned --

7  been owned by this -- this property owner for X

8  amount of years."  And I would consider all those

9  factors rather than simply a percentage of the

16:37:14  10  tenants --

11    Q    Okay.  But --

12    A    -- that are subsidized.

13    Q    If -- if you had all those favorable

14  indicators, what is the maximum number of subsidized

16:37:25  15  tenants -- we're now referring to government

16  subsidies -- subsidized tenants that you would, in

17  exercising your judgment, deem to be eligible for

18  Apartment Pac?

19    A    My personal cut-off point was, I guess, at

16:37:46  20  50 percent, depending on the size of the account.  I

21  guess if there were 200 units and 100 of them were

22  subsidized, that would be a little bit different

23  than when you have a smaller percentage of

24  subsidized on a smaller basis.

16:38:07  25    Q    Explain to me the relationship between a

251

```
        1   small apartment building that has 50 percent

        2   Section 8 and a large apartment building that has

        3   50 percent Section 8 in terms of whether or not in

        4   exercising your judgment they would be ineligible

16:38:33 5   for Apartment Pac.

        6        A    I think it's a control issue about how

        7   many of the units actually are -- when you have

        8   three out of seven, it's a little more manageable, I

        9   guess in my idea, my perception, from the -- from a

16:38:51 10  property owner perception than it would be if you

       11   had 200 units and 100 of them were subsidized.

       12        Q    Okay.  Three out of seven, your perception

       13   is more manageable.  30 out of 70, how does that

       14   impact your analysis?

16:39:16 15       A    That would be -- I would take more

       16   consideration.  30 out of 70 being, what, less --

       17   less than 50, but closer to 40.  It wouldn't be

       18   probably eligible, number one, for -- for our

       19   accounts because if you had that many units, it

16:39:38 20  probably would be outside of our -- our availability

       21   and our eligibility.

       22        Q    I think you're exactly right.  I mean, I

       23   guess you could spread it out over a number of

       24   buildings, but yeah.

16:39:47 25       A    But the total insured value may exceed our
```

252

1    Express --

2         Q    Right.

3         A    -- authority levels.

4         Q    What is it about -- what is it about -- is

16:39:54  5   there -- is there -- in your mind when we were

6    talking about subsidized house and assessing risk,

7    is there -- is there essentially a critical mass or

8    tipping point when it comes to the number of

9    subsidized tenants in an apartment building that

16:40:12 10   could have -- that could generate risks?

11        A    Is there a tipping point?  Was that the

12   question?  I --

13        Q    Uh-huh, yeah.

14        A    None specifically, no.

16:40:27 15        Q    Okay.  Is there -- is there a critical

16   mass you -- that -- that you would not want to

17   exceed in terms of the number or percentage of

18   subsidized tenants in any circumstance?

19        A    I believe I -- my personal cut-off was at

16:40:46 20   50 percent.

21        Q    Okay.

22        A    Or higher, higher than 50 percent.

23        Q    If you go over 50 percent, then that

24   exceeds what you --

16:40:59 25        A    My comfort level.

253

1          Q     Okay.  The 50 percent mark, however, is

2    contrary to the written guidance that Travelers puts

3    out, true?

4          A     True.

16:41:14  5          Q     Under the guidance of Travelers, if you're

6    to apply your definition of subsidized public,

7    government-funded complex, having one person who's a

8    subsidized -- governmentally-subsidized tenant would

9    be a disqualifying event, right?

16:41:33  10         A     True.

11         Q     Did you -- so that's -- for NIS you

12   indicated that you would be willing to go as high as

13   50 percent if there were other factors.  Fifty

14   percent of the tenants could be subsidized.

16:41:53  15               Are there buildings -- go ahead.

16         A     Go ahead.

17         Q     Are there buildings that you recall in

18   which up to half the residents were Section 8

19   tenants that you deemed -- that -- that -- that you

16:42:10  20  were willing to, in exercise of your judgment, not

21   characterize as subsidized housing?

22         MR. COOPER:  Object to the -- it's ambiguous.

23         THE WITNESS:  I would say no.

24   BY MR. BRANCART:

16:42:26  25        Q     Okay.  Did you ever have any discussions

254

1    page, which is 3734.  We have here a letter from

2    Lisa to Chris Bennett and John -- I can't say his

3    last name -- Corneau.

4         A    Corneau.

17:28:01   5         Q    Had you seen this before?

6         A    Yes.

7         Q    Okay.  And then that's your e-mail that's

8    on the top of the page, correct?

9         A    No.  That's from Lisa to me.

17:28:16  10         Q    Okay.  I'm sorry.  I'm sorry.

11              Your e-mail is the next one; is that

12    correct?

