# EXHIBIT 9

```
             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

                   SAN JOSE DIVISION



LINCOLN JONES, JR. and         ) Case No.
MUYESSER NILE JONES,           ) 5:13-cv-02390-LHK
individually and as trustees   )
of the Lincoln and M. Nile     )
Jones Revocable Trust; and     )
PROJECT SENTINEL, INC.,        )
                               )
              Plaintiffs,      )
                               )
         vs.                   )
                               )
TRAVELERS CASUALTY INSURANCE   )
COMPANY OF AMERICA,            )
                               )
              Defendant.       )
_____)


  DEPOSITION OF NATIONAL INSURANCE SOLUTIONS THROUGH ITS

       CORPORATE DESIGNEE, CHRISTOPHER BENNETT

                Los Angeles, California

                Thursday, July 10, 2014




Reported By:
Damon M. LeBlanc,
CSR No. 11958
```

1

```
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                          SAN JOSE DIVISION


LINCOLN JONES, JR. and          ) Case No.
MUYESSER NILE JONES,            ) 5:13-cv-02390-LHK
individually and as trustees    )
of the Lincoln and M. Nile      )
Jones Revocable Trust; and      )
PROJECT SENTINEL, INC.,         )
                                )
              Plaintiffs,       )
                                )
        vs.                     )
                                )
TRAVELERS CASUALTY INSURANCE    )
COMPANY OF AMERICA,             )
                                )
              Defendant.        )
_____)
```

Deposition of NATIONAL INSURANCE SOLUTIONS through its corporate designee, CHRISTOPHER BENNETT, taken on behalf of the Plaintiff, at 333 South Grand Avenue, 47th Floor, Los Angeles, California, beginning at 10:06 a.m. and ending at 5:42 p.m., on Thursday, July 10, 2014, before Damon M. LeBlanc, Certified Shorthand Reporter, Number 11958.

2

```
 1  and I represent National Insurance Solutions.
 2          MR. PETERSON:  Rob Peterson with
 3  Carlson, Calladine & Peterson for Travelers Casualty.
 4
 5                  CHRISTOPHER BENNETT,
 6  having been first duly sworn by the Certified Shorthand
 7  Reporter, was examined and testified as follows:
 8
 9                     EXAMINATION
10  BY MR. BRANCART:
11      Q    Good morning.  Would you please state
12  your full name and spell it.
13      A    Chris Bennett, C-h-r-i-s, B-e-n-n-e-t-t.
14      Q    Mr. Bennett, have you ever gone by the
15  first name of Christopher?
16      A    On legal documents.
17      Q    In the course of your work at NIS,
18  though, you typically use the first name of Chris; is
19  that correct?
20      A    Yes.
21      Q    Would you please state your current
22  business address?
23      A    9400 Topanga Canyon Boulevard,
24  Suite Number 201, Chatsworth, California 91311.
25      Q    How long has that been your business
```

9

```
 1  sitting in a room training on a system, we would say
 2  push this button and you have to answer these
 3  questions.  So it would have just been in the course of
 4  helping them understand how to navigate through a
 5  system.
 6       Q    Okay.  All right.  Do you recall any
 7  conversations with anyone at Travelers regarding
 8  Mr. and Mrs. Jones prior to NIS's receipt of my letter
 9  which is Document Number 3 in Exhibit 131; and my
10  letter is dated December 28, 2012?
11       A    No.
12       Q    Sir, since the date of January 7, 2013
13  to present, have you had any conversation with any
14  employees at Travelers regarding its ineligible
15  operation criteria subsidized complexes?
16       A    Yes.
17       Q    And with whom have you spoken?
18       A    It would have been their
19  underwriting -- I don't know his exact title, but he
20  runs underwriting from my perspective.  His first name
21  is Brad.  I don't recall his last name.  I apologize.
22       Q    Wood?
23       A    That sounds like the right name.  That's
24  correct.
25       Q    Diamond Bar office?
```

70

```
 1          A     I believe so, yes.
 2          Q     And on how many occasions have you
 3  communicated with Mr. Wood about this topic?
 4          A     I believe it was just one time.
 5          Q     Okay.  Was that a face-to-face meeting
 6  or telephonic?
 7          A     I believe it was over the phone.
 8          Q     Did he call you or you call him, sir?
 9          A     I called him.
10          Q     What prompted you to call Mr. Wood at
11  that time or Brad?
12          A     I don't recall specifically.  It would
13  have been likely that it would have been the receipt of
14  the documents and this issue surfacing.
15          Q     Do you recall what the date of that call
16  was?
17          A     No.
18          Q     Did you make any notes?
19          A     No.
20          Q     Did anyone participate in the call?  Was
21  it a conference call in your office?
22          A     I don't think so.  I think it was -- I
23  think it was just Brad.  That's the way I recall it.
24          Q     But from your side --
25          A     No.  I think it was just me.
```

