ROBERT M. PETERSON [Bar No.: 10084; rpeterson@ccplaw.com]
MICHAEL C. COOPER [Bar No.: 114729; mcooper@ccplaw.com]
MELLISSA A. DUBBS [Bar No.: 163650; mdubbs@ccplaw.com]
CARLSON, CALLADINE & PETERSON
353 Sacramento Street, 16th Floor
San Francisco, CA 94111
Telephone:    (415) 391-3911
Facsimile:    (415) 391-3898

PAUL C. CURNIN [*pro hac vice*; pcurnin@stblaw.com]
ANDREW T. FRANKEL [*pro hac vice*; afrankel@stblaw.com]
DAVID ELBAUM [*pro hac vice*; david.elbaum@stblaw.com]
ALEXANDER B. SIMKIN [*pro hac vice*; asimkin@stblaw.com]
MATTHEW T. O'CONNOR [*pro hac vice*; moconnor@stblaw.com]
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave
New York, NY 10025
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

Attorneys for Defendant TRAVELERS CASUALTY
INSURANCE COMPANY OF AMERICA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LINCOLN JONES, JR. and MUYESSER NILE JONES, individually and as trustee of the Lincoln and M. Nile Jones Revocable Trust; and PROJECT SENTINEL, INC.<br><br>                            Plaintiffs,<br><br>         v.<br><br>TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA,<br><br>                            Defendant. | CASE NO.: CV 13-02390<br><br>**DEFENDANT'S OMNIBUS MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>Hon. Lucy H. Koh<br><br>Hearing Date: July 2, 2015<br>Hearing Time: 1:30 p.m.<br>Courtroom:        8<br><br>Filed concurrently herewith: Declaration of Andrew T. Frankel; [Proposed] Order<br><br>**ORAL ARGUMENT REQUESTED** |

# NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on July 2, 2015, at 1:30 p.m., or as soon as the matter may be heard by the Honorable Lucy H. Koh in Courtroom 8, United States District Court for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, CA 95113, Defendant Travelers Casualty Insurance Company of America ("Travelers") shall and hereby does move the Court pursuant to the Court's Order at ECF No. 209, as modified by the Court's Order at ECF No. 211, for an order under Rules 403 and 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993):

Striking the expert reports of Daniel B. Schwarcz in their entirety; or, in the alternative, the opinions expressed at paragraphs 8-23 of the Schwarcz report, paragraphs 2-5, 7-8 of the Schwarcz rebuttal report;

Striking the expert report of Jacob L. Vigdor in its entirety;

Striking the expert reports of Calvin P. Bradford in their entirety; or, in the alternative, certain opinions expressed at pages 13-15 of the Bradford report and pages 2 and 10-16 of the Bradford supplemental report, as described in the attached Memorandum of Law;

Striking the opinions of Catherine M. Bishop in Section 7.A of the Bishop report and certain sentences on page 12 of the Bishop report and pages 2 and 5 of the Bishop rebuttal report, as described in the attached Memorandum of Law;

Striking the opinions of J. Robert Hunter at pages 10-11, 18-19 of the Hunter report, as described in the attached Memorandum of Law; and

Striking the opinions of J. Rosie Tighe in Section 7 of the Tighe report and certain opinions in Section 6 of the Tighe report, as described in the attached Memorandum of Law.

Travelers brings this motion based on this Notice of Motion, supporting Memorandum of Points and Authorities; the Declaration of Andrew T. Frankel ("Frankel Decl."), and exhibits thereto ("Ex."); and such other written or oral argument as may be presented at or before the time this motion is deemed submitted by the Court.

| | |
|---|---|
| DATED:  May 8, 2015 | SIMPSON THACHER & BARTLETT LLP |
| | By: /s/ Andrew T. Frankel |
| | Paul C. Curnin |
| | Andrew T. Frankel |
| | David Elbaum |
| | Alexander B. Simkin |
| | Matthew T. O'Connor |
| | |
| | CARLSON, CALLADINE & PETERSON |
| | Robert M. Peterson |
| | Michael C. Cooper |
| | Melissa A. Dubbs |
| | |
| | Attorneys for Defendant |
| | TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA |

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs expert reports contain a multitude of unsupported and improper opinions and Plaintiffs' experts are generally unqualified.  Their reports should be stricken in whole or in part.

