1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5

6   LINCOLN JONES, JR. AND MUYESSER    )  C-13-02390 LHK
    NILE JONES, INDIVIDUALLY AND AS    )
    TRUSTEES OF THE LINCOLN AND M.     )  SAN JOSE, CALIFORNIA
7   NILE JONES REVOCABLE TRUST; AND    )
    PROJECT SENTINEL, INC.,            )  MAY 7, 2015
8                                      )
                  PLAINTIFFS,          )  PAGES 1-62
9                                      )
            VS.                        )
10                                     )
    TRAVELERS CASUALTY INSURANCE       )
11  COMPANY OF AMERICA,                )
                                       )
12                DEFENDANT.           )
    _____   )
13

14

15             TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE LUCY H. KOH
16            UNITED STATES DISTRICT JUDGE

17  A P P E A R A N C E S:

18  FOR THE PLAINTIFFS:    BRANCART & BRANCART
                           BY:  CHRISTOPHER BRANCART
19                              ELIZABETH BRANCART
                           P.O. BOX 686
20                         PESCADERO, CALIFORNIA  94060

21

22          APPEARANCES CONTINUED ON NEXT PAGE

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:        CARLSON, CALLADINE & PETERSON
                                 BY:  ROBERT M. PETERSON
5                                353 SACRAMENTO STREET, 16TH FLOOR
                                 SAN FRANCISCO, CALIFORNIA  94111
6

7                                SIMPSON, THATCHER & BARTLETT
                                 BY:  ANDREW T. FRANKEL
8                                425 LEXINGTON AVENUE
                                 NEW YORK, NEW YORK  10025
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    MAY 7, 2015

 2                  P R O C E E D I N G S

 3        (COURT CONVENED AT 1:45 P.M.)

 4            THE CLERK:  CALLING CASE 13-CV-02390, JONES, ET AL,

 5    VERSUS TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA.

 6        IF THE PARTIES WOULD PLEASE COME FORWARD AND STATE THEIR

 7    APPEARANCES FOR THE RECORD.

 8            MS. BRANCART:  I'M ELIZABETH BRANCART ON BEHALF OF

 9    THE PLAINTIFFS.

10            MR. BRANCART:  GOOD AFTERNOON.  CHRIS BRANCART ON

11    BEHALF OF THE PLAINTIFFS, WHO ARE PRESENT HERE TODAY ON BEHALF

12    OF PROJECT SENTINEL AND MRS. JONES.

13            THE COURT:  OKAY.

14            MR. PETERSON:  GOOD AFTERNOON, YOUR HONOR.  I'M

15    ROB PETERSON, I'M WITH CARLSON, CALLADINE & PETERSON,

16    REPRESENTING TRAVELERS.

17            MR. FRANKEL:  GOOD MORNING, YOUR HONOR.  ANDY FRANKEL

18    FROM SIMPSON, THATCHER & BARTLETT IN NEW YORK, ALSO ON BEHALF

19    OF TRAVELERS.  AND WE HAVE RACHEL O'NEILL, ALSO ON BEHALF OF

20    TRAVELERS, IN THE AUDIENCE WITH US AS WELL.

21            THE COURT:  ALL RIGHT.  WELCOME TO EVERYONE.

22        DO YOU HAVE THE JONESES HERE?

23            MS. BRANCART:  MRS. JONES.

24            MR. BRANCART:  MRS. JONES.

25            THE COURT:  ALL RIGHT.  WELCOME TO MRS. JONES AND
```

```
1         MRS. O'NEILL, AND EVERYONE ELSE IS FROM?

2              MS. BRANCART:  PROJECT SENTINEL.

3              THE COURT:  OKAY.  WELCOME TO EVERYONE TODAY.

4              MR. PETERSON:  THANK YOU.

5              THE COURT:  LET'S START WITH DISPARATE TREATMENT.

6         WELL, LET ME FIRST ASK, THERE WERE SOME QUESTIONS THAT I

7    HAD.  IT SOUNDS LIKE MRS. JONES CORRECTS HER APPLICATION, THIS

8    IS WITH REGARD TO THE UNDERWRITER NIS, AND SHE ORIGINALLY SAID

9    THERE WERE NO SECTION 8 TENANTS, AND THEN WITHIN A DAY OR TWO

10   SHE CORRECTED IT AND THEN SHE MAILED THE CORRECTED APPLICATION

11   IN TO NIS.

12        DID TRAVELERS ACTUALLY RECEIVE THAT CORRECTED APPLICATION?

13   THERE'S NO EVIDENCE OF THAT IN THE RECORD ONE WAY OR THE OTHER.

14             MS. BRANCART:  NO, THEY -- THERE'S NO EVIDENCE IN THE

15   RECORD THAT THEY RECEIVED IT, OTHER THAN MRS. JONES SAYING SHE

16   MAILED IT.

17             THE COURT:  OKAY.  WHAT ABOUT NIS, DO THEY SAY THEY

18   RECEIVED IT?

19             MS. BRANCART:  THEY CLAIM THEY DID NOT.

20             THE COURT:  OKAY.  SO THEY NEVER RECEIVED THE CHECK,

21   EITHER?

22             MS. BRANCART:  THEY RECEIVED THE CHECK.

23             THE COURT:  OH, I SEE.  OKAY.  BUT THEY'RE SAYING THE

24   CHECK DID NOT INCLUDE AN AMENDED APPLICATION?

25             MS. BRANCART:  THAT'S WHAT THEY'RE SAYING.
```

1           THE COURT:  ALL RIGHT.  SO -- NOW, ONE OF THE

2    EXPLANATIONS THAT TRAVELERS GIVES FOR WHY THEY DID NOT RENEW

3    THE JONESES IS DELAY ON THE PART OF MRS. JONES IN RESPONDING TO

4    THEIR INQUIRY, AND THE RECORD SEEMS TO SAY THAT TRAVELERS

5    CONTACTED THE UNDERWRITER FOR TRAVELERS, WHO WAS, I GUESS,

6    DEALING WITH THE CLAIM OF THE POTENTIAL SUIT THAT HAD BEEN

7    FILED, ASKED FOR THE NUMBER OF SECTION 8 TENANTS ON A FRIDAY;

8    AND THEN THE FOLLOWING MONDAY, THREE DAYS LATER, MRS. JONES

9    GAVE THE DATA TO THE TRAVELERS UNDERWRITER, BUT THE UNDERWRITER

10   HAD ALREADY MADE THE DECISION NOT TO RENEW BEFORE RECEIVING THE

11   DATA FROM MRS. JONES.

12        SO WHAT'S THE BASIS FOR THE DELAY, FOR THE NON-RENEWAL?

13           MR. FRANKEL:  THE DELAY FOR THE NON-RENEWAL?  I THINK

14   THERE'S --

15           THE COURT:  FRIDAY TO MONDAY DOESN'T SOUND LIKE DELAY

16   TO ME.  IT SOUNDS PRETTY GOOD.

17           MR. FRANKEL:  YEAH.  THERE WAS A SERIES -- NOBODY

18   DISPUTES THAT THE REAL REASON FOR THE -- ONE OF THE REASONS FOR

19   THE NON-RENEWAL IS BECAUSE THE POLICY WAS NOT ELIGIBLE UNDER

20   THE SUBSIDIZED GOVERNMENT AND PUBLICLY FUNDED INELIGIBILITY

21   UNDER THE GUIDELINES, SO I WANT TO JUST MAKE THAT CLEAR AT THE

22   OUTSET.

23        THERE WERE A STRING OF E-MAILS BETWEEN MR. NOEL AND THE

24   AGENT FROM NIS, BECAUSE TRAVELERS DOESN'T HAVE DIRECT

25   COMMUNICATIONS WITH THE INSURED, IT'S DONE THROUGH THE AGENT.

```
1    AND THE E-MAILS REFLECT THAT THE AGENT WAS HAVING DIFFICULTY

2    GETTING INFORMATION FROM MRS. JONES ABOUT THIS ISSUE.  THERE

3    WERE OBJECTIONS AND --

4           THE COURT:  IS THIS THE FRIDAY THROUGH MONDAY?  WHEN

5    WAS THE REQUEST MADE?

6           MR. FRANKEL:  I -- I DON'T -- I DON'T KNOW EXACTLY.

7    MY -- I THOUGHT IT WAS OVER ABOUT A WEEK TIME PERIOD, BUT I

8    COULD BE MISTAKEN ABOUT THAT.

9        IT'S NOT A CRITICAL POINT FOR OUR MOTION, BUT IT WAS A

10   COMBINATION OF -- I THINK MR. NOEL, IN HIS DEPOSITION AND IN

11   HIS E-MAILS, THE CONCERN WAS NOT SO MUCH THE DELAY, BUT THE

12   FACT THAT THE AGENT WAS ASKING FOR INFORMATION FROM THE INSURED

13   AND THE INSURED WASN'T PROVIDING IT AND WAS OBJECTING TO IT.

14       BUT AS I SAID AT THE OUTSET, THAT WAS A REASON, BUT THE

15   PRINCIPAL REASON WAS THAT THE POLICY -- OR THE POLICY JUST

16   WASN'T ELIGIBLE UNDER THE GUIDELINES.

17          THE COURT:  OKAY.  WOULD YOU LIKE TO RESPOND TO THAT?

18          MS. BRANCART:  WELL, YES.

19       IN DISCOVERY, IT'S CLEAR THAT THE ONLY REASON THAT THE

20   JONESES WERE CANCELLED WAS BECAUSE OF THE SECTION 8 POLICY.

21          THE COURT:  UM-HUM.

22          MR. BRANCART:  AND THEY ATTEMPTED TO GET INFORMATION

23   FROM HER ON FRIDAY AND SHE WAS UPSET ABOUT IT BECAUSE SHE --

24   BUT SHE CALLED THEM BACK ON MONDAY AND GAVE THEM THE

25   INFORMATION.
```

```
 1                THE COURT:  UM-HUM.

 2                MS. BRANCART:  BUT BEFORE THEN, IN THE MORNING,

 3       THEY'D ALREADY DECIDED TO CANCEL THE POLICY.

 4                THE COURT:  UM-HUM.

 5                MR. BRANCART:  SO --

 6                THE COURT:  YOU'RE SAYING DELAY IS A PRETEXT,

 7       PRETEXTUAL --

 8                MS. BRANCART:  WELL, I THINK IT'S NOT REALLY ONE OF

 9       THE REAL REASONS.  I MEAN, YEAH, IT'S PRETEXT, BUT I DON'T KNOW

10       HOW HARD THEY'RE PUSHING THAT.

11                THE COURT:  OKAY.

12                MS. BRANCART:  AT LEAST FOR PURPOSES OF SUMMARY

13       JUDGMENT.

14                THE COURT:  ALL RIGHT.  LET ME ASK YOU, IS YOUR

15       EVIDENCE OF DISCRIMINATORY INTENT ALL CIRCUMSTANTIAL?

16                MS. BRANCART:  YES, BUT THERE'S A LOT OF IT.

17                THE COURT:  OKAY.  SO TELL ME WHAT -- YOU HAVE THE

18       E-MAILS THAT ARE IN YOUR OPPOSITION.

19                MS. BRANCART:  YES.

20                THE COURT:  YOU HAVE THE NON-RENEWAL SAYING IT'S

21       BECAUSE OF SECTION 8 HOUSING.  WHAT ELSE?

22                MS. BRANCART:  YES.

23                THE COURT:  AM I MISSING ANYTHING?

24                MS. BRANCART:  YES, YES.

25                THE COURT:  OKAY.  WHAT ELSE AM I MISSING?
```

```
1              MS. BRANCART:  SO WE HAVE THE EVIDENCE OF THE POLICY

2      ITSELF, WHICH IS A BINARY POLICY, IT'S TRIGGERED BY THE

3      PRESENCE OF SECTION 8 TENANTS, AND IF THERE'S A PERSON -- IF A

4      LANDLORD IS QUALIFIED WITH NO SECTION 8 TENANTS, THEY WILL GET

5      THE POLICY.

6          IF THEY HAVE ONE OR MORE SECTION 8 TENANTS, THE SAME

7      LANDLORD WOULD NOT BE GETTING THE POLICY.

8              THE COURT:  UM-HUM.

9              MS. BRANCART:  AND WE HAVE EVIDENCE THAT THE

10     POPULATION OF PEOPLE WHO ARE ON SECTION 8 IN SANTA CLARA COUNTY

11     AND CALIFORNIA IS DISPROPORTIONATELY AFRICAN-AMERICAN,

12     DISPROPORTIONATELY FEMALE, DISPROPORTIONATELY FEMALE WITH

13     CHILDREN, DISPROPORTIONATELY ELDERLY, AND IN FACT, IN OTHER

14     PARTS OF THE COUNTRY, IT'S, LIKE, 80, 90 PERCENT

15     AFRICAN-AMERICAN AND SINGLE WOMEN WITH CHILDREN.

16             THE COURT:  UM-HUM.

17             MS. BRANCART:  AND WE ALSO HAVE EVIDENCE, BASED ON

18     THE SOCIAL SCIENCE RESEARCH, THAT THERE ARE STEREOTYPES THAT

19     ARE ASSOCIATED WITH SUBSIDIZED HOUSING, THAT AMERICANS BELIEVE

20     THAT SUBSIDIZED HOUSING IS PREDOMINANTLY MINORITY, THAT THERE'S

21     A LOT OF NEGATIVE CHARACTERISTICS, MIS -- EXCUSE ME -- NEGATIVE

22     CHARACTERIZATIONS OF THE PEOPLE WHO ARE USING SUBSIDIZED

23     HOUSING, THAT IT IS -- AND THOSE SAME NEGATIVE CHARACTERISTICS

24     ARE ASCRIBED TO PEOPLE WITH SUBSIDIZED HOUSING AND MINORITIES

25     AND THAT THEY DON'T TAKE CARE OF THEIR PROPERTY, THEY DON'T
```

1    MAINTAIN IT.

2        SO WE HAVE THESE STEREOTYPES AND WE HAVE A POLICY BY

3    TRAVELERS, WHICH TRAVELERS ADMITS THEY DID NOT, AT THE TIME,

4    HAVE ANY EVIDENCE THAT THEY CONSIDERED ANY KIND OF DATA,

5    STUDIES, EMPIRICAL EVIDENCE TO SUBSTANTIATE MAKING PRIVATE

6    LANDLORDS WITH ONE OR MORE SECTION 8 TENANTS INELIGIBLE FOR

7    THEIR APARTMENT PAC.

8        SO GIVEN THAT, WE ASKED, WELL, WHY DO YOU HAVE THE POLICY?

9        AND IN TRAVELERS' SUBMISSIONS ON SUMMARY JUDGMENT -- AND

10   THIS WAS ALSO INFORMATION THEY GAVE DURING DISCOVERY -- THEIR

11   30(B)(6) WITNESS, BRIAN KEARNEY, EXPLAINS, AND THIS IS IN HIS,

12   IN PARAGRAPH 15 OF HIS DECLARATION, WHICH IS AT THE DOCKET AT

13   156.  HE SAYS, "THE APARTMENT PAC POLICY IS GEARED TOWARD

14   WELL-RUN, WELL MAINTAINED PROPERTIES WITH FULL OCCUPANCY BASED

15   ON FULL MARKET-BASED RENTALS.  THAT IS NOT TO SAY THAT ALL

16   SUBSIDIZED, PUBLIC OR GOVERNMENT FUNDED COMPLEXES NECESSARILY

17   INVOLVE LESS WELL-MAINTAINED PROPERTIES.  BUT SO LONG AS THERE

18   EXISTS A RISK THAT SOME PROPERTIES IN THIS CATEGORY MAY PRESENT

19   HIGHER OR UNKNOWN PROPERTY OR LIABILITY RISKS, IT IS AN

20   INAPPROPRIATE EXPOSURE TO INCLUDE IN A POLICY SUCH AS"

21   APARTMENT PAC.

22        AND THEN HE GOES ON TO SAY THAT "LOWER OCCUPANCY RATES,

23   LESS THAN MARKET-BASED RENTS, GOVERNMENTAL RESTRICTIONS, CASH

24   FLOW, AND OTHER FACTORS THAT MAY BE UNIQUE TO SUBSIDIZED,

25   PUBLIC OR GOVERNMENT FUNDED HOUSING CAN IMPACT THE QUALITY OF

1    THE OWNER'S MAINTENANCE OF THE PROPERTY AND ABILITY TO MINIMIZE

2    PROPERTY LIABILITY LOSSES."

3         SO MAINTENANCE AND THE FAILURE TO HAVE MAINTENANCE IS A

4    BIG ISSUE FOR TRAVELERS IN, IN -- AS A BASIS FOR ITS APARTMENT

5    PAC POLICY EXCLUSION.

6         BUT THEN IN HIS DEPOSITION -- AND THIS IS AT THE DOCKET AT

7    173-3 -- MR. KEARNEY ELABORATED.  HE SAID THAT TRAVELERS, WHEN

8    A LANDLORD HAS NO SUBSIDIZED HOUSING AND THEY -- A PRIVATE

9    LANDLORD -- THAT TRAVELERS WILL INFER THAT IT IS A

10   WELL-MAINTAINED PROPERTY, AND IF THE LANDLORD HAS A SECTION 8

11   TENANT, THEY ARE NO LONGER ENTITLED TO THAT PRESUMPTION.

12        SO ALTHOUGH IN BOTH CASES TRAVELERS HAS THE SAME

13   INFORMATION, THEY BASE -- THEY LOOK AT THE LANDLORD WHO APPLIES

14   FOR APARTMENT PAC AND THEY SAY, YOU KNOW, HOW MANY YEARS HAVE

15   YOU BEEN IN BUSINESS, HOW OLD IS THE BUILDING, WHAT ARE THE

16   UPDATES, WHAT ARE YOUR LOSS INFORMATION, WHAT'S YOUR OCCUPANCY,

17   ALL THAT INFORMATION.

18        WHEN THE LANDLORD IS -- HAS NO SECTION 8 TENANTS, ALL THAT

19   INFORMATION TOGETHER MEANS IT'S A WELL-MAINTAINED PROPERTY.

20        IF THERE'S A SECTION 8 TENANT, EVEN THOUGH THE LANDLORD IS

21   ALSO GIVING THE SAME INFORMATION AND TRAVELERS HAS THE SAME

22   INFORMATION, THE NUMBER OF YEARS IN BUSINESS, THE INSURANCE

23   LOSSES, AGE OF THE BUILDING, VACANCY RATE, IT'S THE PRESENCE OF

24   THE SECTION 8 TENANT AND THE VOUCHER IS WHAT MAKES IT DIFFERENT

25   AND DISQUALIFIES THE PROPERTY.