13         A    Yes.

14         Q    Okay.  So your e-mail is the Matt Noel

17:28:22  15    that appears at the bottom of 3733; is that

16    correct?

17         A    Correct.

18         Q    Okay.  Okay.  Let me show you, if I could,

19    the Exhibit Number 62, and this is Bates 3727 to

17:28:57  20    3731.  I'll give that to your attorney.

21              (Whereupon Exhibit 62 was marked for

22    identification, a copy of which is attached hereto.)

23    BY MR. BRANCART:

24         Q    Do you recognize these e-mails, sir?

17:29:27  25         A    Yes.

281

1       Q    Okay.  And what are they?

2       A    E-mail correspondence to and from me and

3  various people at National Insurance Solutions.

4       Q    Okay.  If you go to the page 3730, this is

17:29:49 5  your e-mail of November 9th to -- to Lisa Mota

6  (sic), your contact at NIS, correct?

7       A    Correct.

8       Q    If you go to the top of the page, it

9  mentions an agent by the name of Craig Franklin.

17:30:14 10      Do you see that?

11      A    Yes.

12      Q    Did you ever do any work with Mr. Franklin

13  as an agent at NIS?

14      A    Well, it's possible that I did.  I don't

17:30:29 15  specifically recall direct conversations with

16  Craig Franklin, no.

17      Q    Okay.  All right.  Sir, if you go now to

18  the Page 3728, at the bottom of the page, this is

19  Ingrid e-mailing you, correct?

17:30:58 20      A    Yes.

21      Q    It indicates that Ingrid spoke with

22  Mr. and Mrs. Jones on Friday.

23           See that?

24      A    Yes, sir.

17:31:10 25      Q    And "Insured wanted to know why we needed

282

1        Q    Okay.  Did you misrepresent to the

2   Joneses -- in your statement for their nonrenewal,

3   did you misrepresent the reason for their

4   nonrenewal?

17:50:47  5        A    Not to my knowledge.

6        Q    Okay.  Did you conceal from the Joneses

7   the real reason why you were nonrenewing them?

8        A    No.

9        Q    Okay.  Did you knowingly withhold from the

17:51:07 10  Joneses a reason why you had decided to nonrenew

11  knew them when you wrote this summary of the

12  statement of reason for nonrenewal?

13        MR. COOPER:  Objection; vague.

14        THE WITNESS:  Knowingly withholding information

17:51:33 15  is pretty broad.  I would say more accurately there

16  were other factors besides this specific reason

17  given that may have been taken into consideration in

18  making my final decision of the nonrenewal.

19  BY MR. BRANCART:

17:51:53 20       Q    Okay.  Was the code -- the code violation

21  that caused the ARN, was that a reason?

22        A    The OSHA code violation?  No, sir.

23        Q    Okay.  Was the delay between Friday and

24  Monday morning at 8:30 in the morning, Mrs. Jones

17:52:18 25  not returning Ingrid's telephone call, was that a

295

1  reason?

2       A    The delay was not, no.

3       Q    Okay.  Was the fact that Ms. Jones accused

4  Travelers of discrimination and was hostile, as you

17:52:33  5  wrote, was that a reason?

6       A    Not that they -- not because she indicated

7  that we may be discriminating.

8       Q    Okay.  So -- okay.  Was it that -- was

9  it -- was it the application, supplemental

17:52:59  10  application that was provided to you for the

11  incorrect address by NIS, was that a reason?

12       A    It was considered, yes.

13       Q    Okay.

14       A    The supplemental application that was

17:53:09  15  given to me was part of the consideration process.

16       Q    All right.  Did -- but at that time you

17  didn't even observe that it was a different address.

18  You didn't know that?

19       A    That's correct.

17:53:21  20       Q    Okay.  So --

21       A    But the address is still a building

22  with -- on the premises of the property itself.

23  There's two buildings on the property.

24       Q    There's -- there are two addresses.  There

17:53:36  25  are not two -- I think they're actually different

296

          1    your underwriting team in -- in Spokane, correct?

          2        A    Correct.

          3        Q    You were instructed to make these

          4    documents accurate, correct?

17:57:28  5        A    Correct.

          6        Q    In honoring an -- an accurate statement of

          7    why you had made a determination of nonrenewal, you

          8    wrote that the Joneses were ineligible because they

          9    had Section 8 tenants, true?

17:57:46 10        A    That is the state specific reason I gave

         11    that would be transferred to the notice of the

         12    nonrenewal, yes.

         13        Q    Okay.  Now, my question to you, though,

         14    was -- is that:  Did you hold or conceal a real

17:58:01 15    reason for the nonrenewal?