71

1    Q    Okay. Would you please state for me
2 what you recall being discussed in this call with
3 Mr. Brad Wood?
4    A    I felt that it would be prudent for
5 National Insurance Solutions to stop asking this
6 question as it pertained to Section 8.
7    Q    And what is it that Mr. Wood said in
8 response?
9    A    Ultimately I don't recall if it was that
10 phone call or not, but ultimately we were advised that
11 we didn't have to address the issue.
12    Q    Okay. Sir, you indicated that you
13 thought it may not be prudent for the question to be
14 asked. What specific question were you referring to?
15    A    Well, I meant -- when I said question,
16 maybe you took me too literally or I spoke too
17 literally. I just mean that issue of Section 8. There
18 is a -- it's supposed to be addressed in the
19 underwriting of apartment insurance with Travelers.
20    And I felt given the fact we were receiving
21 these documents and the issue was surfacing, it would
22 be a bad idea for us to be continue to ask that
23 question. By "us," I mean National Insurance Solutions
24 because we're a small company and can't bear exposure
25 of what I was perceiving to be some kind of threat.

72

1      Q    Right.  And do you recall in that
2  conversation what Mr. Brad Wood said in response?
3      A    If I remember correctly, I think he said
4  that he needed to discuss it internally and that he
5  would get back to me.  That's the way I recall it.  I
6  don't remember when it was communicated, but it was
7  some short time after that.
8      Q    Okay.  Prior to this call with
9  Mr. Brad Wood, did you speak with anyone in your
10 office -- let's go off the record for a second.
11          (Discussion held off the record.)
12      MR. BRANCART:  I'll withdraw the last question.
13 BY MR. BRANCART:
14      Q    Sir, prior to this call with
15 Mr. Brad Wood, did you speak with anyone in your office
16 about why you were going to call Mr. Brad Wood and the
17 concern that you had that you expressed to him?
18      A    You know, I don't recall speaking to
19 anyone in the office.  It would have -- it's possible.
20 But certainly if I would have it would have been John
21 or Lisa, but I don't recall that conversation taking
22 place.
23      Q    All right.  Did you ultimately receive a
24 response back from Travelers to your expressed concern
25 about asking about Section 8?

73

1     A     I ultimately received a phone call from
2  Brad.
3     Q     Okay.  And do you recall how long after
4  your call that you received this response from
5  Mr. Wood?
6     A     I don't, but it wasn't long because we
7  actively call business every day.  And we needed to
8  find out quickly what we were going to do.
9     Q     All right.  And what is it that
10 Mr. Wood said in that call?
11    A     I don't remember the conversation.  He
12 gave us permission not to address that issue from an
13 underwriting standpoint.  That was the gist of the
14 conversation.
15    Q     Did he give you any direction as to how
16 you were to implement this decision not to inquire
17 about the existence of Section 8?
18    A     The only way to do it would be in their
19 system, when a pop-up comes up and says:  Are any of
20 these ineligible operations present?  We would check
21 no, they are not present even though we had not asked
22 the customer.  In other words, we discontinued asking
23 the question or addressing that issue as a whole.  But
24 when we entered it in the system, we implied that we
25 had addressed it simply to get through the system.

74

```
 1          Q     Because it's not disputed -- because
 2   we've spoken to people with Travelers.  Because if you
 3   click yes through the underwriting portal, you're
 4   automatically kicked out or denied --
 5          A     Right.
 6          Q     -- through that?
 7          A     We can't retrieve a quote.
 8          Q     Okay.  Did you communicate this
 9   instruction to your staff?
10          A     Yes.
11          Q     And how did you communicate it to them
12   verbally?
13          A     I believe it was verbally in a meeting.
14          Q     All right.  And is there any writing
15   that was produced by you or anyone in the organization
16   indicating we're not going to be asking the question
17   regarding Section 8?
18          A     I don't believe so.  I think it was
19   clearly communicated verbally with the staff face to
20   face one on one, and it was handled in that matter.
21          Q     Second question:  Was there any
22   communication in writing as to what individuals were to
23   do and using the automatic underwriting portal when it
24   came to this question yes-no?
25          A     No.  It would have been part of that
```

75

```
 1                            **

 2

 3

 4

 5

 6              I DO SOLEMNLY DECLARE UNDER PENALTY OF

 7   PERJURY THAT THE FOLLOWING IS MY DEPOSITION UNDER OATH;

 8   THAT THESE ARE THE QUESTIONS ASKED OF ME AND MY ANSWERS

 9   THERETO; THAT I HAVE READ SAME AND HAVE MADE THE

10   NECESSARY CORRECTIONS, ADDITIONS, OR CHANGES TO MY

11   ANSWERS THAT I DEEM NECESSARY.

12              IN WITNESS WHEREOF, I HEREBY SUBSCRIBE

13   MY NAME THIS_____DAY OF_____,20____.

14

15                                      _____

16                                      WITNESS SIGNATURE

17

18

19

20

21

22

23

24

25
```

268

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER


I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name_____.

Date_____

Certificate Number 11958

269