## LEGAL STANDARD

Under Rule 702, a witness qualified as an expert by knowledge, skill, experience, training, or education may provide opinion testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; *and* (d) the expert has reliably applied the principles and methods of the facts to the case." Fed. R. Evid. 702 (emphasis added).  The trial court has a "gatekeeping" obligation under Rule 702, *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *2 (N.D. Cal. Apr. 4, 2014), and should not admit expert testimony "without first finding it to be relevant and reliable under *Daubert*." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (en banc).  As this Court has explained, "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-cv-00630-LHK, 2014 WL 794328, at *8 (N.D. Cal. Feb. 25, 2014) (quoting *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).  This gatekeeping role is particularly important in the context of this case, in which Plaintiffs have asserted oftentimes inflammatory accusations of discrimination concerning Defendant's intent that have the potential for inflaming the jury and ascribing undue significance to the testimony of purported experts.

## ARGUMENT

**I.      Daniel B. Schwarcz**

Professor Schwarcz's reports are thinly disguised legal briefs written by a law professor who has never worked in the insurance industry.[1]  For example, Professor Schwarcz opines that

---

[1] An expert may not "give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *see also Pokorny v. Quixtar Inc.*, No. 07-00201-SC, 2007 WL

Travelers has engaged in "unfair discrimination." Ex. 1 (Schwarcz Rpt.) ¶ 15.  An expert's use of "judicially defined terms, terms that derived their definitions from judicial interpretations, and legally specialized terms constitutes an expression of opinion as to the ultimate legal conclusion." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 558 (C.D. Cal. 2014) (alternations and quotations omitted) (striking expert opinion that ConAgra "falsely and deceptively labeled" its products because "false" and "deceptive" are judicially defined terms).[2]  This, of course, is the ultimate issue in this case.  Professor Schwarcz's legal opinions are also erroneous.  Professor Schwarcz believes that an insurer "unfairly discriminates" when it differentiates among policyholders on the basis of characteristics that correlate with "suspect" policyholder traits (which he calls a "red flag"), unless the insurer has quantitative empirical evidence establishing that those characteristics are predictive of policyholder risk.  Ex. 1 (Schwarcz Rpt.) ¶¶ 15, 22.  This is not the law; actuarial studies are not required for every underwriting-related decision.[3]  His opinion is also baseless.  Professor Schwarcz predicates his "red flag" test entirely on one page from a 954-page multi-volume handbook on market regulation for *personal lines* insurance that has no applicability to the *commercial* Apartment Pac policies at issue.[4]  The handbook does not purport to reflect "customs or norms" in the industry and its use as a guide by regulators for market conduct examinations has nothing to do with this case.  *See* Ex. 4 (NAIC handbook) at 1 ("The purpose of this handbook is to assist states in optimizing the use of insurance department resources, eliminating duplicative inquiries and investigations and coordinating efforts with other states.").  Professor Schwarcz

---

1932922, at *2 (N.D. Cal. June 29, 2007) ("The prohibition against experts offering legal conclusions is clear . . . ." (citing *United States v. Moran*, 482 F.3d 1101 (9th Cir. 2007))).

[2] "[T]he meaning of federal regulations is a question of law, not a question of fact." *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F.Supp.2d 1229, 1234 (E.D. Cal. 2005) (striking expert testimony about the meaning of FCC regulations).

[3] *See, e.g.*, *Apple v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6, (N.D. Cal. June 30, 2012) ("[B]ecause [expert's opinion] is contrary to law, it is unreliable under FRE 702 and *Daubert* and unduly prejudicial under FRE 403.").

[4] Ex. 4 (Schwarcz Tr.) at 182:10-15 (admitting that other than this 2009 handbook, he wasn't aware of any other law, regulation, academic article or publication that uses the phrase "red flag" in the context of unfair discrimination); *id.* at 180:8-181:1 (admitting handbook section is about personal lines and not commercial lines); Ex. 4 (NAIC handbook) at 66 ("The primary focus of this discussion is personal lines property/casualty coverage and, therefore, regulators must keep in mind that when considering other lines of insurance, not all of the concepts discussed here will apply.").