```
 1        SO IN ADDITION, TRAVELERS IS ALSO CONCERNED THAT
 2   SECTION 8, A LANDLORD WHO RENTS TO SECTION 8 TENANTS WILL HAVE
 3   MORE DISABLED TENANTS, AND THEY DON'T ASK THAT QUESTION OF ANY
 4   LANDLORD WHO APPLIES WHETHER THEY HAVE DISABLED TENANTS.
 5        NOW, THE --
 6            THE COURT:  I'M ACTUALLY GOING TO INTERRUPT YOU HERE.
 7   THANK YOU.
 8            MS. BRANCART:  OKAY.
 9            THE COURT:  LET ME ASK COUNSEL FOR TRAVELERS, YOU
10   AGREE THAT CIRCUMSTANTIAL EVIDENCE WOULD BE SUFFICIENT?  I'M
11   NOT ASKING YOU TO COMMENT ON THE EVIDENCE IN THIS CASE, BUT
12   CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATORY INTENT WOULD BE
13   SUFFICIENT, RIGHT?  THERE'S NO REQUIREMENT THAT YOU HAVE TO
14   HAVE ACTUAL --
15            MR. FRANKEL:  DIRECT EVIDENCE?
16            THE COURT:  -- DIRECT EVIDENCE?
17            MR. FRANKEL:  WE AGREE WITH THAT.  WHEN IT'S
18   SUBSTANTIAL AND SPECIFIC AND IT RISES -- AND IT PERMITS AN
19   INFERENCE OF INTENTIONAL DISCRIMINATION, OR PRETEXT FOR
20   INTENTIONAL DISCRIMINATION, THAT'S RIGHT, CIRCUMSTANTIAL
21   EVIDENCE, IN SOME CASES, CAN BE SUFFICIENT.
22            THE COURT:  OKAY.  BUT YOU'RE SAYING IN THIS CASE
23   IT'S JUST TOO WEAK, IT'S INSUFFICIENT TO MEET THAT BURDEN?
24            MR. FRANKEL:  THERE ARE LOTS OF REASONS, MANY REASONS
25   WE DO SAY THAT, YES, YOUR HONOR.
```

```
1          THE COURT:  OKAY.  LET ME ASK, THE SUPREME COURT'S

2     DECISION ON DISPARATE IMPACT BEING A THEORY FOR A FEDERAL

3     CLAIM, WOULD THAT IMPACT THE STATE CLAIM AT ALL?  OR NOT?

4          MR. FRANKEL:  IT DEPENDS ON -- IT DEPENDS REALLY ON

5     THE DECISION.

6          THE COURT:  OKAY.

7          MR. FRANKEL:  IF DISPARATE IMPACT IS THROWN OUT

8     ENTIRELY BY THE SUPREME COURT, WE CONCEDE THAT UNDER THE STATE

9     STATUTE, THEY DO RECOGNIZE A DISPARATE IMPACT THEORY UNDER THE

10    STATUTORY LANGUAGE.

11         THE COURT:  OKAY.

12         MR. FRANKEL:  SO TO THAT EVENT, IT WOULD NOT EFFECT

13    IT.

14        BUT ON THE OTHER HAND, THERE ARE LOTS OF ISSUES KIND OF IN

15    BETWEEN THOSE TWO YES OR NO SCENARIOS WHERE THE STATE COURTS,

16    EVEN THOUGH IT HAS DIFFERENT STATUTORY LANGUAGE, BECAUSE THE

17    FEDERAL COURTS, AT LEAST IN TITLE VII AND, IN SOME CASES, THE

18    FAIR HOUSING ACT, LOOK TO THE FEDERAL DECISIONS IN TERMS OF HOW

19    TO INTERPRET IT, THINGS LIKE, YOU KNOW, THE EXTENT TO WHICH

20    CAUSATION IS RELEVANT, THE PRIMA FACIE CASE, THE BURDEN

21    SHIFTING, THEY LOOK TO FEDERAL COURTS FOR GUIDANCE AND THEY

22    FOLLOW THOSE DECISIONS.

23        SO IT IS POSSIBLE THAT THERE COULD BE A SITUATION WHERE

24    THE SUPREME COURT RULES -- I THINK IT'S ACTUALLY LIKELY THAT

25    THIS MIGHT HAPPEN -- THAT THE SUPREME COURT IS GOING TO ISSUE
```

1    DECISIONS THAT AREN'T NECESSARILY BINDING OR WILL INVALIDATE

2    DISPARATE IMPACT, BUT WILL CERTAINLY INFORM THE WAY THAT

3    DISPARATE IMPACT WOULD BE APPLIED UNDER EITHER THE STATE OR

4    FEDERAL STATUTE.

5            THE COURT:  DO YOU AGREE WITH THAT?

6            MS. BRANCART:  TO SOME EXTENT.  I DISAGREE, THOUGH,

7    THAT CALIFORNIA JUDGES OR COURTS WOULD PROBABLY NOT -- WOULD BE

8    THAT MUCH SWAYED BY A NEGATIVE SUPREME COURT RULING BECAUSE THE

9    DISPARATE IMPACT IS ACTUALLY WRITTEN INTO THE STATE LAW THAT

10   THAT'S A METHOD OF PROOF.

11           THE COURT:  UM-HUM.

12           MS. BRANCART:  AND THERE'S THE ADDITIONAL PART OF

13   FEHA, WHICH IS GOVERNMENT CODE 12955.6, AND THAT EXPLICITLY

14   STATES THAT FEHA HAS TO BE AS PROTECTIVE AS THE FAIR HOUSING

15   ACT, BUT IT CAN BE MORE PROTECTIVE.

16           THE COURT:  UM-HUM.

17           MS. BRANCART:  SO I DON'T SEE THE COURTS INTERPRETING

18   FEHA -- GOING AGAINST WHAT THE STATUTE SAYS TO INTERPRET IT IN

19   LINE WITH THE SUPREME COURT.

20           THE COURT:  UM-HUM.

21           MS. BRANCART:  AND IF THAT DID HAPPEN, I THINK IT

22   WOULD BE A LONG TIME FROM NOW.

23           THE COURT:  OKAY.  BUT DO YOU AGREE THAT THERE MIGHT

24   BE, I DON'T KNOW, SOME TYPE OF BURDEN OR OTHER -- IF NOT

25   OVERALL, WHETHER THE THEORY ITSELF IS AVAILABLE OR NOT, BUT

```
1     THERE MIGHT BE OTHER CONSEQUENCES IN HOW THIS, THIS THEORY,

2     EVEN UNDER STATE LAW, WOULD BE PRESENTED TO A JURY?

3              MS. BRANCART:  WELL, FEHA ACTUALLY, IN THE DISPARATE

4     IMPACT SECTION WHERE IT DEFINES IT, ACTUALLY STATES WHAT THE

5     BURDENS ARE.

6              THE COURT:  OKAY.

7              MS. BRANCART:  SO UNLIKE THE FAIR HOUSING ACT WHERE

8     IT IS JUST UP IN THE AIR AS CASE LAW, OR NOW THE HUD

9     REGULATION, CALIFORNIA STATE LAW SAYS THIS IS WHAT YOU MUST

10    PROVE, THIS IS WHAT THE REBUTTAL IS.

11         SO, YES, OF COURSE ANY TIME THE SUPREME COURT COMES DOWN

12    WITH SOMETHING THAT IS, YOU KNOW, IN AN AREA OF CIVIL RIGHTS

13    LAW, HOUSING, EMPLOYMENT, I MEAN, IT HAS RIPPLES.

14             THE COURT:  UM-HUM.  BUT YOU CAN'T ENVISION ANYTHING

15    NOW THAT MIGHT BE ALTERED BASED ON THE U.S. SUPREME COURT

16    DECISION?

17             MS. BRANCART:  I DON'T THINK THAT THERE WILL BE

18    ANYTHING THAT'S MAJORLY ALTERED UNLESS THE SUPREME COURT

19    UPHOLDS THE DISPARATE IMPACT AND PUTS DOWN A NEW TEST.

20             THE COURT:  UM-HUM.

21             MS. BRANCART:  I MEAN, I SEE THAT MORE AS -- THAT

22    WOULD HAVE MORE EFFECT THAN I THINK OF THEM STRIKING IT DOWN.

23             THE COURT:  I SEE.  I SEE.

24         DID YOU HAVE ANYTHING SPECIFIC IN MIND THAT YOU THOUGHT

25    MIGHT BE ALTERED BASED ON THE U.S. SUPREME COURT DECISION?
```

1    MR. FRANKEL:  YEAH, I DID ACTUALLY.  YOU KNOW, THERE

2    WAS A DISCUSSION IN, PARTICULARLY IN JUDGE JONES' CONCURRING

3    OPINION IN THE FIFTH CIRCUIT BELOW ABOUT THE IMPORTANCE AND THE

4    SIGNIFICANCE OF CAUSATION WHEN -- IN TERMS OF WHEN A PARTY

5    ALLEGES DISPARATE IMPACT.  IT'S NOT JUST NAKED STATISTICS OR

6    STATISTICAL DISPARITY THAT SUBJECTS SOMEBODY TO POTENTIAL

7    LIABILITY.

8    THE COURT:  YEAH.

9    MR. FRANKEL:  THERE HAS TO BE -- THE PRACTICES AT

10   ISSUE HAVE TO HAVE CAUSED THE DISPARITY.  OTHERWISE IT OPENS UP

11   A CAN OF WORMS.

12   AND I WAS ACTUALLY AT THE SUPREME COURT ARGUMENT AND THERE

13   WAS SOME INTERESTING DIALOGUE WITH THE SOLICITOR GENERAL ON

14   THIS POINT AND SOME CONCERN EXPRESSED BY THE SUPREME COURT

15   ABOUT HOW DISPARATE IMPACT WOULD BE APPLIED UNDER THE FACTS OF

16   THIS CASE, AND THAT'S AN ISSUE HERE AS WELL.

17   THE -- WE AGREE THAT THE FEHA STATUTE HAS SOME GENERAL

18   LANGUAGE ABOUT SHIFTING BURDEN, BUT IT DOESN'T ADDRESS ALL OF

19   THOSE TYPES OF QUESTIONS.

20   THE COURT:  UM-HUM.

21   MR. FRANKEL:  AND SO THAT IS ONE SPECIFIC EXAMPLE ON

22   THE NEED FOR CAUSATION, THE SPECIFICITY OF THE SHOWING THAT

23   WOULD BE REQUIRED THAT'S NOT ADDRESSED BY THE STATE STATUTES,

24   AND IT'S A CLASSIC KIND OF A QUESTION THAT THE STATE COURTS

25   WOULD TURN TO FEDERAL COURTS FOR GUIDANCE.

```
1              THE COURT:  DO YOU HAVE A RESPONSE TO THAT?