         16        MR. COOPER:  Objection; vague, argumentative.

         17        THE WITNESS:  No, I did not conceal anything.

         18    BY MR. BRANCART:

         19        Q    Okay.  All right.  So if you didn't

17:58:10 20    conceal anything, this is a complete and full and

         21    accurate statement of the basis of the nonrenewal --

         22        MR. COOPER:  Objection.

         23        MR. BRANCART:  -- correct?

         24        MR. COOPER:  Objection; argumentative.

17:58:19 25        THE WITNESS:  It is the specific reason why we

                                                                    300

          1   nonrenewed.

          2   BY MR. BRANCART:

          3        Q    Okay.  Was there a nonspecific reason?

          4        A    There are different factors that

17:58:30  5   accumulated that made me make the final decision,

          6   and using this specific language is all that's

          7   required.  The State only requires a state specific

          8   nonrenewal reason.

          9             I was trying, in fact, to not pile on, if

17:58:53 10   you will, on providing other information that I may

         11   have considered in my nonrenewal determination, such

         12   as a possible misrepresentation to my knowledge at

         13   the time of the application, the fact that there was

         14   also a pending loss, and the fact that the insured

17:59:19 15   appeared to be uncooperative in providing the

         16   information to Travelers and/or their own agent that

         17   we had requested.

         18        Q    Okay.  The lack of cooperation wasn't due

         19   to delay, correct?

17:59:35 20        MR. COOPER:  Objection; vague.

         21   BY MR. BRANCART:

         22        Q    You're -- you're not claiming that, are

         23   you?

         24        A    Not specifically due to delay.

17:59:40 25        Q    Okay.  All right.  You're claiming that

                                                                    301

1   fluctuates based on the tenants, and -- and like

2   I've mentioned before, the -- this one indicates

3   that they have long-term tenants, so -- which means

4   that to me that they have a consistency there.

18:20:34   5        So the 20 percent may have just been a

6   figure that she was told by somebody else that

7   worked at National Insurance Solutions that I may

8   have said 20 percent along the way.

9        Q   Okay.  Sir, she is -- before she puts --

18:20:49   10   she wanted to talk to you before she puts through

11   this application.

12       A   Uh-huh.  Uh-huh.

13       Q   Camie is going to use for this

14   particular -- it appears for the size of this unit

18:21:02   15   would be using TravelersExpress, true?

16       A   True.

17       Q   Okay.  When Camie came to the portion of

18   the TravelersExpress interface that said, "Do you

19   have any ineligible activities," and one of them was

18:21:22   20   subsidized housing, it was -- she would go ahead and

21   say, "I don't have any ineligible activities,"

22   correct?

23       A   Correct.

24       Q   She would click that with the

18:21:32   25   understanding that you had already -- you'd approved

318

1    her clicking that she had no ineligible

2    activities?

3         A    Yes.

4         Q    Okay.

18:21:41 5    A    That the -- the -- not necessarily

6    activities, but the occupancies that had been

7    pre-approved and reviewed by me and told her that we

8    would accept that.

9         Q    Right.  So -- but for her to make that

18:21:57 10  happen, she needs to, in Exhibit 29, which is the

11   interface --

12        A    Right.

13        Q    There we go.

14             Where it comes -- on Page 3704 where it

18:22:17 15  says here, "Does the applicant meet all of the above

16   criteria," she would click "yes," correct?

17        A    Yes.

18        Q    And that would be even though -- that

19   would be even though she would have 20 percent

18:22:36 20  Section 8 tenants?

21        A    True.

22        Q    Okay.  Almost done.  Okay.  Exhibit 76.

23             (Whereupon Exhibit 76 was marked for

24   identification, a copy of which is attached hereto.)

18:23:19 25  ///

319

```
 1                          DECLARATION

 2                              OF

 3                      PENALTY OF PERJURY

 4

 5

 6

 7       I declare under penalty of perjury, under the

 8  laws of the State of California, that I have read

 9  the foregoing transcript, I have made any

10  corrections, additions or deletions that I was

11  desirous of making in order to render the within

12  transcript true and correct, and

13       IN WITNESS WHEREOF, I have hereunto subscribed

14  my name this _____ day of _____,

15  _____.

16

17

18

19

20

21              _____

22                          MATTHEW R. NOEL

23

24

25
```

341

```
 1   CERTIFICATION OF

 2              CERTIFIED SHORTHAND REPORTER

 3

 4          I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California do hereby

 6   certify:

 7          That the foregoing proceedings were taken

 8   before me at the time and place herein set forth;

 9   that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand, which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15          That before completion of the deposition,

16   a review of the transcript [ ] was [ ] was not

17   requested.

18          I further certify that I am neither

19   financially interested in the action nor a relative

20   or employee of any attorney of any of the parties.

21          IN WITNESS WHEREOF, I have this date,

22   June 8, 201   scribed my name.

23

24          _____

25          Jana Bommarito, CSR No. 10880
```

342