1  should be excluded in his entirety because the foundation for all of his opinions are premised on

2  these impermissible (and unreliable) legal opinions.[5]

3        Professor Schwarcz's reports also contain irrelevant and prejudicial accounts of

4  discrimination by unknown persons or companies *other than Travelers* in decades and centuries

5  past. Ex. 1 (Schwarcz Rpt.) ¶¶ 9, 12-14, 22-23; Ex. 2 (Schwarcz Rebuttal Rpt.) ¶¶ 2, 5. These

6  "opinions" should be excluded.[6]

7        Professor Schwarcz's reports also contain a number of unreliable opinions based solely on

8  his own *ipse dixit*:[7]

- Professor Schwarcz opines that Travelers' underwriting guideline "clearly" has a ***disparate impact*** on protected classes even though he admits that this is an "empirical question" and that he has not "empirically evaluated it." Ex. 3 (Schwarcz Tr.) at 91:10-20. Even Professor Schwarcz does not believe that his opinion is sufficient to conclude that Travelers' underwriting guideline has an impact on the market. *See id.* at 94:4-7 ("I can take you halfway there but I can't – I have not and I am not trained to provide an ultimate empirical analysis on the effect o[n] the marketplace."). Professor Schwarcz's *ipse dixit* concerning the impact of Travelers' underwriting guideline on the market as set forth in paragraphs 16-18, 20, 23 of his report and paragraph 5 of his rebuttal report should be excluded.

- Professor Schwarcz seeks to opine about Travelers' intent, despite having no basis for knowing why the relevant decision-makers at Travelers made the decisions they made. His opinions concerning Travelers' intent or the intent of a Travelers' employee as set forth in paragraphs 20 and 22 of his report should be excluded.

- Professor Schwarcz asserts that Travelers lacks any empirical or verifiable basis for its underwriting guideline but admits he did no independent investigation of Travelers' loss experience (and only reviewed a fraction of the Travelers documents produced in this case). Ex. 3 (Schwarcz Tr.) at 169:12-20; Ex. 1 (Schwarcz Rpt.) at 10. Paragraphs 20-21 of his report and paragraphs 5, 8 of his rebuttal report should be excluded.

- Professor Schwarcz seeks to opine about "potentially plausible" reasons that Section 8 tenants may be less risky even though he did nothing to test whether any of his theories are true (or even actually plausible) and he has no expertise concerning the risks of properties with Section 8 housing. *See* Ex. 3 (Schwarcz Tr.) at 44:3-5, 93:12-20. Paragraph 21 of his report should be excluded.

---

5     Even if not excluded in his entirety, paragraphs 8-19, 21-23 of his report and paragraphs 2-5, 7-8 of his rebuttal report should be excluded as improper and baseless legal conclusions.

6     Indeed, an individual's *own* prior alleged bad acts are generally not admissible to try to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Here, plaintiffs seek to offer evidence of an *entire industry's* alleged prior conduct to impugn the motives of Travelers.

7     Where a purported expert opinion is "connected to the underlying data only by the *ipse dixit* of the expert," such opinion is properly excluded. *Whitlock v. Pepsi Ams.*, No. C 08-2742, 2011 WL 2746494, at *5 (N.D. Cal. July 13, 2011) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (quotations omitted)).

Case No. 5:13-cv-02390-LHK (PSG)
**TRAVELERS' OMNIBUS *DAUBERT* MOTION TO EXCLUDE**
- 3 -

- Professor Schwarcz opines about how landlords who rent to Section 8 tenants and those who do not are, or are not, distinguished "outside of the insurance industry" despite having no expertise concerning landlords or Section 8 housing within or outside of the insurance industry. Paragraph 19 of his report and paragraph 7 of his rebuttal report should be excluded.

## II.     Jacob L. Vigdor

Dr. Vigdor is an economist who spent a mere 11 hours preparing his "rebuttal" report and a substantial portion of the time was spent rebutting the opinions of Joel Chansky, which were subsequently stricken. Ex. 7 (Vigdor Invoice). Dr. Vigdor's remaining opinions (Nos. 1, 4-6), purported rebuttal to Travelers' experts Scott Harrington and Gary Painter, however, are (1) unreliable and not supported by any analysis, and (2) not helpful to the trier of fact on any issue in this case. Ex. 5 (Vigdor Rpt.).