2              MS. BRANCART:  WELL, THAT WOULD BE IF THEY UPHELD IT,

3       YEAH.

4              THE COURT:  IF THEY UPHELD --

5              MS. BRANCART:  BECAUSE AT THIS POINT IT'S A STATUTORY

6       CONSTRUCTION OF WHETHER THE FAIR HOUSING ACT ALLOWS IT.

7              MR. FRANKEL:  IN THEORY, THE SUPREME COURT CAN STRIKE

8       IT DOWN, BUT STILL HAVE COMMENTARY ON THOSE SORTS OF ISSUES,

9       AND THAT -- IT'S REALLY MORE OF A WE'LL HAVE TO WAIT AND SEE

10      WHAT THEY SAY SITUATION, BUT THAT WAS ONE ISSUE THAT WAS

11      PRONOUNCED FROM OUR PERSPECTIVE.

12             THE COURT:  I'D LIKE TO GIVE YOU A RESPONSE TO

13      RESPOND TO THE REPLY, I WOULD SAY, ON THE QUESTION OF

14      INTERFERENCE, WHETHER PLAINTIFFS ARE ENGAGED IN A PROTECTED

15      ACTIVITY OR NOT.

16             MS. BRANCART:  YES, YOUR HONOR.  UNDER THE -- THE

17      PRECEDENT IN THE NINTH CIRCUIT IS, YES, THEY ARE, BECAUSE

18      THAT'S UNITED STATES VERSUS HAYWARD, AND THAT SPECIFICALLY HELD

19      THAT A LANDLORD RUNNING A MOBILE HOME PARK WAS INTERFERED WITH

20      WHEN THE CITY ATTEMPTED TO MAKE IT MORE DIFFICULT FOR HIM TO

21      RENT TO FAMILIES WITH CHILDREN.

22             THE COURT:  GOING BACK TO THE DISPARATE IMPACT, WHAT

23      ABOUT TRAVELERS' ARGUMENT THAT YOU HAVEN'T SHOWN THAT ANY

24      SPECIFIC INDIVIDUAL WAS IMPACTED BY TRAVELERS' POLICY?

25             MS. BRANCART:  THIS IS WHAT I WOULD SAY, IS THAT IF
```

1    YOU GO BACK TO THE STATUTE, THE FAIR HOUSING ACT STATUTE, IT

2    SAYS AN AGGRIEVED PERSON CAN BRING A CLAIM, AND AN AGGRIEVED

3    PERSON, IN TURN, IS DEFINED AS A PERSON WHO IS -- HAS BEEN

4    INJURED OR BELIEVES THEY'RE ABOUT TO BE INJURED BY A

5    DISCRIMINATORY HOUSING PRACTICE.

6         AND THEN A DISCRIMINATORY HOUSING PRACTICE IS ONE OF THE

7    VARIOUS ITEMS THAT HAVE BEEN OUTLAWED IN THE FAIR HOUSING ACT

8    DURING THE REGULATIONS, WHICH INCLUDE DIFFERENT TREATMENT OR

9    NEGATIVE CONDITIONS IN INSURANCE, PROPERTY INSURANCE, IT

10   INCLUDES INTERFERENCE, IT INCLUDES OTHERWISE MAKING UNAVAILABLE

11   HOUSING.

12        SO THE QUESTION -- THE QUESTION IS, THE FIRST QUESTION IS,

13   DO WE HAVE SOMEONE WHO'S INJURED HERE?  YES.  THE JONESES AND

14   PROJECT SENTINEL.

15        THE QUESTION IS, IS PLAINTIFFS' PROOF OF DISPARATE IMPACT

16   SUFFICIENT TO SHOW A DISCRIMINATORY HOUSING PRACTICE?  AND OUR

17   POSITION IS THAT IT IS.  WE SHOW THAT THE POPULATION OF

18   SECTION 8 VOUCHER HOLDERS IS DISPROPORTIONATELY MEMBERS OF

19   PROTECTED CLASSES.

20        WE ALSO -- THIS CASE IS ANALOGOUS TO THE NEVELS CASE AND

21   THE ALLSTATE -- WADE VERSUS ALLSTATE THAT TALK ABOUT WHEN

22   LANDLORDS HAVE THEIR INSURANCE CANCELLED OR ARE REFUSED

23   INSURANCE BECAUSE THEY'RE RENTING TO SOMEONE IN A PROTECTED

24   CLASS, THAT THAT CREATES A STRONG DISINCENTIVE FOR THEM TO WANT

25   TO CONTINUE RENTING TO PEOPLE.

1    SO THE FAIR HOUSING ACT PRECLUDES -- PROHIBITS THINGS THAT

2    HAVE A DISCRIMINATORY EFFECT, AND A DISCRIMINATORY EFFECT IS

3    SOMETHING THAT ACTUALLY OR PREDICTIVELY RESULTS IN

4    DISCRIMINATION OR ACTIVELY OR -- ACTUALLY OR PREDICTIVELY

5    RESULTS IN A DISPROPORTIONATE NEGATIVE IMPACT ON PROTECTED

6    CLASSES.

7    WELL, SO WE HAVE THAT, YOU KNOW, FUNDAMENTAL COMMON SENSE

8    THING THAT IF YOU TAKE AWAY THE INSURANCE OF PEOPLE, THAT THEY

9    HAVE A STRONG INCENTIVE NOT TO WANT TO CONTINUE ENGAGING IN THE

10   ACTIVITY THAT CAUSED THE CANCELLATION OF THEIR INSURANCE,

11   RENTING TO PEOPLE IN SECTION 8.

12   THE OTHER THING IS THAT TRAVELERS' OWN DOCUMENTS SHOW THAT

13   THEY, AT TIMES, CONDITIONED THE CONTINUATION OF INSURANCE OR

14   THE ISSUANCE OF POLICIES ON A LANDLORD EITHER REDUCING OR

15   ELIMINATING SECTION 8 TENANTS, AND THAT THEY ALSO -- OR IN

16   OTHER CASES THAT THEY -- AS LONG AS THEY DIDN'T GET ANY MORE

17   SECTION 8 TENANTS, THEY WERE OKAY.

18   SO I THINK THAT FACT IN ITSELF SHOWS THAT THERE'S A STRONG

19   INFERENCE THAT SOMEONE WAS AFFECTED, AND THAT SOMEONE IN A

20   PROTECTED CLASS WAS AFFECTED.

21   BUT THE ISSUE IS, DOES TRAVELERS HAVE A RULE THAT ACTUALLY

22   OR PREDICTIVELY RESULTS IN DISCRIMINATION?  AND DID THAT RULE,

23   APPLICATION OF THAT RULE, HARM THE PLAINTIFFS IN THIS CASE?

24   SO, YES, THEY HAVE A RULE THAT ACTUALLY PREDICTIVELY

25   RESULTS IN DISCRIMINATION.

```
1          AND OUR POSITION IS YOU DON'T NEED TO SHOW A PERSON WHO

2     WAS DENIED HOUSING IN ORDER TO SHOW THAT THE RULE ACTUALLY OR

3     PREDICTIVELY RESULTS IN DISCRIMINATION WHEN YOU'RE APPLYING IT

4     TO THE TRIGGERED BY THE PRESENCE OF A CLASS OF PEOPLE THAT ARE

5     DISPROPORTIONATELY AFRICAN-AMERICAN, FEMALE, FEMALES WITH

6     CHILDREN, ELDERLY.

7          DOESN'T THAT MAKE SENSE?

8          THE COURT:  SO THIS IS WHAT I WOULD LIKE TO DO.  I'LL

9     GIVE YOU A MINUTE TO RESPOND.

10         MR. FRANKEL:  OKAY.

11         THE COURT:  AND THEN I'D ACTUALLY LIKE TO RULE ON

12    YOUR SUMMARY JUDGMENT MOTIONS AND THEN I'D LIKE TO HAVE THE

13    CASE MANAGEMENT CONFERENCE BEFORE YOU LEAVE.  OKAY?

14         GO AHEAD, PLEASE.

15         MR. FRANKEL:  IN TERMS OF -- YOU KNOW, I THINK

16    THERE'S NO -- THERE'S NO DISPUTE THAT DISPARATE IMPACT REQUIRES

17    A SUBSTANTIAL DISPROPORTIONATE IMPACT ON PROTECTED CLASSES.

18         THE WADE CASE, THE ALLSTATE CASE THAT MS. BRANCART

19    REFERRED TO, THOSE ARE MOTIONS TO DISMISS IN DISPARATE

20    TREATMENT CASES.  THEY DON'T ADDRESS DISPARATE IMPACT.

21         THE COURT:  DO YOU AGREE THEY CAN BE A PREDICTABLE

22    IMPACT?  THERE DOESN'T HAVE TO BE AN ACTUAL IMPACT?

23         MR. FRANKEL:  THERE CAN'T -- AS LONG AS IT'S BASED ON

24    ACTUAL EVIDENCE AND NOT CIRCUMSTANTIAL EVIDENCE OR INFERENCES.

25    THE NINTH CIRCUIT IN BOTH GAMBLE AND THE PALMER V. U.S. ARE
```

1      VERY CLEAR THAT A SUBSTANTIAL DISPARATE IMPACT CAN'T BE PROVEN

2      THROUGH INFERENCES.

3            AND THE ISSUE HERE, YOUR HONOR, IS THAT --

4            THE COURT:  BUT THEY DO SAY IT CAN BE ACTUAL OR

5      PREDICTABLE AS FAR AS THE IMPACT, RIGHT?

6            MR. FRANKEL:  THE IMPACT ON PROTECTED CLASSES, RIGHT.

7      IT DOESN'T -- IN OTHER WORDS, OUR POSITION IS NOT SIMPLY THE

8      FACT THAT THERE WAS NO ACTUAL IMPACT HERE, THAT DISPARATE

9      IMPACT NECESSARILY HAS TO FALL.

10           IT IS TRUE THERE IS NO IMPACT HERE, AND I DON'T THINK

11     THERE'S ANY OPPOSITION TO THAT.

12           IT'S ALSO TRUE THAT IN AN APPROPRIATE CASE WHERE A

13     PLAINTIFF COMES IN WITH EVIDENCE THAT THERE'S A PREDICTABLE

14     IMPACT IN THE FUTURE, THEN THAT MIGHT BE ENOUGH TO SURVIVE

15     SUMMARY JUDGMENT AND TO MAKE A DISPARATE IMPACT.

16           THEY HAVE NOT DONE THAT HERE, YOUR HONOR.  THERE IS NO

17     EVIDENCE THAT ANYTHING THAT TRAVELERS DID, THERE'S NO STUDY,

18     THERE'S NO EXPERT REPORT, THERE'S NO EVIDENCE WHATSOEVER THAT

19     THE TRAVELERS UNDERWRITING GUIDELINES, OR ANYTHING ELSE FOR

20     THAT MATTER, WILL HAVE A -- WILL CAUSE ANY NUMBER OF TENANTS TO

21     NOT PARTICIPATE IN THE SECTION 8 PROGRAM, TO -- AND, THEREFORE,

22     WHETHER, EVEN IF THAT HAPPENED, WHETHER OR NOT THAT -- YOU

23     KNOW, WHAT KIND OF EFFECT THAT WOULD HAVE.  THAT IS A THEORY

24     THAT IS JUST NOT SUPPORTED.

25           AND ON SUMMARY JUDGMENT, THE PLAINTIFF HAS AN OBLIGATION

1    TO COME FORWARD WITH ADMISSIBLE EVIDENCE TO SHOW THAT THERE'S A

2    MATERIAL ISSUE OF FACT HERE, AND THERE'S NOT.

3         THE ONLY THING THAT WE HEARD IS THAT THIS IS A THEORY AND

4    THAT YOU CAN MAKE AN INFERENCE.  IT IS -- THE NINTH CIRCUIT IS

5    CLEAR THAT YOU CANNOT BASE SUBSTANTIAL DISPARATE IMPACT ON AN

6    INFERENCE, PARTICULARLY IN THIS CASE, YOUR HONOR, WHERE THE

7    INFERENCE THAT WE'RE TALKING ABOUT, IT'S NOT A LOGICAL, EASY TO

8    UNDERSTAND INFERENCE THAT THEY'RE ASKING THE COURT TO DRAW, OR

9    THE JURY TO DRAW.

10        IT'S A -- THERE'S A WIDE -- THERE'S A RIVER, A GAP, A HUGE

11   GAP BETWEEN THE UNAVAILABILITY OF INSURANCE AND WHAT KIND OF

12   EFFECT THAT WOULD ULTIMATELY HAVE IN TERMS OF DISCOURAGING

13   PEOPLE IN THE FUTURE FROM PARTICIPATING IN SECTION 8 OR DOING

14   EXACTLY WHAT THE JONESES DID, YOUR HONOR.

15        IT HAD NO IMPACT ON THE JONESES AND THERE'S NOTHING IN THE

16   RECORD TO SUGGEST ONE WAY OR THE OTHER --

17            THE COURT:  WELL, THEY LOST OUT ON SIGNIFICANTLY

18   CHEAPER INSURANCE.

19            MR. FRANKEL:  AND THAT'S RIGHT.  BUT THE FAIR HOUSING

20   ACT DOES NOT GUARANTEE A LANDLORD THE LEAST EXPENSIVE

21   INSURANCE.

22        AND, AGAIN, IN TERMS OF DISPARATE IMPACT, IT'S NOT INJURY

23   TO THE LANDLORDS.  IT'S INJURY TO A PROTECTED CLASS, AND I

24   THINK THAT'S A FUNDAMENTAL -- THE PLAINTIFF IS TRYING TO

25   CONFLATE THAT BY TALKING ABOUT CASES LIKE WADE AND AN AGGRIEVED

1     PERSON THAT DEALS WITH THE ISSUE OF STANDING.

2          THERE'S NO DISPUTE THERE HAS TO BE A SUBSTANTIAL

3     DISPROPORTIONATE IMPACT ON PROTECTED CLASSES, NOT ON LANDLORDS.

4          AND THERE IS NO EVIDENCE WHATSOEVER EITHER AS TO, AS TO

5     EXISTING INDIVIDUALS OF A PROTECTED CLASS, OR IN THE FUTURE,

6     NONE WHATSOEVER.  AND THAT WAS THEIR BURDEN ON SUMMARY

7     JUDGMENT.

8          THE COURT:  ALL RIGHT.  I WOULD LIKE TO THANK YOU

9      BOTH FOR THE BRIEFING, AS WELL AS FOR THE ADDITIONAL

10     CLARIFICATION TODAY, BUT I'M GOING TO RULE ON TRAVELERS' MOTION

11      FOR SUMMARY JUDGMENT.

12          SO TRAVELERS HAS MOVED FOR SUMMARY JUDGMENT ON BOTH OF THE

13     PLAINTIFFS' CAUSES OF ACTION ON THE VARIOUS THEORIES.  THE

14     PARTIES ARE IN AGREEMENT THAT THE FEDERAL AND STATE CAUSES OF

15     ACTION ARE IDENTICAL AND, IF ANYTHING, THE FEHA CAUSE OF ACTION

16     MAY BE BROADER IN SCOPE THAN THE FEDERAL FHA CAUSE OF ACTION.

17          BUT LET'S GO THROUGH THE DIFFERENT THEORIES.  THERE'S THE

18     DISPARATE TREATMENT THEORY, THE DISPARATE IMPACT THEORY, AND

19     THE INTERFERENCE THEORY.

20          I'LL FIRST SAY THAT, ON SUMMARY JUDGMENT, ALL EVIDENCE

21     MUST BE VIEWED IN THE LIGHT FAVORABLE TO THE NON-MOVING PARTY

22     AND ALL FAVORABLE INFERENCES HAVE TO BE DRAWN IN THE NON-MOVING

23     PARTY'S FAVOR BASED ON THE EVIDENCE.

24          SO WITH REGARD TO DISPARATE TREATMENT, TRAVELERS ARGUES

25     THAT PLAINTIFFS ARE UNABLE TO PREVAIL ON THIS CLAIM, OR THIS

1    THEORY OF THEIR CLAIMS, BECAUSE THE PLAINTIFFS ARE LANDLORDS

2    AND NOT TENANTS AND, THEREFORE, PLAINTIFFS ARE NOT MEMBERS OF

3    THE PROTECTED -- OF ANY PROTECTED CLASS; SECOND, THE DEFENDANTS

4    ARGUE THAT PLAINTIFFS HAVE NO EVIDENCE THAT TRAVELERS HAD ANY

5    DISCRIMINATORY INTENT; AND, THIRD, THAT TRAVELERS HAD A

6    LEGITIMATE, NON-DISCRIMINATORY JUSTIFICATION FOR ITS DECISION

7    NOT TO INSURE PROPERTY THAT HAS SECTION 8 TENANTS.

8        THE COURT IS GOING TO ADDRESS EACH OF THESE THREE

9    ARGUMENTS.

10       FIRST, THE NINTH CIRCUIT HELD IN SAN PEDRO HOTEL COMPANY

11   VERSUS CITY OF LOS ANGELES, 159 F.3D 470 AT 475, NINTH CIRCUIT,

12   1998, THAT THE FAIR HOUSING ACT PROVIDES FOR A PRIVATE CLAIM

13   FOR THOSE WHO ARE AGGRIEVED BY DISCRIMINATORY CONDUCT.  TO HAVE

14   A CLAIM UNDER THIS ACT, THE PLAINTIFF NEED NOT ALLEGE THAT HE

15   OR SHE WAS A VICTIM OF DISCRIMINATION AND NEED ONLY ALLEGE THAT

16   AS A RESULT OF THE DEFENDANT'S DISCRIMINATORY CONDUCT, THE

17   PLAINTIFF HAS SUFFERED A DISTINCT AND PALPABLE INJURY.

18       UNDER THE ACT, ANY PERSON HARMED BY DISCRIMINATION,

19   WHETHER OR NOT THE TARGET OF THE DISCRIMINATION, CAN SUE TO

20   RECOVER FOR HIS OR HER OWN INJURY.

21       HERE PLAINTIFFS MEET THAT DEFINITION BECAUSE THEY ALLEGE

22   THAT TRAVELERS NON-RENEWED THE PLAINTIFFS' INSURANCE POLICY

23   SOLELY BECAUSE PLAINTIFFS RENTED TO SECTION 8 TENANTS, AND IT

24   SOUNDS LIKE THE PARTIES DON'T REALLY HAVE ANY DISAGREEMENT THAT

25   THE REAL REASON, OR THE REASON THAT TRAVELERS NON-RENEWED THE

1    JONESES' INSURANCE POLICY WAS BECAUSE THE PLAINTIFFS RENTED TO

2    SECTION 8 TENANTS.

3         SECOND, PLAINTIFFS MAY ESTABLISH A PRIMA FACIE CASE OF

4    DISPARATE TREATMENT BY EITHER SATISFYING THE MCDONNELL DOUGLAS

5    FOUR-PART TEST OR BY PRODUCING DIRECT OR CIRCUMSTANTIAL

6    EVIDENCE DEMONSTRATING THAT A DISCRIMINATORY REASON MORE LIKELY

7    THAN NOT MOTIVATED THE CHALLENGED DECISION.  AND FOR THIS I

8    CITE THE NINTH CIRCUIT'S 2008 DECISION IN BUDNICK VERSUS TOWN

9    OF CAREFREE, 518 F.3D 1109 AT 1114.

10        EITHER WAY, ONCE A PRIMA FACIE CASE IS ESTABLISHED,

11   SUMMARY JUDGMENT FOR THE DEFENDANT WILL ORDINARILY NOT BE

12   APPROPRIATE ON ANY GROUND RELATING TO THE MERITS BECAUSE THE

13   CRUX OF A TITLE VII DISPUTE IS THE ELUSIVE FACTUAL QUESTION OF

14   INTENTIONAL DISCRIMINATION, AND THIS QUOTATION IS FROM LOWE V.

15   CITY OF MONROVIA, 775 F.2D 998 AT 1009, NINTH CIRCUIT, 1985.

16        THIS CASE CONTINUES:  MOREOVER, WHEN A PLAINTIFF HAS

17   ESTABLISHED A PRIMA FACIE INFERENCE OF DISPARATE TREATMENT

18   THROUGH DIRECT OR CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATORY

19   INTENT, HE WILL NECESSARILY HAVE RAISED A GENUINE ISSUE OF

20   MATERIAL FACT WITH RESPECT TO THE LEGITIMACY OR BONA FIDES OF

21   THE DEFENDANT'S ARTICULATED REASON.

22        HERE, PLAINTIFFS HAVE PROVIDED SUFFICIENT CIRCUMSTANTIAL

23   EVIDENCE OF TRAVELERS' DISCRIMINATORY INTENT TO SURVIVE A

24   MOTION FOR SUMMARY JUDGMENT.  SPECIFICALLY, PLAINTIFFS HAVE

25   PROVIDED EVIDENCE THAT NOTWITHSTANDING TRAVELERS UNDERWRITING

1    CRITERION FOR ASSESSING RISK, THE PRESENCE OF A SINGLE

2    SECTION 8 TENANT TRANSFORMS AN APARTMENT FROM AN ACCEPTABLE

3    RISK TO AN UNACCEPTABLE RISK EVEN IF NOTHING ELSE CHANGED.

4         TRAVELERS' NON-RENEWED THE JONESES' POLICY BECAUSE ONE OF

5    THE JONESES' TENANTS WAS RECEIVING SECTION 8 SUBSIDIES.

6         PLAINTIFFS POINT IN ADDITION TO THE TESTIMONY FROM

7    TRAVELERS' 30(B)(6) DEPONENT THAT TRAVELERS DID NOT KNOW WHY

8    TRAVELERS ADOPTED THE "NO SECTION 8" RULE AND THAT TRAVELERS

9    ADOPTED THIS RULE WITHOUT ANY STUDY, DATA, OR ANALYSIS.

10        THIS SAME DEPONENT SUGGESTED THAT SECTION 8 TENANTS,

11   QUOTE, "MAY HAVE A HIGHER PREPONDERANCE OF DISABILITY OR

12   MOBILITY ISSUES," UNQUOTE.

13        PLAINTIFFS ALSO HAVE PROVIDED STATISTICAL ANALYSIS OF

14   SECTION 8 TENANTS AND HOW THEY ARE DISPROPORTIONATELY

15   MINORITIES, SINGLE MOTHERS, ELDERLY, OR DISABLED.

16        PLAINTIFFS ALSO PROVIDED STATEMENTS FROM TRAVELERS'

17   UNDERWRITERS IN APPLYING THE "NO SECTION 8" RULE, FURTHER

18   SUGGESTING THAT STEREOTYPES INFORMED TRAVELERS' PRACTICES AND

19   REFLECT THE UNDERSTANDING AND ATMOSPHERE IN WHICH TRAVELERS

20   APPLIES ITS RULE AGAINST INSURING PROPERTIES HOUSING SECTION 8

21   TENANTS.

22        THESE FACTS, WEIGHED IN THE LIGHT MOST FAVORABLE TO

23   PLAINTIFFS, SUGGEST THAT TRAVELERS REFUSES TO PROVIDE COVERAGE

24   TO PROPERTY HOUSING SECTION 8 TENANTS BASED ON AN INTENT TO

25   DISCRIMINATE AGAINST MEMBERS OF A PROTECTED CLASS.

1       WHILE TRAVELERS MAY DISPUTE THE CONCLUSIONS DRAWN FROM

2   THESE FACTS, THE PRESENCE OF THIS VERY DISPUTE IS ONE THIS

3   COURT IS NOT PERMITTED TO RESOLVE ON SUMMARY JUDGMENT.

4       TO SURVIVE SUMMARY JUDGMENT ON THE ISSUE OF DISCRIMINATORY

5   INTENT, THE PLAINTIFF NEED PROVE VERY LITTLE EVIDENCE TO RAISE

6   A GENUINE ISSUE OF FACT.  ANY INDICATION OF DISCRIMINATORY

7   MOTIVE MAY SUFFICE TO RAISE A QUESTION THAT CAN ONLY BE

8   RESOLVED BY A FACT-FINDER, AND THIS IS QUOTING FROM PACIFIC

9   SHORES PROPERTIES, LLC VERSUS THE CITY OF NEWPORT BEACH, 730

10  F.3D 1142 AT 1159, AND THAT IS A NINTH CIRCUIT 2013 DECISION.

11      FINALLY, WHILE THE PREVIOUSLY STATED REASON ALONE IS

12  SUFFICIENT TO DENY SUMMARY JUDGMENT, PLAINTIFFS HAVE ALSO

13  PRESENTED SUFFICIENT EVIDENCE TO REBUT TRAVELERS' CONTENTION

14  THAT TRAVELERS' DECISION NOT TO INSURE PROPERTIES THAT HOUSE

15  SECTION 8 TENANTS HAS LEGITIMATE, NON-DISCRIMINATORY

16  JUSTIFICATIONS.  SEE ALSO LOWE, 775 F.2D AT 1009, HOLDING THAT

17  CIRCUMSTANTIAL EVIDENCE OF DISCRIMINATORY INTENT WILL

18  NECESSARILY RAISE A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT

19  TO STATED BUSINESS JUSTIFICATION.

20      IN THE INSTANT CASE, THERE ARE SOME EXAMPLES.  FIRST,

21  TRAVELERS CONTENDS THAT SECTION 8 TENANTS PROVIDE UNIQUE RISKS

22  REGARDING PROPERTY MAINTENANCE, CASH FLOW, AND RENTER'S

23  INSURANCE REQUIREMENTS, AND THAT SECTION 8 TENANTS MAY HAVE A

24  HIGHER PREPONDERANCE OF DISABILITY OR MOBILITY ISSUES THAT

25  COULD LEAD TO LIFE AND SAFETY CONCERNS.

1          BUT TRAVELERS DOES NOT COLLECT OR CONSIDER SIMILAR

2     INFORMATION REGARDING TENANTS WHO DO NOT RECEIVE SECTION 8

3     SUBSIDIES AND INSTEAD CATEGORICALLY DENIES -- DECLINES, EXCUSE

4     ME, TO INSURE PROPERTIES HOUSING SECTION 8 TENANTS, APPARENTLY

5     BASED ON STEREOTYPES ATTACHED TO THIS DEMOGRAPHIC.

6          MOREOVER, PLAINTIFFS' EXPERTS HAVE OPINED THAT THERE ARE

7     NO RECOGNIZED RISK DIFFERENCES IN THE ECONOMIC SECTOR BETWEEN

8     PRIVATE LANDLORDS WITH SECTION 8 TENANTS AND PRIVATE LANDLORDS

9     WITHOUT ANY SUCH TENANTS.

10         BECAUSE THIS ISSUE IS DISPUTED, PLAINTIFFS ARE ENTITLED TO

11    HAVE A JURY DECIDE THIS ISSUE, NOT THE COURT ON SUMMARY

12    JUDGMENT.

13         SO VIEWING THE EVIDENCE IN LIGHT MOST FAVORABLE TO THE

14    PLAINTIFFS, PLAINTIFFS HAVE PRESENTED SUFFICIENT EVIDENCE TO

15    ESTABLISH GENUINE ISSUES OF MATERIAL FACT AS TO DISCRIMINATORY

16    INTENT AND TO TRAVELERS' ALLEGED LEGITIMATE, NON-DISCRIMINATORY

17    JUSTIFICATIONS.  THUS, THESE ISSUES WILL GO TO THE JURY ON

18    PLAINTIFFS' CLAIM FOR DISPARATE TREATMENT, AND TRAVELERS'

19    MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' DISPARATE TREATMENT

20    THEORIES FOR FEDERAL AND STATE FAIR HOUSING LAW VIOLATIONS IS

21    DENIED.

22         LET'S GO TO THE INTERFERENCE THEORY OF THE FHA AND FEHA

23    CAUSES OF ACTION.

24         TRAVELERS MOVED FOR SUMMARY JUDGMENT ON THE INTERFERENCE

25    THEORY OF PLAINTIFFS' CLAIMS ON THE GROUNDS THAT PLAINTIFFS

1    CANNOT ESTABLISH THAT TRAVELERS ACTED WITH A DISCRIMINATORY

2    INTENT.  AS I HAVE ALREADY STATED WITH REGARD TO THE DISPARATE

3    TREATMENT THEORY FOR PLAINTIFFS' CAUSES OF ACTION, THE COURT

4    CONCLUDES THAT PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE ON

5    THIS ISSUE TO WITHSTAND SUMMARY JUDGMENT.

6         IN ITS REPLY BRIEF, TRAVELERS ALSO ARGUED FOR THE FIRST

7    TIME THAT PLAINTIFFS ARE NOT ENGAGED IN A PROTECTED ACTIVITY

8    UNDER THE FAIR HOUSING ACT AND THAT, THEREFORE, PLAINTIFFS

9    CANNOT PREVAIL ON THEIR INTERFERENCE CLAIM.

10        NOW, NORMALLY THE COURT WOULD NOT CONSIDER AN ISSUE THAT'S

11   RAISED FOR THE FIRST TIME IN A REPLY BRIEF, BUT NONETHELESS, I

12   WILL CONSIDER THIS ARGUMENT IN THIS INSTANCE.

13        UNDER BROWN V. CITY OF TUCSON, A 2003 NINTH CIRCUIT CASE,

14   336 F.3D 1181 AT 1191 THROUGH 1192, THE ELEMENTS OF AN

15   INTERFERENCE CLAIM ARE THAT THE PLAINTIFFS WERE ENGAGED IN A

16   PROTECTED ACTIVITY, THAT PLAINTIFFS SUFFERED AN ADVERSE ACTION,

17   AND THAT THERE WAS A CAUSAL LINK BETWEEN THE TWO.

18        TRAVELERS CONTENDS, BY CITING A TENTH CIRCUIT CASE, THAT

19   PLAINTIFFS' ACTIVITY OF RENTING TO PROTECTED CLASSES IS NOT A

20   PROTECTED ACTIVITY UNDER THE FHA.

21        THIS COURT HAS CONSIDERED THE CONFLICTING AUTHORITIES

22   PROVIDED BY THE PARTIES AND IS PERSUADED BY THE NINTH CIRCUIT

23   AUTHORITY PROVIDED BY THE PLAINTIFFS ON THIS ISSUE.

24        SPECIFICALLY, THE NINTH CIRCUIT HAS BROADLY APPLIED

25   INTERFERENCE CLAIMS UNDER THE FHA TO REACH ALL PRACTICES WHICH