Dr. Vigdor's opinion that it is "misleading" to group landlords who rent to Section 8 tenants with landlords managing other forms of "subsidized, public or government funded complexes" (Opinion No. 1) is not based on any analysis or study. Dr. Vigdor has no relevant expertise or qualifications to opine as to whether landlords who rent to Section 8 tenants are actuarially more risky than landlords who do not and his report is not based on any reliable methodology or analysis. Ex. 6 (Vigdor Tr.) at 53:21-54:4. Dr. Vigdor's personal opinion as to whether properties participating in the Section 8 program should be classified as "subsidized, public, or government funded complexes" is entirely irrelevant; at best, it reflects his view that Travelers' application of the guidelines was "wrong, mistaken, or unwise," which is ***insufficient*** to establish discriminatory motive or pretext as a matter of law. *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc*., 642 F.3d 728, 746 (9th Cir. 2011).

Dr. Vigdor's opinions concerning the potential impact on tenants from an insurer's decision to exit the market (Opinion Nos. 4-5) are based solely on unidentified "concepts of microeconomics" and not any reliable analysis of facts or data. *Id.* at 166:13-14. He offers pure speculation about how a hypothetical landlord might react to a decision by a hypothetical insurer in a hypothetical circumstance and the resulting potential impact on hypothetical tenants. Ex. 5 (Vigdor Rpt.) at Ops. 4-5. In addition to being wholly theoretical, Dr. Vigdor concedes that his economic theory does not necessarily apply in the real world. Ex. 6 (Vigdor Tr.) at 152:12-18.

1  Nor did Dr. Vigdor attempt to study the actual effects of Travelers' underwriting guideline.[8]  Dr.
2  Vigdor's opinions concerning the hypothetical impact of an insurer's decision to "exit" a market
3  are also irrelevant because Plaintiffs do not allege that Travelers has "exited" any market.

4       Dr. Vigdor's claim that he has personally seen no evidence that Travelers lost money
5  insuring landlords who rent to Section 8 tenants (Opinion No. 6) is entirely undercut by his
6  admission that he did not consider or look for any such evidence.  Dr. Vigdor admits that he does
7  not know whether Travelers made or lost money insuring landlords who rent to Section 8 tenants.
8  Ex. 6 (Vigdor Tr.) at 92:25-93:7.  Dr. Vigdor's "expert" corollary that companies generally try to
9  make a profit  is also not an appropriate expert opinion.

10  **III.**     **Calvin P. Bradford**

11       Dr. Bradford is a sociologist who reviewed census data and asserts that Section 8 recipients
12  are disproportionately members of certain protected classes when compared to the population as a
13  whole.  Dr. Bradford's entire methodology is unreliable, however, since Plaintiffs' counsel
14  instructed him to exclude any data regarding Hispanic and Asian-American households that
15  contradicts Plaintiffs' theory of the case.  Ex. 10 (Bradford Tr.) at 79:3-80:18.

16       Dr. Bradford's reports also contain four specific defects.  First, he opines that Travelers'
17  guideline "impacts the households that hold Section 8 vouchers."  Ex. 9 (Bradford Supp. Rpt.) at
18  2.  This opinion is not based on any analysis or study; he did not, for example, analyze how
19  Travelers' guideline impacts the price of insurance, how landlords may react to any pricing
20  impact, and what impact any price impact might have on tenants.  Ex. 10 (Bradford Tr.) at 121:3-
21  20.  Nor did he assess whether other insurance was available.  *Id.* at 105:11-16.  To the contrary,
22  *he freely admits that he is not aware of a single injured landlord or tenant*.  *Id.* at 114:13-22 (Q:
23  "there's certainly nothing in your report about any tenant suffering anything as a result of any
24  policy of Travelers, correct?" A: "That's – that's right.").  Other courts have excluded similar
25  analyses by Dr. Bradford on the basis that his opinions were "inherently speculative."  *Hallmark*

---

[8]    *See, e.g.*, *Joiner*, 522 U.S. at 144, 146 (affirming exclusion of expert opinions that were based on studies too "dissimilar to the facts presented" to support them, and holding that "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

1  *Developers, Inc. v. Fulton County.*, 466 F.3d 1276, 1283, 1286 (11th Cir. 2006).  The Ninth
2  Circuit itself has made clear that disparate impact may not be proven by inference, and inference is
3  the most Dr. Bradford has to offer.[9]

4  Second, Dr. Bradford's "four-fifths" legal test, Ex. 8 (Bradford Rpt.) at 13-15, is improper
5  and unreliable.  *See* Ex. 10 (Bradford Tr.) at 102:24-103:3 (explaining that his test is "not a
6  statistical thing" but rather a "kind of standard already used in [employment] cases").  Dr.
7  Bradford admits that no court has ever applied his four-fifths standard in a house discrimination
8  case and that no articles suggest its use is appropriate.  *Id.* at 102:1-5, 103:14-15.  But to make
9  matters worse, he applies this invalid rule to wholly imaginary data:  "Consider a case where the
10 denial of housing would affect 8% of households without children and 12.5% of the households
11 with children."  Ex. 8 (Bradford Rpt.) at 14.  But this admittedly imaginary data has no connection
12 to this case.