```
1     HAVE THE EFFECT OF INTERFERING WITH THE EXERCISE OF RIGHTS

2     UNDER FEDERAL FAIR HOUSING LAWS.  WALKER VERSUS CITY OF

3     LAKEWOOD, 272 F.3D 1114 AT 1128 THROUGH 1129.  THAT'S A 2001

4     NINTH CIRCUIT DECISION.

5          IN THE INSTANT CASE, THE PLAINTIFFS ALLEGE THAT TRAVELERS

6     INTERFERED WITH PLAINTIFFS' ABILITY TO PROVIDE HOUSING FOR

7     SECTION 8 TENANTS WHEN TRAVELERS NON-RENEWED THE JONESES'

8     INSURANCE.

9          OTHER DISTRICT COURTS WITHIN THE CIRCUIT HAVE HELD THAT

10    SIMILAR CLAIMS PASS AS VIABLE INTERFERENCE CLAIMS UNDER

11    SECTION 3617, FOR EXAMPLE, NEVELS VERSUS WESTERN WORLD

12    INSURANCE COMPANY, 359 F.SUPP.2D 1110 AT 1122 THROUGH 1123, A

13    WESTERN DISTRICT OF WASHINGTON CASE FROM 2004.  IT INVOLVED AN

14    ALLEGED INTERFERENCE WITH PLAINTIFF'S ABILITY TO PROVIDE

15    HOUSING FOR MENTALLY DISABLED INDIVIDUALS BASED ON DEFENDANT'S

16    THREATS TO CANCEL THE PLAINTIFF'S INSURANCE POLICIES.

17         SO THE COURT DENIES TRAVELERS' MOTION FOR SUMMARY JUDGMENT

18    ON THE PLAINTIFFS' INTERFERENCE THEORY FOR THEIR FHA AND FEHA

19    CAUSES OF ACTION.

20         SO THE FINAL THEORY IS DISPARATE IMPACT.  TRAVELERS ARGUES

21    THAT PLAINTIFFS ARE UNABLE TO PREVAIL ON THEIR DISPARATE IMPACT

22    CLAIM BECAUSE THE FHA AND FEHA DO NOT SUPPORT DISPARATE IMPACT

23    LIABILITY; PLAINTIFFS HAVE NO EVIDENCE OF ANY IMPACT ON ANYONE;

24    TRAVELERS HAS A LEGITIMATE, NON-DISCRIMINATORY JUSTIFICATION

25    FOR ITS DECISION NOT TO INSURE PROPERTIES HOUSING SECTION 7
```

1    TENANTS; AND PLAINTIFFS' CLAIMS ARE BARRED BY THE

2    MCCARRAN-FERGUSON ACT.

3         THE COURT WILL ADDRESS EACH OF THESE IN TURN.

4         FIRST, THE NINTH CIRCUIT HAS HELD THAT THE FHA COULD

5    SUPPORT DISPARATE IMPACT LIABILITY.  SEE PFAFF, P-F-A-F-F,

6    VERSUS U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

7    88 F.3D 739 AT 745 THROUGH 746, NINTH CIRCUIT, 1996.  SEE ALSO

8    OJO, O-J-O, VERSUS FARMERS GROUP INCORPORATED, 600 F.3D 1205 AT

9    1207 THROUGH 1208, A 2010 NINTH CIRCUIT DECISION.

10        UNLESS THE SUPREME COURT RULES OTHERWISE IN TEXAS

11   DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS VERSUS INCLUSIVE

12   COMMUNITIES PROJECT, WHICH WAS ARGUED ON JANUARY 21 OF 2015,

13   THIS COURT WILL FOLLOW THE NINTH CIRCUIT'S GUIDANCE IN PFAFF

14   AND OJO.

15        TRAVELERS ALSO ARGUES THAT BECAUSE COURTS HAVE REPEATEDLY

16   REFUSED TO ALLOW CLAIMS UNDER THE FHA OR FEHA FOR A LANDLORD'S

17   REFUSAL TO RENT TO SECTION 8 TENANTS, THIS COURT SHOULD

18   SIMILARLY REFUSE TO ALLOW CLAIMS AGAINST INSURERS FOR FAILURE

19   TO INSURE PROPERTIES HOUSING SECTION 8 TENANTS.

20        TRAVELERS, HOWEVER, CITES NO CASES WHERE A COURT HAS HELD

21   THAT LANDLORDS AND INSURERS ARE SIMILARLY SITUATED UNDER

22   SECTION 8, AND THE COURT IS PERSUADED BY PLAINTIFFS' ARGUMENTS

23   THAT THE CASES CITED BY TRAVELERS ARE DISTINCT FOR THE REASONS

24   STATED IN PLAINTIFFS' OPPOSITION.

25        SECOND, TRAVELERS CONTENDS THAT PLAINTIFFS LACK ANY

1    EVIDENCE THAT ANYONE WAS IMPACTED BY TRAVELERS' REFUSAL TO

2    INSURE PROPERTIES HOUSING SECTION 8 TENANTS, BUT A PLAINTIFF

3    MEETS ITS BURDEN OF PROOF TO PROVE DISPARATE IMPACT IF THE

4    DEFENDANT'S CONDUCT ACTUALLY OR PREDICTABLY RESULTED IN

5    DISCRIMINATION, AND THAT IS CITING FROM PFAFF, 88 F.3D AT 745.

6         VALID STATISTICAL EVIDENCE IS ADMISSIBLE FOR THIS PURPOSE.

7    ALSO CITING PFAFF, 88 F.3D AT 746.

8         PLAINTIFFS SUBMITTED DR. BRADFORD'S REPORTS WHICH PROVIDE

9    EVIDENCE THAT TRAVELERS' "NO SECTION 8" RULE HAS A

10   STATISTICALLY SIGNIFICANT DISPARATE IMPACT ON THE BASIS OF

11   RACE, SEX, AGE, AND FAMILIAL STATUS.  THIS EVIDENCE, COMBINED

12   WITH THE EVIDENCE THAT TRAVELERS NON-RENEWED PLAINTIFFS AND

13   OTHER LANDLORDS FOR RENTING TO SECTION 8, TENANTS PROVIDES

14   SUFFICIENT EVIDENCE, WHEN VIEWED MOST FAVORABLY TO THE

15   PLAINTIFFS, THAT TRAVELERS' CONDUCT PREDICTABLY FALLS MORE

16   HEAVILY ON PROTECTED CLASSES AND RESULTS IN DISCRIMINATION.

17        HERE, UNLIKE IN GAMBLE VERSUS CITY OF ESCONDIDO, 104 F.3D

18   300, NINTH CIRCUIT, 1997, PLAINTIFFS HAVE PRESENTED EVIDENCE

19   PURPORTEDLY ESTABLISHING A CORRELATION BETWEEN MEMBERS OF

20   PROTECTED CLASSES AND SECTION 8 TENANTS.

21        TRAVELERS MAY CHALLENGE THE STATISTICAL EVIDENCE AND

22   DR. BRADFORD'S OPINIONS, MAY CROSS-EXAMINATION DR. BRADFORD AT

23   TRIAL, BUT THE COURT NONETHELESS DETERMINES THAT PLAINTIFFS

24   HAVE PROVIDED SUFFICIENT EVIDENCE TO PRECLUDE SUMMARY JUDGMENT

25   ON THE ISSUE OF IMPACT AND CAUSATION.

1        THIRD, AS STATED EARLIER IN CONNECTION WITH PLAINTIFFS'

2    DISPARATE TREATMENT CLAIM, PLAINTIFFS HAVE PROVIDED SUFFICIENT

3    EVIDENCE THAT, WHEN VIEWED IN PLAINTIFFS' FAVOR, PRESENTS A

4    FACTUAL QUESTION FOR THE TRIER OF FACT AS TO WHETHER TRAVELERS

5    HAS LEGITIMATE, NON-DISCRIMINATORY JUSTIFICATIONS.

6        FOURTH, TRAVELERS CONTENDS THAT DISPARATE IMPACT LIABILITY

7    UNDER THE FHA WOULD IMPAIR OR SUPERSEDE CALIFORNIA INSURANCE

8    LAWS IN VIOLATION OF THE MCCARRAN-FERGUSON ACT.  THAT ACT

9    PROVIDES THAT NO ACT OF CONGRESS SHALL BE CONSTRUED TO

10    INVALIDATE, IMPAIR, OR SUPERSEDE ANY LAW ENACTED BY ANY STATE

11    FOR THE PURPOSE OF REGULATING THE BUSINESS OF INSURANCE, UNLESS

12    SUCH ACT SPECIFICALLY RELATES TO THE BUSINESS OF INSURANCE, 15

13    UNITED STATES CODE SECTION 1012(B).

14        THE FAIR HOUSING ACT IS SUBJECT TO REVERSE PREEMPTION

15    UNDER THE MCCARRAN-FERGUSON ACT.  SEE OJO, 600 F.3D AT 1209.

16        THE DETERMINATIVE ISSUE IS, THUS, WHETHER CALIFORNIA LAW

17    PERMITS INSURANCE COMPANIES TO CONSIDER THE RECEIPT OF BENEFITS

18    UNDER SECTION 8 IN DETERMINING WHETHER TO OFFER INSURANCE, EVEN

19    IF THE DENIAL OF INSURANCE TO SECTION 8 HOUSING HAS A DISPARATE

20    IMPACT ON A PROTECTED CLASS, CITING OJO AGAIN AT 1209 THROUGH

21    1210.

22        THE COURT IS NOT PERSUADED THAT CALIFORNIA LAW WOULD ALLOW

23    SUCH PRACTICE AND INSTEAD HOLDS THAT THE FAIR HOUSING ACT

24    COMPLEMENTS CALIFORNIA LAW IN THIS REGARD FOR THE REASONS

25    STATED BY PLAINTIFFS' OPPOSITION ON PAGE 29.  SEE ALSO NEVELS,