13 Third, Dr. Bradford's opinions about "the history of discrimination," Ex. 9 (Bradford
14 Supp. Rpt.) at 10-16, are irrelevant, inflammatory, and prejudicial.  For example, he claims an
15 unrelated insurance publication from 1907 is "profoundly anti-semitic" and that racial
16 discrimination has been supported by the federal courts.  *Id.* at 14 and 10.  Dr. Bradford's
17 offensive "lunch counter" analogy, *id.* at 7, which he has repeatedly used in unrelated cases, is
18 irrelevant, prejudicial and "flawed."  *Hallmark*, 466 F.3d 1276 at 1288.  None of the historical acts
19 of discrimination cited by Dr. Bradford are alleged to have been committed by Travelers, let alone
20 the individuals involved in the facts of this case.

21 Fourth, Dr. Bradford's opinion about a "moral hazard" underwriting standard, Ex. 9
22 (Bradford Supp. Rpt.) at 15-16, is baseless.  Dr. Bradford never worked in the insurance industry,
23 has no experience with insurance for commercial real estate, and is not an actuary.  Ex. 10
24 (Bradford Tr.) at 17-18, 22, 25.  Thus, Dr. Bradford simply has no basis to opine about insurance
25 industry underwriting practices.

---

[9] *See Gamble v. City of Escondido*, 104 F.3d 300, 306-07 (9th Cir. 1997); *Palmer v. United States*, 794 F.2d 534, 536-37 (9th Cir. 1986).

**Case No. 5:13-cv-02390-LHK (PSG)**
**TRAVELERS' OMNIBUS *DAUBERT* MOTION TO EXCLUDE**
- 6 -

### IV. Catherine M. Bishop

Ms. Bishop is a former tenant advocacy attorney. Her opinions are steeped in legal advocacy but unsupported by facts, data, or reliable analysis. Her thoughts about whether Travelers' business justifications for its underwriting guideline are "applicable," "relevant" or "valid," Ex. 11 (Bishop Rpt.) at 2, are improper legal opinions and, fundamentally, seeks to answer the wrong question.[10] Fundamentally, whether Plaintiffs or their experts believe that Travelers' underwriting guidelines are "wrong, mistaken, or unwise," or should not apply to Section 8 properties, is simply not relevant to pretext or intent, and thus her opinions would not be helpful to the trier of fact on any issue. *Lucent*, 642 F.3d at 746. Ms. Bishop argues, for example, that the Section 8 program does not lead to reduced rates of occupancy, lower than market rents, inadequate cash flow for landlords, diminished property maintenance, or increased losses. *Id.* at 13. Even if Ms. Bishop were correct, that would not prove discriminatory intent or pretext.[11] Further, Ms. Bishop is not qualified to offer this testimony because she is not an economist, statistician, or actuary, nor an expert in insurance, business, or behavioral psychology. Ex. 13 (Bishop Tr.) at 42:23-44:5.

Ms. Bishop's report cites no study or analysis of market rents and, moreover, she concedes that in the Section 8 voucher program a government entity imposes a *cap* on rents at the 40th percentile of what the agency believes to be the median rent, which undermines her premise. Ex. 11 (Bishop Rpt.) at 9. Ms. Bishop likewise has no foundation for her argument that the Section 8 voucher program leads to "more stable tenants" and does not lead to "inadequate cash flows" for landlords. *Id.* at 12, 13. Her opinions regarding landlord cash flows and occupancy rates are not

---

[10] It is well settled that even a showing that a defendant's facially neutral business justification is "wrong, mistaken, or unwise" is insufficient to establish a claim of discrimination or to overcome a defendant's business justification. *See Lucent*, 642 F.3d at 746.