```
1    359 F.SUPP.2D AT 1123, HOLDING A SIMILAR APPLICATION OF THE FHA

2    IN WASHINGTON WOULD ADVANCE WASHINGTON'S PROHIBITION ON

3    DISCRIMINATION.

4         SO THE COURT ALSO DENIES TRAVELERS' MOTION FOR SUMMARY

5    JUDGMENT ON PLAINTIFFS' DISPARATE IMPACT THEORY.

6         SO TRAVELERS' MOTION FOR SUMMARY JUDGMENT IN WHOLE IS

7    DENIED.

8         LET ME MOVE ON TO THE MOTION TO STRIKE.

9         TRAVELERS FILED, IN CONJUNCTION WITH ITS REPLY IN SUPPORT

10   OF ITS MOTION FOR SUMMARY JUDGMENT, A MOTION TO STRIKE

11   PLAINTIFFS' EXPERT REPORTS PROVIDED BY MESSRS. VIGDOR,

12   BRADFORD, AND SCHWARCZ.  TRAVELERS CONTENDS THAT THE REBUTTAL

13   REPORTS PROVIDE NEW THEORIES AND THAT PORTIONS OF THESE REPORTS

14   CONTAIN LEGAL CONCLUSIONS.

15        THE COURT DENIES THIS MOTION.  THE REBUTTAL REPORTS WERE

16   TIMELY SUBMITTED BY THE DEADLINE TO FILE REBUTTAL REPORTS AND

17   ARE RESPONSIVE TO THE OPENING REPORTS SUBMITTED BY TRAVELERS'

18   EXPERTS, HARRINGTON AND PAINTER.

19        TRAVELERS' MOTION TO STRIKE PORTIONS OF THESE REPORTS FOR

20   CONTAINING LEGAL CONCLUSIONS IS DENIED WITHOUT PREJUDICE.

21        IF YOU ABSOLUTELY FEEL IT'S APPROPRIATE, YOU CAN RERAISE

22   ANY SUCH OBJECTIONS AT TRIAL.

23        SO THE MOTION TO STRIKE IS ALSO DENIED.

24        OKAY.  SO WE'RE GOING TO TRIAL IN THIS CASE.

25        LET ME ASK YOU, WHAT'S THE STATUS OF YOUR PRIVATE
```

```
 1      MEDIATION EFFORTS?  DO YOU HAVE A MEDIATOR IDENTIFIED?  DO YOU

 2      HAVE A DATE FOR YOUR SESSION?

 3              MR. BRANCART:  GOOD AFTERNOON, YOUR HONOR.

 4       CHRIS BRANCART FOR THE PLAINTIFFS.

 5          WE HAVE WORKED VERY DILIGENTLY TO IDENTIFY A MEDIATOR.

 6      UNFORTUNATELY, THOSE THAT WE ALL AGREE ON ARE VERY POPULAR, AND

 7      SO WE'VE WRESTLED WITH THAT.

 8              THE COURT:  OKAY.

 9              MR. BRANCART:  NONETHELESS, I BELIEVE WE HAVE ARRIVED

10      AT A NAME THAT -- AND WE HAVE TALKED ABOUT DATES AND AFTER THIS

11      HEARING WE WERE GOING TO PUT OUR HEADS TOGETHER AS TO THE RANGE

12      OF DATES TO MAKE SURE THAT IT WORKS FOR BOTH SIDES.

13          BUT I'VE ALREADY PROVIDED THEM WITH DATES THAT WORK FOR

14      PLAINTIFFS AND I'M SURE THAT, GIVEN OUR TIME SCHEDULE, WE'RE

15      GOING TO MAKE -- EVERYONE IS GOING TO MAKE THIS A PRIORITY.

16              THE COURT:  WELL, WE'RE JUST RUNNING OUT OF TIME.

17              MR. BRANCART:  WE ARE RUNNING OUT OF TIME.

18              THE COURT:  SO WHO IS YOUR AGREED UPON MEDIATOR?

19              MR. BRANCART:  FORMER MAGISTRATE JUDGE LARSON.

20              THE COURT:  OKAY.  AND HAVE YOU BEEN ABLE TO SPEAK

21      WITH HIM TO GET ON HIS CALENDAR?

22              MR. BRANCART:  WE HAVE BEEN PROVIDED WITH DATES.

23              THE COURT:  OKAY.

24              MR. BRANCART:  A RANGE OF DATES, SEVERAL OF WHICH

25      WORK FOR PLAINTIFFS.  I BELIEVE THAT WE HAVE DATES THAT ALSO
```

```
 1       WORK FOR THE DEFENDANTS.  WE HAVEN'T COMPLETED THAT

 2       CONVERSATION, BUT HE DOES HAVE DATE OPPORTUNITIES THAT GIVE

 3       US --

 4              THE COURT:  AND WHEN ARE THOSE?  IN MAY OR JUNE?

 5              MR. BRANCART:  THEY ARE MAY -- MAY --

 6              THE COURT:  IS THIS SOMETHING WE CAN DECIDE ON HERE?

 7              MR. BRANCART:  IT'S THE 29TH OF MAY OR THE 1ST OF

 8       JUNE.

 9              THE COURT:  MS. O'NEILL CAN'T SPEAK FOR TRAVELERS?

10       WHO DO YOU NEED?  YOU'RE SHAKING YOUR HEAD THAT YOU CAN'T

11       DECIDE THIS TODAY.

12              MR. PETERSON:  I JUST DIDN'T KNOW WHAT THE DATES WERE

13       UNTIL JUST NOW.

14              THE COURT:  OH, I SEE.  WELL, DO WE HAVE ALL THE

15       RELEVANT PEOPLE HERE?  CAN WE PICK A DATE?

16              MR. PETERSON:  WE DON'T, YOUR HONOR.

17              THE COURT:  WHO DO YOU NEED?

18              MR. PETERSON:  MR. BRIAN KEARNEY.

19              THE COURT:  AND WHO IS --

20              MR. PETERSON:  MR. KEARNEY IS THE 30(B)(6) WITNESS

21       WHO'S IN HARTFORD.

22              THE COURT:  OKAY.

23              MR. PETERSON:  I THINK IT'S -- I THINK THE PARTIES

24       WILL COME TO AGREEMENT ON A DATE VERY QUICKLY THAT WILL BE

25       SOMETIME IN EARLY JUNE.
```

```
1            THE COURT:  OKAY.  THAT'S FINE.  THAT'S GREAT.

2     PLEASE GO AHEAD AND MOVE AHEAD ON THAT.

3            MR. BRANCART:  YOUR HONOR --

4            THE COURT:  GO AHEAD.

5            MR. BRANCART:  I WAS GOING TO SAY, ONCE WE DO CONFIRM

6     A DATE, EVEN IF IT'S WHAT WE'VE TOLD YOU HERE TODAY, WE'LL FILE

7     A VERY SHORT JOINT STATEMENT SAYING HERE'S THE DATE THAT WE

8     ARRIVED AT, AND THEN WE'LL FOLLOW UP WITH THAT AT LEAST SEVEN

9     DAYS AFTER THE MEDIATION SO YOU HAVE A STATUS REPORT.  SO WE'LL

10    ADVISE THE COURT IN A VERY BRIEF JOINT FILING.

11           THE COURT:  THAT WOULD BE GREAT.  CAN WE SET A DATE

12    BY WHICH YOU'RE GOING TO LET ME KNOW THAT YOU HAVE A DATE?

13           MR. BRANCART:  YES, YOUR HONOR.  I BELIEVE THAT --

14    WELL, LET ME -- I'M GOING TO DEFER TO THE -- I'M GOING TO DEFER

15    TO THE DEFENSE BECAUSE I BELIEVE THAT THEY HAVE -- WE COULD DO

16    IT BY MONDAY, THE 11TH, YOUR HONOR, BUT I DON'T KNOW IF THAT'S

17    TOO SOON FOR THE DEFENDANTS.

18           MR. PETERSON:  WE CAN -- WE'LL BE ABLE TO DO THAT BY

19    MONDAY.

20           THE COURT:  OKAY, GREAT.  SO WHY DON'T -- IF YOU

21    WOULD, PLEASE, ON MAY 11TH OF 2015, JUST FILE A JOINT MEDIATION

22    STATUS REPORT THAT JUST LETS ME KNOW THAT YOU HAVE SELECTED A

23    DATE AND WHAT DATE YOU'VE SELECTED.  ALL RIGHT?

24           MR. BRANCART:  YES.

25           THE COURT:  THANK YOU.  OKAY.
```

```
 1          NOW, LET'S TALK ABOUT -- SO YOU WANT POST-TRIAL BRIEFING

 2     ON THE INJUNCTION IF YOU PREVAIL.  IS THAT RIGHT?

 3               MR. PETERSON:  WELL, WE --

 4               MR. BRANCART:  YOUR HONOR, THE ISSUE ASSOCIATED WITH

 5     THE POST-TRIAL BRIEFING AND HOW THE COURT WOULD HANDLE IT WAS

 6     SOMETHING THAT -- OBVIOUSLY IT'S AN EQUITABLE REMEDY.  IT WILL

 7     HAVE TO BE DETERMINED BY THE COURT.

 8               THE COURT:  UM-HUM.

 9               MR. BRANCART:  IT IS NOT SOMETHING THAT -- I THOUGHT

10     IT WAS A BIT PREMATURE, BUT NONETHELESS, IN PREPARING THE JOINT

11     STATEMENT, THERE WAS A BELIEF THAT WE SHOULD BRING IT TO THE

12     COURT'S ATTENTION.

13               THE COURT:  OKAY.

14               MR. BRANCART:  AS I UNDERSTAND IN FAIR HOUSING CASES

15     THAT WE'VE BEEN INVOLVED IN, DEPENDING UPON THE OUTCOME OF THE

16     CASE, MOTIONS CAN BE BROUGHT BEFORE THE COURT TO ADDRESS

17     INJUNCTIVE REMEDIES.

18               THE COURT:  OKAY.

19               MR. BRANCART:  HOW THAT IS -- HOW THAT LOOKS AND

20     TYPICALLY HOW THAT'S PRESENTED TURNS LARGELY, OBVIOUSLY OF

21     COURSE, ON WHAT THE JURY DETERMINES --

22               THE COURT:  UM-HUM.

23               MR. BRANCART:  -- AND ON THE POST-VERDICT DISCUSSIONS

24     BETWEEN THE PARTIES, BECAUSE WHEN IT COMES TO INJUNCTIVE OR

25     EQUITABLE RELIEF, OFTEN TIMES THE PARTIES, AFTER THE VERDICT,
```

```
 1        ARE THE VERY BEST, WORKING TOGETHER COLLABORATIVELY, AND CAN

 2        ARRIVE AT A SOLUTION.

 3               THE COURT:  UM-HUM.

 4               MR. BRANCART:  SO THE SHORT ANSWER IS, YES, A

 5        MOTION -- IN THOSE EVENTUALITIES THAT WE GO TO TRIAL, WE HAVE A

 6        VERDICT, WE WOULD BE BRINGING A MOTION FOR INJUNCTIVE EQUITABLE

 7        RELIEF, AND WE WOULD TYPICALLY FILE A STIPULATION WITH THE

 8        COURT OUTLINING THE BRIEFING SCHEDULE AND HAVE THE COURT DECIDE

 9        IF THAT SCHEDULE WORKS FOR THE COURT.

10               THE COURT:  AND WHAT KIND OF BIFURCATION OF DAMAGES

11        ISSUES WERE THE DEFENDANTS CONTEMPLATING?

12               MR. PETERSON:  WELL, THE DEFENDANTS, YOUR HONOR, ARE

13        CONTEMPLATING A MOTION TO BIFURCATE THE PUNITIVE DAMAGE PHASE,

14        IF ANY, UNDER CALIFORNIA CIVIL CODE 3294, WHICH IS THE

15        PREDICATE STATUTE FOR A PUNITIVE DAMAGE CLAIM UNDER THE FEHA

16        STATUTE.

17               THE COURT:  WHAT WOULD YOUR POSITION BE ON THAT

18        REQUEST?

19               MR. BRANCART:  MAY I HAVE A MOMENT?

20          WE WOULD NOT OPPOSE THAT REQUEST BY THE DEFENDANTS, BY THE

21        DEFENDANT.

22               MR. PETERSON:  AND TO CLARIFY, YOUR HONOR, TRAVELERS

23        HAS NOT DECIDED WHETHER WE -- WHETHER WE WILL BRING SUCH A

24        REQUEST TO THE COURT, ONLY THAT WE WANTED TO ALERT THE COURT IN

25        THE JOINT CASE MANAGEMENT STATEMENT THAT THAT IS SOMETHING THAT
```

```
1     TRAVELERS IS CONSIDERING.