[11] Pretext requires a showing that defendant's justification contains "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the [defendant's] proffered legitimate reasons for its action that [the jury] could . . . find them unworthy of credence." *Burrell v. County of Santa Clara*, No. 11-CV-04569-LHK, 2013 WL 2156374, at *19 (N.D. Cal. May 17, 2013) (quoting *Lucent*, 642 F.3d at 746). Disagreement with Travelers' concerns does not rise to the level of such inconsistencies as to support a claim of pretext. *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1063 (9th Cir. 2002).

supported by her experience as a tenant advocate, or any other experience, and she did not survey landlords or review literature (or do anything else) to inform her opinion on these issues.[12] Likewise, Ms. Bishop's argument that Section 8 landlords are a "better insurance risk than other private landlords," Ex. 12 (Bishop Rebuttal Rpt.) at 5, lacks reliable foundation and is not based on any data, study or other reliable information. Ms. Bishop brings no qualifications, facts or data to support any of these opinions. Thus, Section 7.A of Ms. Bishop's report should be excluded in its entirety, Ex. 11 (Bishop Rpt.) at 13-16, along with her opinion in Section 6 that the voucher program leads to more stable tenants, *id.* at 12, and her opinion in her rebuttal report that Section 8 landlords are a better insurance risk. Ex. 12 (Bishop Rebuttal Rpt.) at 2, 5.

## V.   J. Robert Hunter

Mr. Hunter is an actuary, Ex. 14 (Hunter Rpt.) at 27, who has no experience with insurance for landlords that rent to voucher holders or with the Section 8 program generally. Ex. 15 (Hunter Tr.) at 50:22-52:11. Mr. Hunter was principally retained to rebut Mr. Chansky. The Court should exclude Mr. Hunter's opinion that the financial condition of landlords in the Section 8 voucher program is "fine." Ex. 14 (Hunter Rpt.) at 12. Mr. Hunter is not qualified to provide such testimony, Ex. 15 (Hunter Tr.) at 50:22-52:11, 62:6-63:5, nor is his opinion based on any facts or data. Rather than conducting any analysis, he relied entirely on the unsupported opinion of Ms. Bishop. *Id.* at 102:9-22, 107:9-108:3, 111:22-114:22.[13] The Court should also exclude Mr. Hunter's statement that "the variation in quality and safety standards by housing agencies is monitored and corrected by HUD." Ex. 14 (Hunter Rpt.) at 11. Mr. Hunter's report does not cite anything at all in support of that statement, which is plainly beyond Mr. Hunter's area of expertise

---

[12]   Ms. Bishop cites three articles to support her argument that Section 8 voucher recipients are more stable tenants. However, the articles she cites do not compare Section 8 HCV tenants to the general population, but to "unassisted households at comparable income levels" to Section 8 tenants. Ex. 11 (Bishop Rpt.) at 12.

[13]   *See, e.g.*, *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. 2:08-cv-1448 JCM (RJJ), 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011) ("As courts have repeatedly held, and can be implied from rule 702, an expert cannot merely base his opinions upon the opinions of others without having an independent basis for his opinion." (citing *United States v. 99.66 Acres of Land*, 970 F.2d 651, 657 (9th Cir. 1992))); *Newkirk v. Conagra Foods, Inc.*, 727 F. Supp. 2d 1006, 1031 (E.D. Wash. 2010) (excluding experts who relied on opinion of another expert who was excluded under *Daubert*), *aff'd*, 438 F. App'x 607 (9th Cir. 2011).

as an actuary. The Court should further exclude Mr. Hunter's opinion that insuring landlords who rent to Section 8 voucher holders "did not cause a problem for Travelers in earning a profit" as it is also unsupported. *Id.* at 19. Mr. Hunter relies solely on information showing that Travelers Commercial Multi-Peril business as a whole made a profit without any connection to the Apartment Pac policies at issue, let alone the Apartment Pac policies sold to landlords who rent to Section 8 tenants. Ex. 15 (Hunter Tr.) at 239:16-240:9 ("I guess I don't have a basis . . . .").

### VI.    J. Rosie Tighe

Dr. Tighe is an assistant professor of urban studies. Ex. 16 (Tighe Rpt.) at 1. Dr. Tighe opines that (1) stereotypes exist in "the public" or in "America" generally and (2) Travelers' underwriting guideline and certain statements by Travelers' employees are "consistent with" or "illustrative of" stereotyping. *Id.* at 8, 11. Dr. Tighe's opinion about stereotypes (Section 6) contains numerous prejudicial accounts of acts of purported discrimination *by entities other than Travelers* at other times under other circumstances. These irrelevant and prejudicial opinions should be excluded.