2          THE COURT:  OKAY.  ALL RIGHT.  IF YOU DECIDE TO BRING

3     IT, IS THAT AN ISSUE YOU'RE GOING TO RAISE IN THE PRETRIAL

4     CONFERENCE, OR --

5          MR. PETERSON:  YES, YOUR HONOR, IF THAT'S

6     APPROPRIATE.

7          THE COURT:  WELL, I TRY TO LIMIT THE NUMBER OF

8     MOTIONS FOR THE PRETRIAL CONFERENCE.  WHAT ELSE DO YOU ENVISION

9     RAISING?

10         MR. PETERSON:  WELL, THE ISSUES THAT APPEAR TO BE

11    SORT OF UNSTATED THAT WE THOUGHT NEEDED TO BE FLESHED OUT IN

12    THE JOINT CASE MANAGEMENT STATEMENT WAS THIS BIFURCATION ISSUE,

13    WHICH WE MAY OR MAY NOT BRING.

14         THE COURT:  UM-HUM.

15         MR. PETERSON:  AND SECOND WAS THE ISSUE OF THE

16    INJUNCTIVE PROCEEDING AND WHETHER AN EVIDENTIARY HEARING OF

17    SOME SORT WOULD BE NECESSARY, AND WE WANTED TO MAKE IT CLEAR

18    BECAUSE WE BELIEVE THAT THE, THE TRIAL ESTIMATE, AS ORDERED BY

19    THE COURT, IS OVERLY OPTIMISTIC GIVEN THE NUMBER OF WITNESSES

20    DESIGNATED, AND WE WANTED TO MAKE SURE THAT WE ALERTED THE

21    COURT THAT THERE IS -- THAT THERE IS AN INJUNCTIVE PHASE

22    POTENTIALLY DEPENDING ON WHAT THE JURY DOES.

23         BUT I THINK THOSE ARE REALLY THE TWO MAIN ISSUES THAT WE

24    WOULD HAVE RAISED WITH THE COURT.

25         WE DID ALSO RAISE THIS ISSUE OF, GIVEN THE LIKELY TIMING
```

1      OF THE INCLUSIVE COMMUNITIES DECISION BY THE U.S. SUPREME

2      COURT --

3              THE COURT:  UM-HUM.

4              MR. PETERSON:  -- AND OUR PRETRIAL CONFERENCE, THAT

5      PERHAPS WE SHOULD BUILD IN NOW SOME PROCESS WHERE THE PARTIES

6      COULD SUPPLEMENT THE PRETRIAL CONFERENCE STATEMENT WITH ANY

7      ADDITIONAL ISSUES THAT HAVE BEEN BROUGHT FORWARD BY THE U.S.

8      SUPREME COURT, BECAUSE THE TIMING IS VERY TIGHT.

9              THE COURT:  UM-HUM.  WELL, I WOULD ASSUME THAT WE

10     WOULD HANDLE ANY INJUNCTIVE RELIEF, IF THERE IS A REQUEST FOR

11     ONE, JUST BY WAY OF BRIEFING AFTER THE TRIAL.

12             MR. BRANCART:  AGREED, YOUR HONOR.

13             THE COURT:  SO I DON'T REALLY KNOW IF THERE'S

14     ANYTHING MORE WE NEED TO DECIDE ON THAT AT THIS TIME.

15             MR. PETERSON:  WELL, YOUR HONOR, WE HAD ASSUMED

16     ACTUALLY THAT THERE WOULD BE SOME SORT OF PRESENTATION OF

17     EVIDENCE, WHETHER IT'S EITHER IN A BENCH TRIAL OR THROUGH

18     DECLARATIONS AND EVIDENTIARY SUBMISSIONS, BUT THAT THAT WOULD

19     NEED TO BE ADDRESSED BECAUSE, IN OUR VIEW, THERE IS EVIDENCE

20     THAT IS -- THAT MAY BE RELEVANT TO THE COURT IN CONNECTION WITH

21     ANY INJUNCTIVE PHASE THAT'S REALLY NOT RELEVANT TO THE JURY.

22         AND SO THERE IS SOME SEPARATION, BUT ISSUES THAT ARE

23     IMPORTANT THAT MAY COME UP IN AN INJUNCTION -- AN INJUNCTION

24     PHASE IS NECESSARY.

25             THE COURT:  SURE.  BUT WHY CAN'T THAT BE DONE IN

```
 1        PLEADINGS?  I MEAN, I HAVE HANDLED INJUNCTIONS POST-TRIAL IN

 2        OTHER CASES AND THEY'VE GENERALLY BEEN DONE ON THE BRIEFS.

 3            WE COULD SET A HEARING DATE AND IF, AFTER REVIEWING THE

 4        BRIEFS, IT WOULD BE HELPFUL TO HAVE A HEARING, WE CAN HAVE A

 5        HEARING.

 6            I GENERALLY DON'T HAVE AN EVIDENTIARY HEARING.  IT'S MORE

 7        ATTORNEY ARGUMENT.  I WAS NOT ENVISIONING HAVING A MINI BENCH

 8        TRIAL OR JURY TRIAL ON INJUNCTIVE RELIEF.

 9                MR. PETERSON:  WELL, SO LONG AS --

10                THE COURT:  YEAH.

11                MR. PETERSON:  -- TRAVELERS IS NOT FORECLOSED FROM

12        PRESENTING ADDITIONAL EVIDENCE ON THE INJUNCTION ISSUES, IF THE

13        COURT PREFERS TO HEAR THE EVIDENCE THROUGH DECLARATIONS, THEN

14        THAT'S FINE.

15                THE COURT:  WELL, LET ME HEAR FROM THE PLAINTIFFS.

16        WHAT IS YOUR VIEW ON THIS?

17                MR. BRANCART:  YOUR HONOR, OUR PRACTICE IN HANDLING A

18        NUMBER OF FAIR HOUSING CASES HAS BEEN AS YOU DESCRIBE IT.

19            IF THERE IS EVIDENCE THAT IS UNIQUELY RELEVANT TO THE

20        INJUNCTIVE REQUEST OF PLAINTIFFS AND TRAVELERS WOULD LIKE TO

21        BRING THAT FORWARD, WE ARE PREPARED TO RESPOND TO IT AND WE

22        WILL WORK WITH TRAVELERS.

23            IF THEY FEEL THERE NEEDS TO BE AN EVIDENTIARY HEARING OR

24        PRESENTATION OF EVIDENCE THAT ISN'T BROUGHT OUT DURING THE

25        TRIAL, WE'LL WORK WITH THEM, AND IF WE CAN PUT TOGETHER A JOINT
```

1    STIPULATION FOR BRIEFING AND HOW THAT WOULD BE PRESENTED, WE'LL

2    DO THAT.

3         AS A GENERAL MATTER, THE EVIDENCE THAT COMES IN AT TRIAL

4    IDENTIFIES WHAT THE DISCRIMINATORY HOUSING PRACTICES ARE, AND

5    IN CONNECTION WITH THOSE DISCRIMINATORY HOUSING PRACTICES SETS

6    A PARAMETER AS TO WHAT'S TO BE DONE TO STOP THE PRACTICES,

7    WHAT'S TO BE DONE TO ALLEVIATE THE DISCRIMINATORY EFFECT OF

8    THOSE PRACTICES.

9         GENERALLY IN FAIR HOUSING CASES, THE COURT HAS THAT BODY

10   OF EVIDENCE FROM THE TRIAL ITSELF.

11        BUT IF THERE ARE UNIQUE ISSUES THAT WE DON'T ANTICIPATE --

12             THE COURT:  YEAH.

13             MR. BRANCART:  -- I'M OPEN TO WORKING WITH COUNSEL

14   FOR TRAVELERS SO THAT THEY HAVE AN OPPORTUNITY TO PRESENT THOSE

15   TO THE COURT.

16             THE COURT:  ALL RIGHT.  WELL, I DON'T REALLY THINK

17   THERE'S ANYTHING TO RESOLVE NOW.  I WOULD AGREE WITH

18   PLAINTIFFS' COUNSEL THAT IT SHOULD BE LARGELY OVERLAPPING

19   EVIDENCE.

20        I THINK IT WOULD BE SOMEWHAT PREJUDICIAL TO NOW SAY,

21   "OOPS, WE LOST AT TRIAL, NOW LET ME RUN A WHOLE NEW DISCOVERY

22   PROCESS FOR THE POST-TRIAL PHASE OF THE CASE."  I THINK THAT'S

23   UNFAIR AND I WOULD PROBABLY EXCLUDE IT.

24        I MEAN, YOU ALL HAVE KNOWN WHAT THE PRAYER FOR RELIEF IS

25   FROM THE BEGINNING OF THE CASE.  I'M ASSUMING THAT ISSUE HAS

1    BEEN WORKED UP THROUGH THE YEARS THAT THIS CASE HAS BEEN

2    PENDING.

3         SO I DON'T THINK I HAVE TO, RIGHT NOW, IN THE ABSTRACT,

4    MAKE A RULING ONE WAY OR THE OTHER AS TO WHAT'S COMING IN OR

5    WHAT'S NOT COMING IN.  THE PARTIES IN THIS CASE HAVE BEEN QUITE

6    ACTIVE IN MOVING TO STRIKE WHERE THEY THOUGHT IT'S APPROPRIATE.

7         SO I'LL JUST SAY THAT MY INCLINATION IS TO HANDLE ANY

8    INJUNCTION REQUEST POST-TRIAL IN BRIEFING.  IT SHOULD BE

9    LARGELY OVERLAPPING EVIDENCE WITH WHAT WAS PRESENTED AT TRIAL.

10        AND I'M NOT INCLINED TO ALLOW WHOLESALE BRAND NEW EXPERTS

11   OR DISCOVERY OR STATISTICAL ANALYSIS JUST FOR THE INJUNCTION

12   BECAUSE I THINK THAT'S UNFAIR.  THAT'S UNFAIR TO SUDDENLY

13   CREATE NEW EVIDENCE.  EVERYONE HAS KNOWN FROM THE BEGINNING OF

14   THE CASE WHAT PRAYER FOR RELIEF IS IN THIS COMPLAINT.

15        SO JUST WITH THAT GUIDANCE, I'M TELLING YOU THAT'S HOW I'M

16   LIKELY TO RULE.  I'M NOT LIKELY TO ALLOW BRAND NEW, WHOLESALE

17   NEW EVIDENCE FOR AN INJUNCTION REQUEST OR AN OPPOSITION TO AN

18   INJUNCTION REQUEST.

19        AS FAR AS BIFURCATION ON THE PUNITIVE DAMAGES REQUEST, WHY

20   DON'T -- IT SOUNDS LIKE YOU COULD PROBABLY WORK OUT A

21   STIPULATION.  IF THAT HAPPENS, JUST FILE THAT STIPULATION

22   BEFORE THE PRETRIAL CONFERENCE.

23             MR. BRANCART:  AGREED.

24             THE COURT:  OKAY.  NOW, I CAN SET A DEADLINE WITH

25    REGARD TO WHEN THE U.S. SUPREME COURT IS GOING TO ISSUE ITS

```
 1        RULING AND WHEN YOU HAVE TO FILE A SUPPLEMENTAL DOCUMENT.

 2            (LAUGHTER.)

 3                THE COURT:  BUT I JUST THINK I HAVE NO CLUE AS TO

 4    WHAT DATE THAT SHOULD BE.  I'M WONDERING IF YOU ALL SHOULD JUST

 5    IMMEDIATELY ALERT THE COURT AND JUST FILE, YOU KNOW, JUST A

 6    JOINT NOTICE THAT THE DECISION HAS COME DOWN AND PERHAPS THEN

 7    YOU CAN PROPOSE SOME KIND OF SUPPLEMENTAL BRIEFING AS TO WHAT

 8    NOW IS THE IMPACT OF THAT DECISION ON THIS CASE OR THIS TRIAL.

 9                MY IDEAL SCENARIO IS TO HAVE EVERYTHING SORT OF COMPLETELY

10    PREPARED AT THE PRETRIAL CONFERENCE, BUT I REALIZE THAT MAY NOT

11    BE THE CASE IF WE DON'T GET A DECISION UNTIL MID OR LATE JUNE.

12                SO, YOU KNOW, MY REQUEST IS IF WE HAVE THE TIME, TRY TO

13    HAVE THIS ISSUE TEED UP FOR THE PRETRIAL CONFERENCE.

14                IF THAT'S NOT POSSIBLE BECAUSE THE DECISION COMES OUT TOO

15    LATE, THEN MOST LIKELY I WILL SET ANOTHER HEARING DATE SOMETIME

16    IN JULY BETWEEN THE PRETRIAL CONFERENCE AND BEFORE TRIAL, AND

17    IF YOU ALL CAN STIPULATE TO SOME BRIEFING SCHEDULE THAT ALLOWS,

18    YOU KNOW, US TO TRY TO DIGEST WHAT'S JUST HAPPENED AND HOW WE

19    REACT AND RESPOND TO THAT, THAT WOULD BE GREAT.

20                SO LET'S LEAVE IT FLEXIBLE.  WE'LL JUST LEAVE IT TO YOU TO

21    IMMEDIATELY ALERT ME AND TRY TO COME UP WITH AN AGREED UPON

22    SCHEDULE AND THEN WE'LL GO FROM THERE.

23                MR. BRANCART:  THANK YOU.

24                THE COURT:  OKAY?

25            NOW, WHAT ELSE WAS THERE?
```

```
1              MR. PETERSON:  I HAVE A COUPLE OF QUESTIONS, YOUR

2       HONOR.

3              THE COURT:  OKAY, SURE.

4          NOW, PLAINTIFFS' APPLICATION FOR AN ORDER EXTENDING THE

5       DEADLINE TO FILE OPPOSITION TO THE DEFENDANT'S MOTION FOR

6       SUMMARY JUDGMENT, I THINK YOU WERE, WHAT, 30 OR 45 MINUTES LATE

7       IN FILING YOUR OPPOSITION DECLARATION EXHIBITS, THAT MOTION IS

8       GRANTED.  I'M --

9              MR. BRANCART:  THANK YOU.

10             THE COURT:  I'M GOING TO DECIDE, AND DID, ON THE

11      MERITS AND NOT ON THE PROCEDURAL TECHNICALITY, BUT DON'T BE

12      LATE AGAIN.

13             MR. BRANCART:  YES.

14             THE COURT:  OKAY.  SO WHAT WERE YOUR ISSUES?

15         OTHERWISE WE ARE SET TO HAVE YOUR OPENING DAUBERT BRIEFING

16      TOMORROW.

17             MR. BRANCART:  CORRECT.

18             THE COURT:  OPPOSITIONS THE 22ND, REPLIES THE 29TH,

19      PRETRIAL CONFERENCE ON JULY 2ND.

20             MR. BRANCART:  YES.

21             THE COURT:  IN ADDITION TO THE LIMITED NUMBER OF

22      MOTIONS IN LIMINE, YOU MAY OR MAY NOT HAVE THIS ISSUE ON

23      BIFURCATING PUNITIVE DAMAGES.

24         ANYTHING ELSE THAT SHOULD BE ON THE AGENDA FOR THE PTC?

25             MR. BRANCART:  THERE IS NOTHING MORE FOR THE
```

```
1      PLAINTIFFS.

2                THE COURT:  OKAY.  WHAT ABOUT FOR DEFENDANTS?

3                MR. PETERSON:  SO THE TWO POINTS I HAD, YOUR HONOR,

4      PERTAIN TO THE COURT'S ORDER, WHICH IS DOCUMENT 209 --

5                THE COURT:  OKAY.

6                MR. PETERSON:  -- FIRST OF ALL, LIMITING THE PARTIES

7      TO FIVE PAGES FOR THE DAUBERT MOTIONS.

8                THE COURT:  YES.

9                MR. PETERSON:  AND WE HAVE WORKED VERY HARD, OF

10     COURSE, TO COMPLY AND WILL COMPLY WITH THE COURT'S ORDER, BUT

11     IN LIGHT OF PARTICULARLY THE COURT'S RULINGS ON SUMMARY

12     JUDGMENT AND THE NUMBER OF ISSUES AND EXPERTS THAT WILL BE

13     TESTIFYING AT TRIAL --

14               THE COURT:  UM-HUM.

15               MR. PETERSON:  -- TRAVELERS BELIEVES THAT IN ORDER TO

16     PRESENT ITS ARGUMENTS TO THE COURT THAT IT WOULD NEED 15 PAGES,

17     WHICH IS REALLY THREE PAGES PER EXPERT.

18               THE COURT:  YOU'RE MOVING TO STRIKE ALL FIVE EXPERTS?

19               MR. PETERSON:  NO, WE'RE NOT MOVING TO STRIKE ALL OF

20     THE EXPERTS IN THEIR ENTIRETY.

21          BUT THERE ARE LENGTHY REPORTS PREPARED BY EACH EXPERT

22     WHICH ARE IN FIELDS THAT ARE VERY BROAD, FROM A LAW PROFESSOR

23     TO A SOCIOLOGIST TO AN ACTUARY TO AN ECONOMIST, AND THE -- THE

24     CRUX OF THE MOTION HAS TO DO WITH THE -- WHETHER THEY'VE RELIED

25     ON A RELIABLE METHODOLOGY, AND IT'S -- IN THIS CASE IT'S
```

```
 1        SOMEWHAT DIFFICULT TO EVEN EXPLAIN WHAT THE EXPERTS ARE SAYING
 2        IN A PAGE.
 3             SO FIVE PAGES IS -- WE JUST DON'T BELIEVE THAT WE CAN,
 4        THAT WE CAN ADEQUATELY EXPLAIN TO THE COURT WHAT OUR POSITION
 5        IS, EVEN THOUGH WE RECOGNIZE THAT THE COURT APPRECIATES
 6        BREVITY.  WE'RE DOING OUR BEST, BUT WE --
 7             THE COURT:  WHAT ELSE ARE YOU ASKING FOR?  WHAT'S
 8        YOUR SECOND POINT?  I DON'T THINK I'M GOING TO LIKE THAT ONE,
 9        EITHER.
10             MR. PETERSON:  OUR SECOND POINT, ALSO PERTAINING TO
11        THE COURT'S ORDER, WAS TO PERMIT THE PARTIES TO, IN ADDITION
12        TO -- IN ADDITION TO FILING MOTIONS TO STRIKE NON-RETAINED
13        EXPERTS, TO BE ABLE TO FILE FIVE MOTIONS IN LIMINE RATHER THAN
14        WHAT THE COURT ORDERED, WHICH WAS --
15             THE COURT:  FOUR.
16             MR. PETERSON:  -- FOUR, AND I CONSTRUED THE COURT'S
17        ORDER TO MEAN FOUR, INCLUDING THE MOTION TO STRIKE THE
18        NON-RETAINED EXPERTS.
19             AND VERY BRIEFLY, THE REASON FOR MY REQUEST, YOUR HONOR,
20        IS THAT IN A CASE LIKE THIS INVOLVING DISCRIMINATION, THERE ARE
21        SOME VOLATILE, SENSITIVE ISSUES AND I DO BELIEVE THAT, ALTHOUGH
22        THERE ARE LOTS OF EVIDENCE --
23             THE COURT:  OKAY, WAIT.  I'M SORRY.  YOU WANT 15
24        PAGES ON YOUR DAUBERT MOTION AND YOU WANT FIVE MOTIONS IN
25        LIMINE AND YOU THINK YOU HAVE A SEPARATE CATEGORY OF MOTIONS TO
```

```
 1        STRIKE CONSULTANTS?
 2              MR. PETERSON:  NON-RETAINED EXPERTS.
 3              THE COURT:  WHERE IS YOUR BASIS TO FILE THAT?  I
 4        NEVER AUTHORIZED THAT.  YOU DON'T CONSIDER THAT A DAUBERT?
 5              MR. PETERSON:  NO, YOUR HONOR.
 6              THE COURT:  WHAT ARE YOU BASING --
 7              MR. PETERSON:  THE PARTIES HAD STIPULATED TO A -- HAD
 8        ENTERED INTO A STIPULATION THAT THE MOTION TO STRIKE
 9        NON-RETAINED EXPERTS WOULD BE DEFERRED.
10          (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE
11        CLERK.)
12              THE COURT:  OKAY.  SO HOW MANY -- WHY DO YOU WANT TO
13        STRIKE NON-TESTIFYING EXPERTS?
14              MR. PETERSON:  THEY ARE TESTIFYING EXPERTS.  THEY'RE
15        JUST NOT RETAINED.  THEY WERE DISCLOSED AS REBUTTAL EXPERTS WHO
16        WOULD PROVIDE EXPERT TESTIMONY, BUT WERE NOT RETAINED BY THE
17        PLAINTIFFS AS EXPERT WITNESSES.
18              THE COURT:  AND WHAT'S YOUR BASIS FOR STRIKING THEM?
19              MR. PETERSON:  WELL, THE REAL -- I HAVE TWO-FOLD.
20        VERY GENERALLY, IT IS THAT THESE WERE PERCIPIENT FACT WITNESSES
21        WHICH SHOULD HAVE BEEN DISCLOSED DURING FACT DISCOVERY IF THEY
22        HAVE KNOWLEDGE ABOUT HOUSING PRACTICES.
23              THE COURT:  WHY ISN'T THAT A MOTION IN LIMINE THEN?
24        IF YOU'RE MAKING A PROCEDURAL OBJECTION OF UNTIMELY DISCLOSURE,
25        THAT'S A MOTION IN LIMINE TO ME.  THAT'S NOT A WHOLE NEW ANIMAL
```

1    SEPARATE FROM A DAUBERT OR A MOTION IN LIMINE.

2         BUT GO AHEAD.  SO YOU THINK THEY WERE NOT TIMELY

3    DISCLOSED.  WHAT'S THE SECOND BASIS FOR STRIKING?

4             MR. PETERSON:  THEY WERE NOT TIMELY DISCLOSED; AND

5    THEN THE OTHER REASON HAS TO DO WITH THE DEFINITION OF WHAT AN

6    OPENING EXPERT REPORT SHOULD INCLUDE AND WHAT IS APPROPRIATE

7    FOR A REBUTTAL EXPERT, AND IN OUR -- IN OUR VIEW, THE FEDERAL

8    RULES OF EVIDENCE, WHICH DO RECOGNIZE EXPERT -- WITNESSES WHO

9    HAVE EXPERT OPINIONS, BUT WHO ARE NOT RETAINED BY A PARTY,

10   ALTHOUGH THE EVIDENCE CODE RECOGNIZES THAT, IT'S OUR VIEW THAT

11   THE CODE IS NOT DESIGNED TO PREVENT WHAT'S TAKEN PLACE IN THIS

12   CASE, WHICH IS THE DISCLOSURE OF THREE --

13            THE COURT:  I'M SORRY TO INTERRUPT YOU.

14            MR. PETERSON:  YES.

15            THE COURT:  I DON'T REALLY UNDERSTAND.  THESE PEOPLE

16   ARE NOT RETAINED BY THE PLAINTIFF, BUT THEY'VE SUBMITTED EXPERT

17   REPORTS?

18            MR. BRANCART:  THEY HAVE NOT SUBMITTED EXPERT

19   REPORTS, YOUR HONOR.  PURSUANT TO RULE 26(A)(2), THESE ARE

20   THREE INDIVIDUALS WHO HAVE EXPERTISE, BECAUSE OF THEIR TRAINING

21   AND EXPERIENCE, THAT POTENTIALLY MAY BE RELEVANT IN REBUTTAL.

22        AND WHO ARE THEY?  THEY'RE AN INSURANCE ADJUSTOR WHO WORKS

23   IN THE SPECIALTY INSURANCE MARKET; THEY ARE A PROPERTY

24   MANAGEMENT FIRM THAT CAN TALK ABOUT THE ECONOMICS OF PROPERTY

25   MANAGEMENT; THEY ARE A -- AN ADMINISTRATOR IN THE LOCAL PUBLIC

```
 1        HOUSING AUTHORITY.

 2            WHETHER ANY OF THESE INDIVIDUALS TESTIFY DEPENDS ENTIRELY

 3    UPON WHETHER OR NOT THEY ARE NEEDED FOR PURPOSES OF REBUTTAL.

 4            WE HAVE, IN ACCORDANCE WITH RULE 26(A)(2), MADE AN

 5    UNRETAINED EXPERT DISCLOSURE, AND IN IT WE PROVIDED ALL THAT

 6    INFORMATION THAT WAS REQUIRED AND IDENTIFIED WHO THEY MAY BE

 7    CALLED TO REBUT.

 8            BY THE SAME TOKEN, DEFENDANTS DID IT WITH A PERSON AT

 9    TRAVELERS.  AGAIN, IT WAS A 26(A)(2) DISCLOSURE.

10            I WOULD LEAVE IT AT THIS, YOUR HONOR, SORT OF TO CUT

11    THROUGH AT THE KNOT:  PLAINTIFFS DO NOT OBJECT IF THEY DO IT IN

12    LIMINE.  IF THEY WANT TO BRING IT AS ONE OF THEIR IN LIMINE

13    MOTIONS TO ADDRESS THE TIMELINESS OR THE PROPRIETY OF THE

14    DISCLOSURE, THEN WE CAN TAKE IT UP IN LIMINE.

15                MR. PETERSON:  WELL, MAY I, YOUR HONOR?

16                THE COURT:  GO AHEAD, PLEASE.

17                MR. PETERSON:  I DIDN'T INTEND TO ARGUE THE MERITS OF

18    THE MOTION TO STRIKE THESE EXPERTS.  BUT AS RULE 26(A)(2) WAS

19    RAISED, IT'S OUR VIEW --

20                THE COURT:  OKAY, I'M SORRY TO INTERRUPT YOU.  I

21    DON'T WANT TO GET INTO THE SUBSTANCE OF THIS ANYWAY.  THIS IS

22    GOING TO HAVE TO BE BRIEFED.  I'LL HAVE TO CONSIDER IT ONCE I

23    LOOK AT THE LAW.

24            SO WHAT IS THE FULL UNIVERSE OF EVERYTHING THAT YOU WANT?

25    SO YOU WANT FIVE --
```

```
1              MR. PETERSON:  FIFTEEN --

2              THE COURT:  -- EXPERTS FOR YOUR DAUBERT MOTION,

3    YOU'RE GOING TO MOVE TO STRIKE PORTIONS OR ALL OF THE TESTIMONY

4    OF THE REPORTS OF FIVE EXPERTS; YOU WANT 15 PAGES; YOU WANT

5    FIVE MOTIONS IN LIMINE; AND THEN YOU WANT THREE MOTIONS TO

6    STRIKE NON-RETAINED EXPERTS?

7              MR. PETERSON:  OR ONE OMNIBUS MOTION.  IT'S THE SAME

8    ISSUES.

9              THE COURT:  WHY ISN'T THAT A MOTION IN LIMINE?  THAT,

10   TO ME, IS A MOTION IN LIMINE.

11             MR. PETERSON:  WELL, YOUR HONOR, IT'S REALLY --

12   MOTIONS IN LIMINE ARE, ARE FILED AFTER THE COMPLETION OF EXPERT

13   DEPOSITIONS AND SO --

14             THE COURT:  ISN'T THIS BEING FILED AFTER THE CLOSE OF

15   EXPERT DISCOVERY?

16             MR. PETERSON:  NO, BECAUSE THEY HAVEN'T BEEN -- THE

17   PARTIES HAD STIPULATED THAT WE WOULD DEFER THE NON-RETAINED

18   EXPERT DEPOSITIONS UNTIL AFTER THIS HEARING AND THE HEARING ON

19   THE DAUBERT MOTIONS AND THE MOTION TO STRIKE.

20             THE COURT:  SO YOU ALL SCHEDULED A MOTION TO STRIKE

21   THE NON-RETAINED EXPERTS AND NEVER BOTHERED TO TELL THE COURT?

22   I MEAN, WHO DO YOU THINK IS GOING TO RULE ON THESE MOTIONS TO

23   STRIKE?

24             MR. PETERSON:  WE DIDN'T SCHEDULE THEM, YOUR HONOR.

25             THE COURT:  WHEN WERE YOU ENVISIONING THAT THAT WAS
```

1    GOING TO BE DECIDED?  YOU WANTED TO DO IT AFTER THE JULY 2ND

2    PRETRIAL CONFERENCE?  TRIAL COMMENCES JULY 27TH.

3         YOU WERE PLANNING, AFTER JULY 2ND, TO TAKE DEPOSITIONS AND

4    HAVE A MOTION TO -- NO.  YOU WERE GOING TO -- I GUESS I'M

5    UNCLEAR ON WHAT WERE YOU ENVISIONING IN TERMS OF THE TIMING?

6         MR. PETERSON:  THAT WE WOULD BE FILING THE MOTIONS TO

7    STRIKE SO THAT THE MOTIONS WOULD BE HEARD AT THE SAME TIME THAT

8    THE COURT WAS HEARING MOTIONS IN LIMINE AT THE PRETRIAL

9    CONFERENCE.  SO THAT, IN OTHER WORDS, ALL OF THIS WOULD BE

10   RESOLVED BY TRIAL.

11        WE HAVE BEEN WORKING WITH PLAINTIFFS' COUNSEL.  WE HAVE

12   REQUESTED DATES TO TAKE THESE EXPERT DEPOSITIONS.

13        THE COURT:  AND YOU WERE PLANNING TO TAKE THEM BEFORE

14   OR AFTER THE MOTION TO STRIKE?

15        MR. PETERSON:  WELL, ORIGINALLY WE WANTED TO TAKE

16   THEM AFTER THE MOTION TO STRIKE, BUT THEN BECAUSE WE ARE COMING

17   UP ON DEADLINES, WE'VE ASKED THE PLAINTIFFS TO BE ABLE TO TAKE

18   ALL OF THEM IN MAY.

19        THE COURT:  ALL RIGHT.  AND THEN I'M ASSUMING, AFTER

20   YOU TAKE THE DEPOSITION, YOU'RE THEN GOING TO BE SAYING, "WELL,

21   NOW I WANT TO FILE A DAUBERT MOTION BECAUSE NOW THEY TESTIFIED

22   TO SOMETHING THAT I DON'T THINK IS APPROPRIATE UNDER RULE 702."

23        I MEAN, THIS IS JUST -- THIS IS LIKE A METASTASIZING

24   CANCER HERE.  IT JUST KEEPS GROWING AND GROWING IN THE OPPOSITE

25   DIRECTION, RIGHT?  THIS IS -- I'M TRYING TO IMPOSE NARROWING

1     AND LIMITS.  I DO HAVE HUNDREDS AND HUNDREDS OF OTHER CRIMINAL

2      AND CIVIL CASES AND THIS IS JUST EXPLODING.

3          I AM NOT GOING TO HEAR TWO MOTIONS ON THESE NON-RETAINED

4     EXPERTS.  YOU'RE GOING TO HAVE ONE SHOT TO BRING WHATEVER IT IS

5     YOU WANT TO BRING.  I'M NOT GOING TO HEAR IT IN TWO PHASES, A

6     PROCEDURAL, TIMELINESS, INAPPROPRIATE DISCLOSURE MOTION; AND

7     THEN AFTER YOU TAKE THE DEPOSITION, A DAUBERT MOTION UNDER 702

8     BECAUSE IT'S NOT APPROPRIATE EXPERT TESTIMONY.  I'M NOT GOING

9     TO DO THAT.

10         SO -- AND, YOU KNOW, TO BE HONEST, MOST MOTIONS IN LIMINE

11    END UP SAYING "EXCLUDE EVERYTHING THAT'S BAD FOR MY CASE

12    BECAUSE IT'S HIGHLY PREJUDICIAL," AND I END UP DENYING IT

13    WITHOUT PREJUDICE AND LETTING YOU BRING A SPECIFIC OBJECTION TO

14    AN ACTUAL EXHIBIT OR TO AN ACTUAL PIECE OF TESTIMONY, AND THEN

15    MOST TIMES PEOPLE DON'T EVEN BRING IT ANYWAY.

16         SO, I MEAN, I FRANKLY THINK A LOT OF MOTIONS IN LIMINE END

17    UP NOT BEING SUPER HELPFUL BECAUSE THEY END UP LARGELY BEING

18    DENIED WITHOUT PREJUDICE BECAUSE THEY'RE OVERBROAD.

19         THAT'S WHY I LIKE TO KEEP THEM LIMITED BECAUSE I JUST

20    HAVEN'T SEEN THEM BE SUPER HELPFUL.

21         SO THIS IS WHAT I'M GOING TO DO:  I'M GOING TO GET -- I'M

22    GOING TO INCREASE THE NUMBER OF MOTIONS, BUT THIS IS IT, SO

23    TAKE YOUR BEST SHOT.  DON'T DO A "LET ME EDUCATE THE JUDGE AND

24    SHOW ALL THE GREAT EVIDENCE I HAVE" AND DO AN OVERBROAD MOTION

25    IN LIMINE THAT I'M GOING TO DENY WITHOUT PREJUDICE ANYWAY.

```
1          SO I WISH I COULD GIVE YOU UNLIMITED RESOURCES, BUT THAT'S

2     NOT HOW THE FEDERAL COURTS ARE STAFFED, SO I JUST -- I NEED

3     NARROWING.  I MEAN, AS IT IS, TRYING TO DO DAUBERTS ON --

4          I MEAN, HOW MANY DAUBERTS -- HOW MANY EXPERTS ARE YOU

5     GOING TO DAUBERT?

6          MR. BRANCART:  YOUR HONOR, YOU SAID WE HAD TO WRITE A

7     MOTION IN FIVE PAGES.  WE HAVE REDUCED IT TO FIVE PAGES.  WE

8     ADDRESS, I BELIEVE, ONE EXPERT IN HIS ENTIRETY AND WE ADDRESS

9     ONE ISSUE THAT PERVADES TWO OTHER REPORTS.

10         MS. BRANCART:  I THINK SO.  THEY'RE ALL PARTIAL.

11         MR. BRANCART:  THEY'RE ALL PARTIAL.

12         THE COURT:  ALL RIGHT.  WELL, I MEAN, AS IT IS WE'RE

13    GOING TO HAVE DIFFICULTY JUST TRYING TO HANDLE EVERYTHING THAT

14    I HAD ALREADY AUTHORIZED, BUT NOW EXPANDING THIS FURTHER, IT'S

15    GOING TO BE MORE DIFFICULT.

16         I LIKE TO TRY TO GIVE TIMELY RULINGS.  JULY 2ND IS REALLY

17    CLOSE TO YOUR TRIAL DATE, SO I NEED TO GIVE YOU FAST RULINGS.

18    OTHERWISE YOU'RE GOING TO BE --

19         MR. BRANCART:  AGREED.

20         THE COURT:  -- SPINNING YOUR WHEELS PREPARING THIS IN

21    THE ALTERNATIVE OF THAT, NOT KNOWING WHICH WAY.

22         WHAT IF -- OKAY.  YOU'RE NOT ASKING FOR AN EXPANSION OF

23    THE THREE PAGE LIMIT ON THE MOTIONS IN LIMINE, OR ARE YOU?

24         MR. PETERSON:  NO, NOT ON THE PAGE LIMIT.

25         THE COURT:  ALL RIGHT.  WHAT IF I EXPANDED THIS
```

```
 1        NUMBER TO SIX MOTIONS EACH?  AND THEN YOU'RE GOING TO HAVE TO

 2        DECIDE WHICH OF THESE RETAINED EXPERTS YOU'RE GOING TO MOVE ON

 3        AND INCLUDE THEM IN YOUR MOTIONS IN LIMINE.

 4            AND THEN -- I MEAN, IF YOU HAVEN'T EVEN TAKEN THEIR

 5        DEPOSITION, I GUESS YOU'RE NOT GOING TO BE DOING A DAUBERT ON

 6        THEM, RIGHT, BECAUSE THE OPENING DAUBERTS ARE DUE TOMORROW.

 7                    MR. PETERSON:  IT APPEARS THAT WAY, YOUR HONOR.

 8                    THE COURT:  WHAT?

 9                    MR. PETERSON:  I SAID IT APPEARS THAT WAY, YES.

10                    THE COURT:  ALL RIGHT.  WOULD SIX BE ENOUGH?

11                    MR. PETERSON:  I BELIEVE SO, YOUR HONOR, YES.  THANK

12        YOU.

13                    THE COURT:  ALL RIGHT.  SO THERE'S GOING TO BE A

14        TOTAL OF SIX EACH, SIX TOTAL MOTIONS IN LIMINE, NO MORE THAN

15        THREE PAGES, PLEASE, EACH.

16            NOW, ON THE DAUBERTS -- OKAY.  LET ME TELL YOU ONE OTHER

17        THING THAT I REALLY DISLIKE.  I REALLY DISLIKE WHEN PARTIES,

18        TRYING TO GO WITHIN THE PAGE LIMITS, SAY, "WELL, I'M

19        INCORPORATING BY REFERENCE MY 170 PAGE EXPERT REPORT."  OKAY?

20        SO THEY'LL FILE A REALLY SMALL MOTION, BUT THEN THEY CIRCUMVENT

21        THE PAGE LIMITS BY JUST INCORPORATING BY REFERENCE THE ENTIRE

22        EXPERT REPORT WHICH IS OVER 100 PAGES.  PLEASE DON'T DO THAT.

23            NOW, ON THE DAUBERT -- SO YOU'RE MOVING ON FIVE EXPERTS,

24        MOVING TO EXCLUDE THEM COMPLETELY OR JUST PORTIONS OF THEIR

25        REPORTS AND TESTIMONY?
```

```
1              MR. PETERSON:  WELL, YOUR HONOR, FOUR OF THEM,
2      PORTIONS; AND THE FIFTH, I'M SORRY, I JUST CAN'T REMEMBER.
3              THE COURT:  OKAY.
4              MR. PETERSON:  IF I COULD CONFER WITH MR. FRANKEL, HE
5      WOULD KNOW.
6              THE COURT:  THAT'S ALL RIGHT.  THAT'S OKAY.  IT'S NOT
7      A PROBLEM.
8          WHAT IF -- SO YOU NEED FIVE PAGES PER EXPERT?  IS THAT
9      WHAT YOU'RE --
10             MR. PETERSON:  I'M SORRY, YOUR HONOR?
11             THE COURT:  WHAT ABOUT TEN PAGES?
12             MR. PETERSON:  WE CAN LIVE WITH THAT, YOUR HONOR.
13     THANK YOU.
14             THE COURT:  OKAY.  SO THE DAUBERT IS TEN PAGES EACH
15     SIDE; AND WHAT ABOUT THE REPLY, FOUR PAGES?
16             MR. BRANCART:  THAT'S ACCEPTABLE TO PLAINTIFF, YOUR
17     HONOR.
18             MR. PETERSON:  YES, YOUR HONOR.
19             THE COURT:  OKAY.  ALL RIGHT.
20         ALL RIGHT.  SO THERE'S GOING TO BE NO DAUBERTS ON THOSE
21     RETAINED EXPERTS.  I NEVER APPROVED WHATEVER STIPULATION TO
22     LEAVE ALL THIS HANGING AT THE END.
23             MR. BRANCART:  YOUR HONOR, YOUR ORDER ON THIS WAS
24     DOCUMENT 209.
25             THE COURT:  DIDN'T WE ORIGINALLY HAVE AN EARLIER
```

TRIAL DATE AND THEN YOU ALL ASKED US TO MOVE IT? BECAUSE I THINK IT WAS --

MR. PETERSON: YES.

THE COURT: -- SET BACK IN SEPTEMBER OF 2013. IT WAS SET FOR MAY 11TH AND THE PRETRIAL CONFERENCE WAS SET FOR APRIL 16TH.

MR. BRANCART: CORRECT.

THE COURT: I BELIEVE YOU ALL ASKED FOR AN EXTENSION. WHY DID YOU ASK FOR AN EXTENSION?

MR. BRANCART: YOUR HONOR, THE EXTENSION WAS GRANTED IN THE -- I CAN'T READ THE DOCUMENT NUMBER. IT WAS GRANTED ON JULY 2014, AND --

THE COURT: IT WAS BASED ON THE PARTIES' STIPULATION.

THE CLERK: JUDGE, DO YOU WANT A COPY?

THE COURT: WELL, I HAVE IT IN FRONT OF ME.

THE CLERK: IT'S 58. IT'S HARD TO READ.

THE COURT: HAVING CONSIDERED THE STIPULATION OF THE PARTIES FOLLOWING THE FILING OF PLAINTIFFS' MOTION FOR ISSUANCE OF AN ORDER AMENDING CASE MANAGEMENT SCHEDULE, DOCKET 58.

OH, WELL.

OKAY. WHAT ELSE? ANYTHING ELSE?

MR. BRANCART: TWO QUESTIONS, YOUR HONOR.

THE COURT: WHAT'S THAT?

MR. BRANCART: ONE IS --

THE COURT: IS THIS EVEN GOING TO GO TO TRIAL? WHAT

```
 1        DO YOU THINK THE LIKELIHOOD IS NOW THAT SUMMARY JUDGMENT HAS

 2     BEEN DENIED?  WHAT'S YOUR SENSE?  AND I KNOW PEOPLE CAN NEVER

 3     REALLY SAY.  IT'S HARD TO PREDICT.

 4             MR. PETERSON:  I WOULD SAY IT'S A PRETTY GOOD SHOT,

 5     YOUR HONOR.

 6             THE COURT:  OKAY.  ALL RIGHT.  AND IF IT SETTLES, DO

 7     YOU NEED THE PRETRIAL CONFERENCE RULINGS, OR NOT?

 8             MR. PETERSON:  I DON'T THINK SO.

 9             THE COURT:  I DON'T SEE WHY THAT WOULD CHANGE MUCH.

10        ALL RIGHT.  WELL, I HOPE YOU PICK A DATE IN MAY RATHER

11     THAN -- WELL, I GUESS YOUR BRIEFING SCHEDULE IS ALREADY SET.

12     YOU WON'T BE ABLE TO SAVE ANY OF YOUR OWN RESOURCES I THINK, AT

13     LEAST IN TERMS OF DAUBERTS.

14             MR. BRANCART:  YOUR HONOR --

15             THE COURT:  YEAH.

16             MR. BRANCART:  -- IF I MAY?  TWO QUESTIONS.

17             THE COURT:  YES.

18             MR. BRANCART:  REGARDING THE DAUBERT MOTIONS, WE HAVE

19      YOUR BRIEFING SCHEDULE.

20         DO YOU ENVISION US ARGUING THOSE AT THE PRETRIAL

21     CONFERENCE?  OR ARE YOU JUST GOING TO TAKE THEM ON THE PAPERS?

22             THE COURT:  I DON'T KNOW YET.  I HAVE TO READ IT

23      FIRST.

24             MR. BRANCART:  OKAY.

25             THE COURT:  OKAY?  NOW, WITH MY PRETRIAL CONFERENCE
```

1    RULINGS, I USUALLY GIVE VERY SHORT REASONS ON THE RECORD

2    ORALLY, BUT THEN THE PRETRIAL CONFERENCE ORDER JUST SAYS "FOR

3    THE REASONS STATED ON THE RECORD, BALANCING THE FACTORS SET

4    FORTH IN FEDERAL RULE OF EVIDENCE 403, THE COURT," AND THEN I

5    JUST LIST IT.

6         SO THAT I TRY TO DO PRETTY QUICKLY BECAUSE YOU NEED THAT

7    TO PREPARE FOR TRIAL.

8         MR. BRANCART:  RIGHT, RIGHT.  YOUR HONOR, I BELIEVE

9    THERE'S ONE OTHER ISSUE.

10         THE COURT:  WHAT'S THAT?

11         MR. BRANCART:  AND THAT IS THAT THERE WAS, I BELIEVE,

12    A CALL FOR AN ORDER REGARDING THE SEALING OF DOCUMENTS THAT HAD

13    TO BE -- DOCUMENTS HAD BEEN DESIGNATED AS CONFIDENTIAL BY

14    TRAVELERS.  WE HAD TO RELY ON THEM AND FILE A VARIETY OF

15    DIFFERENT VERSIONS OF OUR PAPERS.

16         THE COURT:  YEAH.

17         MR. BRANCART:  TRAVELERS PRESENTED A STATEMENT

18    REGARDING THEIR BELIEF AS TO WHY THOSE DOCUMENTS SHOULD BE

19    FILED UNDER SEAL, AND I BELIEVE THAT IS PENDING TO BE DECIDED

20    BY THE COURT.

21         THE COURT:  A SEALING MOTION?

22         MR. BRANCART:  YES.

23         THE COURT:  OKAY.  I'M SORRY.  REPEAT AGAIN WHAT

24    DOCUMENT THAT'S RELATED TO.

25         MR. BRANCART:  THIS WAS PART OF THE EVIDENCE THAT WAS

```
1          SUBMITTED IN PLAINTIFF' OPPOSITION, WHICH I BELIEVE WAS 173.

2               IF YOU'LL GIVE ME ONE MOMENT, YOUR HONOR.

3                    THE CLERK:  IT'S 194, YOUR HONOR.

4                    THE COURT:  THAT'S THE SEALING NUMBER?

5                    THE CLERK:  THAT'S THE SEALING NUMBER.

6                    THE COURT:  194, OKAY.

7                    MR. BRANCART:  194.

8               AND, YOUR HONOR --

9                    THE COURT:  BOTH HAVE HAMMERS ON THEM?  DO THEY BOTH

10     HAVE HAMMERS ON THEM?

11                   THE CLERK:  YES, YOUR HONOR.

12                   THE COURT:  178 AND 194?

13                   THE CLERK:  172 AND 194, YOUR HONOR.

14                   THE COURT:  OKAY.

15                   MR. BRANCART:  THAT'S OUR NOTES, YOUR HONOR.

16                   THE COURT:  ALL RIGHT.  WE'LL TRY TO TURN TO THAT.

17              OKAY.  WHAT ELSE?

18                   MR. BRANCART:  THAT IS IT FOR PLAINTIFFS, YOUR HONOR.

19                   THE COURT:  OKAY.  ANYTHING ELSE, MR. FRANKEL OR

20     MR. PETERSON?

21                   MR. PETERSON:  NO, YOUR HONOR.  THANK YOU VERY MUCH.

22                   THE COURT:  OKAY.  THANK YOU.

23                   MR. BRANCART:  THANK YOU.

24                   MR. PETERSON:  THANK YOU, YOUR HONOR.

25                   THE COURT:  LET ME ASK YOU A QUESTION.  IT SEEMS A
```

```
 1        LITTLE BIT UNFAIR -- THE FILING DEADLINE IS TOMORROW.  YOU

 2        PREPARED THE 5 PAGE ORDER, THEY PREPARED A 15 PAGE ORDER.  DO

 3        YOU WANT ME TO EXTEND THAT DEADLINE?  I THINK THAT WOULD ONLY

 4        BE FAIR.

 5                  MR. BRANCART:  WE WERE ACTUALLY FAIRLY EXCITED BY

 6        YOUR RULING, GIVEN EVERYTHING ELSE THAT HAS TO BE DONE, YOUR

 7        HONOR, THAT WE -- OFTEN TIMES THE LEGAL WORK EXPANDS TO THE

 8        PAGES ALLOTTED AND WE, WE THOUGHT THIS WAS A BIT OF A GIFT.

 9                  THE COURT:  WELL, THIS IS DUE TOMORROW, SO I FEEL

10        LIKE IT'S A LITTLE BIT UNFAIR TO DOUBLE THE PAGE NUMBERS

11        WITHIN, YOU KNOW -- WHAT? -- NINE HOURS OF THE DEADLINE.

12                  MR. BRANCART:  WE'RE FINE WITH THE EXISTING DEADLINE,

13        YOUR HONOR.  WE'VE PREPARED OUR -- WE'VE PREPARED OUR DAUBERT

14        MOTION AND WE WILL SUBMIT IT.

15                  THE COURT:  I COULD JUST GO TO EIGHT PAGES.

16            I MEAN, I DON'T SEE WHY YOU WAITED UNTIL MAY 7TH WHEN THE

17        FILING DEADLINE IS MAY 8TH.  IS THERE A REASON THAT YOU -- I

18        THINK IT'S JUST A LITTLE BIT PREJUDICIAL TO THE OTHER SIDE TO

19        DOUBLE THE PAGE NUMBERS WITHIN NINE HOURS OF THE FILING

20        DEADLINE.

21                  MR. PETERSON:  WELL, THE -- THE ONLY REASON -- YOUR

22        HONOR, ONE OF THE REASONS WAS THAT WE RECEIVED YOUR COURT --

23        YOUR HONOR'S RULING ON THE 1ST OF MAY.

24                  THE COURT:  UM-HUM.

25                  MR. PETERSON:  AND WE JUST FELT THAT IT WAS
```

```
 1        APPROPRIATE TO RAISE IT AT THE CMC.

 2              THE COURT:  ALL RIGHT.  I MEAN, THAT IS REASONABLE,

 3        BUT I THINK IT IS UNFAIRLY PREJUDICIAL TO THE OTHER SIDE

 4        BECAUSE THEY'VE BEEN WORKING WITHIN MY DEADLINE, OR WITHIN THE

 5        PAGE LIMIT.

 6              MR. PETERSON:  WELL, WE --

 7              THE COURT:  CAN YOU WORK WITHIN MY PAGE LIMIT?  IF

 8        YOU CAN'T -- I MEAN, WHAT WERE YOU ASSUMING IF I DENIED YOUR

 9        REQUEST?  WHAT WERE YOU GOING TO FILE TOMORROW?  I MEAN, YOU

10        JUST WEREN'T GOING TO CHOP IT AND FILE A THIRD OF IT, RIGHT, OF

11        WHAT YOU HAVE?  WHAT WERE YOU PLANNING TO FILE TOMORROW IF I

12        DENIED YOUR REQUEST?

13              MR. PETERSON:  WELL, WE'D BE FILING A FIVE PAGE

14        MOTION THAT, IN OUR VIEW, INADEQUATELY SET FORTH OUR POSITION.

15              THE COURT:  ALL RIGHT.

16          WELL, DO YOU HAVE ANY REQUESTS, MR. BRANCART?

17              MR. BRANCART:  YOUR HONOR, I DO NOT.

18              THE COURT:  ALL RIGHT.

19              MR. BRANCART:  THE EXISTING DEADLINE AND THE

20        EXPANSION TO TEN PAGES IS FINE.  WE'VE COMPLETED OUR BRIEF.

21        IT'LL BE FILED TOMORROW.

22              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU ALL.

23              MR. BRANCART:  THANK YOU.

24              MR. PETERSON:  THANK YOU.

25          (THE PROCEEDINGS WERE CONCLUDED AT 3:09 P.M.)
```

1

2

3                            CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____

17  LEE-ANNE SHORTRIDGE, CSR, CRR
    CERTIFICATE NUMBER 9595

18       DATED:  MAY 29, 2015

19

20

21

22

23

24

25