Dr. Tighe's opinions about six cherry-picked Travelers email excerpts (none of which pertain to the Joneses or this case) (Section 7) should be excluded in their entirety as unreliable, unhelpful to the trier of fact, and unduly prejudicial.[14] Dr. Tighe herself concedes she is "not comfortable saying that those e-mails represented stereotypes." Ex. 17 (Tighe Tr.) at 187:10-11. She admits that the emails are not sufficiently representative to make any generalizations about whether *Travelers* stereotypes or has "any kind of discriminatory intent." *Id.* at 179:9-181:4, 193:20-21. As the Supreme Court has observed, such anecdotal evidence "prove[s] nothing at all." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2556 (2011) (120 anecdotes of discrimination "selected from literally millions of employment decisions prove nothing at all"). She has no evidence that Travelers engaged in any conduct based on these emails, Ex. 17 (Tighe Tr.) at 194:1-9, or that "any stereotypes were acted upon as a result [of] those e-mail exchanges,"

---

[14]    "[B]are qualifications alone cannot establish the admissibility of scientific expert testimony" where the methodology and basis of analysis employed by the expert are unreliable, even for non-scientific experts. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)).

1  *id.* at 187:14-17. Dr. Tighe acknowledges that to draw any meaningful conclusions she would
2  have had to analyze a random sample of emails that was large enough to support a conclusion of
3  statistical significance, which she did not do. *Id.* at 174:10-178:15. She also concedes that the
4  methodology she applied here has not been used in any published studies and thus is not accepted
5  in her field. *Id.* at 171:4-15; *see also id.* at 164:21-25.

6      Allowing Dr. Tighe to offer her opinions about these email excerpts would result in
7  unnecessary mini-trials as to the context of these emails and the authors' state of mind. It is also
8  improper to allow an expert to simply re-hash statements by others about which the witness has no
9  personal knowledge, particularly on issues relating whether a defendant acted based on
10 discriminatory motives.[15] Finally, whatever minimal probative value Dr. Tighe's opinions could
11 possibly have as to whether emails or other statements are "consistent with" social research on
12 stereotyping would be greatly outweighed by the obvious prejudice and confusion such testimony
13 would cause.[16]

14     Lastly, when Dr. Tighe claims that there is "evidence of discrimination toward voucher
15 holders," Ex. 16 (Tighe Rpt.) at 7, she is referring only to "source of income discrimination," Ex.
16 17 (Tighe Tr.) at 132:9-13. Since source of income is not a protected class, or the subject of any
17 claim in this case, this opinion is irrelevant, highly prejudicial and likely to confuse the jury.

18 **CONCLUSION**

19     For these reasons, Travelers respectfully submits that its Motion to Exclude be granted.

---

[15] *See Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) ("Where expert testimony simply rehash[es] otherwise admissible evidence about which [the expert] has no personal knowledge, such evidence—taken on its own—is inadmissible." (citation omitted)).

[16] Dr. Tighe argues that Travelers "assum[ed] the worst about subsidized housing," Ex. 16 (Tighe Rpt.) at 10, but she admits she disregarded key factors relied upon by Travelers, such as the underwriting concerns that stem from having a government agency involved in the financing of Section 8 landlords, Ex. 17 (Tighe Tr.) at 70:13-22. The only explanation Dr. Tighe purported to consider was Travelers' concern with the maintenance of Section 8 properties—but Dr. Tighe is not an expert in property management and she did not do any research or analysis to determine whether there is a correlation between the amount of rent a landlord charges and the quality of maintenance and upkeep of the property. *Id.* at 47:22-25, 79:10-15.

| | |
|---|---|
| Dated: May 8, 2015 | SIMPSON THACHER & BARTLETT LLP |
| | By /s/ Andrew T. Frankel |
| |     Andrew T. Frankel |
| | Paul C. Curnin |
| | Andrew T. Frankel |
| | David Elbaum |
| | Alexander B. Simkin |
| | Matthew T. O'Connor |
| | CARLSON, CALLADINE & PETERSON |
| | Robert M. Peterson |
| | Michael C. Cooper |
| | Melissa A. Dubbs |
| | Attorneys for Defendant TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA |